**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

FILED

MAY 19 2004

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | |
|---|---|
| FREEDOM MORTGAGE CORP., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 03 C 6508 |
| | ) |
| BURNHAM MORTGAGE, INC., EXETER TITLE | ) Judge Mark Filip |
| COMPANY, TICOR TITLE INSURANCE | ) |
| COMPANY, JAMES C. PEDDLE, | ) |
| DERRICK DAVIS, ERIC C. VEHOVC, MARKET | ) |
| VALUE APPRAISAL, INC., MAYA N. JORDAN, | ) |
| LARRY D. BURKS, KEVIN R. BRISKER, | ) |
| JOHN JEFFREY HLAVA, ADAM BAT, | ) |
| ADAM BUTAR, ZBIGNIEW RYMARZ, | ) |
| WALDEMAR FLORKIEWICZ, DOROTHY | ) |
| SPANN, CHARLENE ADAMS, GROSZ PIOTR, | ) |
| BARBARA ODRZYWOLSKA, LESZEK | ) |
| DOBROWSKI, and BOGDAN PAWLAK, | ) |
| | ) |
| Defendants. | ) |

## AMENDED COMPLAINT

Plaintiff, Freedom Mortgage Corporation, by its attorneys, and for its Amended Complaint against Burnham Mortgage, Inc., Exeter Title Company, Ticor Title Insurance Company, James C. Peddle, Derrick Davis, Eric C. Vehovc, Market Value Appraisal, Inc., Maya N. Jordan, Larry D. Burks, Kevin R. Brisker, John Jeffrey Hlava, Adam Bat, Adam Butar, Zbigniew Rymarz, Dorothy Spann, Charlene Adams, Grosz Piotr, Barbara Odrzywolska, Leszek Dombrowski and Bogdan Pawlak, states as follows:

## PARTIES

1. Freedom Mortgage Corporation ("Freedom") is a New Jersey corporation with its principal place of business in New Jersey. Freedom is engaged, *inter alia*, in the business of making mortgage loans.

2.      Burnham Mortgage, Inc. ("Burnham") is an Illinois corporation with its principal place of business in Chicago, Illinois. Burnham is engaged in the business of originating, brokering, making, and selling mortgage loans. Burnham originated, brokered and sold at least nine mortgage loans to Freedom.

3.      Exeter Title Company ("Exeter") is an Illinois corporation with its principal place of business in Chicago, Illinois. Exeter is a title company, and was the title company/closing agent for the mortgage transactions at issue originated by Burnham and purchased by Freedom. For each such transaction, Exeter prepared the documents of conveyance, including deeds, conducted settlements of the sale and financing transactions and disbursed purchase money, including down payments and loan proceeds.

4.      Ticor Title Insurance Company ("Ticor") is a California Corporation with offices in Chicago, Illinois and which regularly transacts business in Chicago, Illinois. Ticor is engaged in the business of providing title insurance. Ticor provided title insurance and a closing protection letter on the mortgage loan transactions at issue, originated by Burnham and purchased by Freedom. Ticor is also the principal of Exeter.

5.      James C. Peddle ("Peddle") is the President of Burnham and, upon information and belief, the alter ego of Burnham. Peddle is a citizen of the State of Illinois, residing at 1364 North Cleveland Avenue, Chicago, Illinois.

6.      Derrick Davis ("Davis") is the Secretary of Burnham and, upon information and belief, the alter ego of Burnham. Davis is a citizen of the State of Illinois, residing at 1368 North Mohawk, Chicago, Illinois.

7.      Eric C. Vehove ("Vehove") is, upon information and belief, a shareholder of Burnham and, upon information and belief, the alter ego of Burnham. Vehove is a citizen of the State of Illinois, residing at 345 North LaSalle Street, Unit 1201, Chicago, Illinois.

2

8. Market Value Appraisal, Inc. ("MVA") is an Illinois corporation with its principal place of business in Chicago, Illinois. MVA is engaged in the business of preparing and providing appraisals for real property.

9. Maya Jordan ("Jordan") is the President of MVA and, upon information and belief, the alter ego of MVA. Jordan a citizen of the State of Illinois, residing at 6749 South Cornell Avenue, Apt. 3N, Chicago, Illinois.

10. Larry D. Burks ("Burks") is an individual engaged in the business of preparing and providing appraisals for real property. Burks is a citizen of the State of Illinois, residing at 15243 South Woodlawn Avenue, Dolton, Illinois.

11. Kevin R. Brisker ("Brisker") is an individual engaged in the business of preparing and providing appraisals for real property. Brisker is a citizen of the State of Illinois, residing at 1016 E. 168th St., South Holland, Illinois.

12. John Jeffrey Hlava ("Hlava") is an individual and an attorney licensed to practice law in the State of Illinois. Hlava is a citizen of the State of Illinois, residing at 1226 Forest Avenue, Oak Park, Illinois. Hlava was an officer of Exeter.

13. Adam Bat ("Bat") is a citizen of the State of Illinois, residing at 1658 North Milwaukee, #407, Chicago, Illinois.

14. Adam Butar ("Butar") is, upon information and belief, a citizen of the State of Illinois.

15. Zbigniew Rymarz ("Rymarz") is a citizen of the State of Illinois, residing at 10203 McNierney Drive, Franklin Park, Illinois.

16. Waldemar Florkiewicz ("Florkiewicz") is a citizen of the State of Illinois, residing at 6648 W. Foster, Chicago, Illinois.

17.     Dorothy Spann ("Spann") is a citizen of the State of Illinois, residing at 1050 N. Central, Chicago, Illinois 60651.

18.     Charlene Adams ("Adams") is, upon information and belief, a citizen of the State of Illinois.

19.     Grosz Piotr ("Piotr") is, upon information and belief, a citizen of the State of Illinois.

20.     Barbara Odrzywolska ("Odrzywolska") is a citizen of the State of Illinois, residing at 8901 Western, Des Plaines, Illinois.

21.     Leszek Dombrowski ("Dombrowski") is a citizen of the State of Illinois, residing at 5502 S. Union, 2nd Floor, Chicago, Illinois.

22.     Bogdan Pawlak ("Pawlak") is a citizen of the State of Illinois, residing at 6524 N. Nashville Ave, Chicago, Illinois.

## JURISDICTION AND VENUE

23.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(a). The matter in controversy is between citizens of different states, and the amount in controversy exceeds the sum and value of $75,000.00, exclusive of interest and costs. This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1964. This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331.

24.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a) in that all of the defendants reside in this judicial district and a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

## BACKGROUND FACTS

25.     On June 18, 2001, Freedom, as buyer, and Burnham, as Broker, entered into a Broker Agreement (the "Agreement"). The Agreement is attached and incorporated herein as

4

Exhibit A. Pursuant to the Agreement's terms and conditions, Freedom purchased, from time to time, residential mortgage loans brokered, originated and made by Burnham.

26.    Among the residential mortgage loans Burnham brokered, originated and made, were the seven mortgage loans at issue in this case, purchased by Freedom from Burnham.

27.    Each mortgage loan Freedom purchased was subject to Burnham's agreements concerning its business practices and fulfillment of certain conditions precedent, including, but not limited to, Burnham's warranties and representations in the Agreement.

28.    Burnham made the following agreements, covenants, representations and warranties to Freedom to induce Freedom to purchase each of the nine mortgage loans at issue:

    a.    Burnham shall be the originator of all loans offered for purchase under the Agreement. Burnham shall obtain appraisal, credit and other documentation required by Freedom for each Mortgage Loan for which an individual borrower has authorized Burnham to provide financing.

    b.    Burnham warrants that none of the statements or information contained in any loan package will contain any untrue or erroneous statements or admissions of material fact which would in any way affect Freedom's loan application review and approval and that Burnham warrants that the accuracy of all information contained in any loan package submitted to Freedom.

    c.    Burnham warrants that unless disclosed to Freedom in writing for the funding of any loan, Burnham shall not receive any direct or indirect payment from any third party with respect to the loan, including without limitation, payment involving escrow, appraisal or sale and Burnham shall have no direct or indirect ownership in any property acting as security for the loan being reviewed by Freedom for purposes of purchase.

d.  Burnham warrants that all real estate appraisals made in connection with each loan shall have been performed in accordance with Freedom's underwriting guidelines and with industry standards in the appraising industry.

e.  Burnham warrants that all loan applications submitted to Freedom will be originated and prepared by trained, licensed as necessary employees of Burnham, competent in all aspects of mortgage lending activities and will be properly originated, prepared and completed in accordance with the procedures and guidelines of Freedom.

f.  Burnham warrants that Burnham shall not accept any undisclosed fees for Burnham's services, appraisal services or compensation as a participant, either directly or indirectly in a loan transaction submitted to Freedom.

29.  Pursuant to paragraph 4 of the Agreement, Burnham also represented that it would indemnify and hold Freedom harmless with regard to any and all loss, damage, liability, cost and expense, including reasonable attorney's fees incurred by reason of or arising out of or in connection with any breach of any representation or warranty contained in the Agreement or Burnham's failure to perform any obligation under the Agreement, with said indemnity including all repurchase demands of any third parties to which Freedom had sold any loans.

30.  Pursuant to paragraph 6 of the Agreement, Burnham agreed that, upon written request, it would repurchase from Freedom any loan that was not in compliance with Burnham's warranties contained therein, with the purchase price equal to the unpaid principal balance of the loan, including accrued but unpaid interest due Freedom on the date of repurchase, premiums paid for any loan advances owing, foreclosure costs, and any other costs including reasonable attorneys' fees incurred by Freedom regarding the repurchase.

6

31.     Burnham is obligated to repurchase seven of the loans at issue due to, among other things: (1) Burnham's submission to Freedom of false and/or negligently inflated appraisals on the mortgaged property which served as security for the loans; (2) Burnham's submission of loan packages to Freedom with fictitious employment, income and asset information for the borrowers; and (3) Burnham's failure to confirm the source of cash payments at settlement made by borrowers, where such cash payments were excessive in light of the borrowers' income and assets.

32.     As more fully set forth herein, Burnham's breach of its obligations under the Agreement was part of a mortgage fraud scheme to fraudulently induce Freedom to purchase residential mortgage loans at greatly inflated prices.

## THE SCHEME

33.     Mortgage fraud schemes involve mortgage brokers, real estate appraisers and title companies, among others. The brokers, sometime known as "flippers," search for houses at bargain-basement prices. As the flippers search for houses, they also troll for first-time homebuyers or aspiring landlords ("borrowers").

34.     The borrowers and sellers, including Bat, Butar, Rymarz, Florkiewicz, Spann and Adams would purchase the houses, and engage in a practice of selling the properties to one another over a short period of time for highly inflated values.

35.     Burnham then prepared a package of documents that typically involved submissions to Freedom of loan packages that included false documentation designed to make the deal legitimate and the borrowers creditworthy. These records inflated the borrowers' cash at settlement payment, income and assets. Each of the transactions involved purported cash at settlement made by borrowers well in excess of the borrowers' stated income and assets, that

were either not made by the borrowers or were made with the lender's or the broker's funds, despite settlements representing that the cash came from the borrower.

36.     Freedom will not provide a mortgage to finance the purchase of real estate unless an appraiser has prepared an appraisal wherein the appraiser values the house at or above the purchase price.

37.     Burnham led Freedom to believe that it contacted appraisers who had appraised the property at issue in an amount that would cover a loan to value ratio of between 60% and 90% of the purchase price. However, unbeknownst to Freedom, the appraisals of the properties at issue were knowingly and intentionally falsified so that the loan to value rations were well in excess of 100% of the actual property values.

38.     Burnham, in conjunction with the borrowers and sellers, schemed with appraisers, specifically, MVA, Jordan, Burks and Brisker to issue fraudulent appraisals of the properties. MVA, Jordan, Burks and Brisker issued written appraisal reports which appraised the properties at values far in excess of their market values.

39.     Burnham, in conjunction with the borrowers, sellers and appraisers, fraudulently and/or negligently induced Freedom to purchase mortgage loans that greatly exceeded the value of the underlying property. Burnham, the borrowers, sellers and appraisers, used falsified documents and false information to obtain mortgage loans for the buyers. For some of the borrowers, Burnham, the borrowers and sellers supplied the borrowers with fictitious employment, income, asset and personal information, so that the borrowers appeared to qualify for the mortgages.

40.     Burnham also submitted mortgage loan packages to Freedom which included false or inaccurate information from the title companies and Hlava, regarding the borrowers'

8

purported cash at settlement payments at closing, where such cash at settlement payments were in excess of what the borrowers' income and assets revealed they could pay.

41.    Burnham and the borrowers and sellers submitted inflated appraisals so the properties could be sold for more than the properties were worth, and secure mortgages for more than the properties value.

42.    Upon information and belief, prior to the loans closing, Burnham advised Hlava, Ticor and Exeter of the documents needed to settle the loan and the terms that would have to appear on the settlement statements, to make the settlement statements appear as if a *bona fide* transaction was conducted based on the inflated appraisal value of the properties, including, upon information and belief, a false cash at settlement payment.

43.    Hlava, Ticor and Exeter participated in the scheme by preparing and submitting settlement statements that in many instances reflected cash at settlement payments made by borrowers when, in fact, such borrowers made no such cash at settlement payments, or the funds were taken from the lender's funds.  Hlava, Ticor and Exeter knew of the fraudulent scheme because they were experienced in real estate transactions in Chicago, Illinois, that the values assigned to the properties could not be true, and/or knew that the borrower's cash at settlement payments were either not produced by the buyers or were questionable.

44.    Contrary to the settlement statements prepared for several loans, the only funds actually available at settlement were those provided by the lender under the first lien purchase money loan.

45.    Burnham retained Exeter and Hlava (who was a Vice President of Exeter) (collectively "Exeter/Hlava") to perform the title searches and loan closing functions on the seven mortgage loan transactions at issue.

46. Exeter/Hlava had actual or constructive knowledge through public loan records about the prior sale prices of the properties in question and that the properties were being sold and mortgaged for highly inflated values.

47. Exeter had actual knowledge that its Vice President, Hlava, prepared the deeds and represented each of the respective sellers in the loan transactions at issue, and that he collected a fee for doing so.

48. Exeter knew or should have known that Hlava may have had a conflict of interest in representing sellers of properties where the sale prices were highly inflated while at the same time, exposing his principal, Exeter, to risk for issuing marked up title reports, title insurance binders and closing documents on conveyances and mortgages for properties with falsely inflated prices.

49. In addition, Hlava also participated in the scheme by representing as an attorney each of the sellers of the properties.

50. Ticor provided title insurance and a Closing Protection Letter (the "Letter"). The Letter is attached and incorporated herein as Exhibit B.

51. Ticor agreed to reimburse the lessee or purchaser of an interest in land or a lender secured by a mortgage of an interest in land for actual loss incurred in connection with closings conducted by title companies when the loss arises out of:

       1. Failure of the Issuing Agent or Approved Attorney to comply with your written closing instructions to the extent that they relate to (a) the status of the title to said interest in land or validity, enforceability and priority of the lien of said mortgage on said interest in land, including the obtaining of documents and the disbursement of funds necessary to establish such status of title or lien, or (b) the obtaining of any other document, specifically

required by you, but not to the extent that said instructions require a determination of the validity, enforceability or effectiveness of such other document, or (c) the collection and payment of funds due you, or

2. Negligence of the Issuing Agent or Approved Attorney in handling your funds or documents in connection with such closings.

52.    The Letter applies to Freedom because Freedom is a lender secured by a mortgage of an interest of land.

53.    As a direct and proximate result of the aforesaid scheme, Freedom purchased loans in amounts that were well over 100% of the fair market value of the mortgaged property involved, while certain defendants earned fees and profits.

## 735 NORTH SPRINGFIELD LOAN TRANSACTION

54.    On or about July 25, 2001, Spann purchased property known as 735 North Springfield, Chicago, Illinois (the "Springfield Property") for $40,000.00.

55.    Five days later, on July 30, 2001, Spann sold the Springfield Property to Butar for $120,000.00.

56.    Less than two months later, on or about September 8, 2001, Burnham submitted a loan application package to Freedom from Bat, to finance the purchase of the Springfield Property.

57.    Bat misrepresented financial and other information on the loan application.

58.    Burnham retained the services of an Illinois licensed appraiser, Larry Burks.

59.    On August 27, 2001, Burks appraised the property at $270,000.00.

60.    Burnham knew that Freedom would rely upon the appraisal to make a mortgage loans and that the assignees of the loan would rely on the appraisal.

61. Freedom loaned Bat $243,000.00 in reliance on the appraisal and Bat's ability to pay the cash required at settlement.

62. Hlava represented Butar in the sale of the property.

63. Hlava also acted as Exeter's Vice President at the closing of the Springfield Property. Hlava/Exeter prepared a false settlement statement.

64. Freedom resold the mortgage loan to an investor.

65. Bat defaulted on the loan.

66. The investor demanded Freedom repurchase the loan.

67. Freedom repurchased the loan.

68. The property was appraised on April 9, 2002 and found to be worth only $175,000.

69. Burks' appraisal was intentionally defective and not performed in accordance with industry standards in Chicago, in that the comparable properties used by Burks were incorrect, that prior sales of comparable properties at lower prices had not been disclosed as they should have been, and that Burks grossly exaggerated and fraudulently misrepresented the property's value.

70. By submitting a loan package to Freedom that contained a defective appraisal of the property, and false and inaccurate information regarding Bat, Burnham breached the warranties granted Freedom pursuant to the Agreement.

71. On or about August 7, 2002, pursuant to the Agreement, Freedom made a written demand upon Burnham to purchase the loan or otherwise indemnify Freedom. Burnham refused.

## 708 NORTH DRAKE STREET LOAN TRANSACTION

72.     On or about May 10, 2001, Butar purchased property known as 708 North Drake, Chicago, Illinois (the "Drake Property") for $81,500.00.

73.     Four months later, on or about September 15, 2001, Burnham submitted a mortgage loan application package to Freedom from Bat to finance purchase of the Drake Property from Butar.

74.     Bat misrepresented financial and other information on the loan application.

75.     Burnham retained the services of an Illinois licensed appraiser, Larry Burks, who appraised the property at $270,000.00 on August 27, 2001. Burnham knew that Freedom would rely upon the appraisal to make mortgage loans and be relied upon by assignees of those loans. Freedom made the loan to Bat in reliance upon the appraisal and Bat's ability to make the required cash at settlement payment.

76.     In reasonable reliance on Burks' appraisal of the Drake Property appraisal, Freedom funded a loan for $243,000.00 to Bat.

77.     Hlava represented Butar in the sale of the property.

78.     Hlava also acted as Exeter's Vice President at the closing of the Drake Property. Hlava/Exeter prepared a false settlement statement.

79.     Freedom resold the mortgage loan to an investor.

80.     Bat defaulted on the loan and the investor demanded that Freedom repurchase the loan.

81.     Freedom repurchased the loan.

82.     A subsequent review appraisal performed on July 1, 2002 revealed that the actual fair market value of the Drake Property was only $169,000, and that Burks' appraisal was defective, had not been performed in accordance with industry standards in Chicago, that the

comparables used by Burks were incorrect, prior sales of comparable properties at lower prices had not been disclosed as they should have been, and that Burks grossly exaggerated the overall value of the Drake Property.

83.     By submitting a loan package to Freedom that contained a defective appraisal of the Drake Property, and false and/or inaccurate information regarding Bat, Burnham breached its aforesaid warranties to Freedom.

84.     On or about August 7, 2002, Freedom made a written demand on Burnham, pursuant to the Agreement, to purchase this loan or otherwise indemnify Freedom. Burnham refused.

## 728 NORTH HAMLIN STREET LOAN TRANSACTION

85.     On or about March 21, 2001, Adams purchased property known as 728 North Hamlin Street, Chicago, Illinois (the "Hamlin Property") for $40,000.00.

86.     Less than five months later, on August 16, 2001, Adams sold the Hamlin Property to Butar for $70,000.00.

87.     One month later, on or about September 20, 2001, Burnham submitted a loan application package to Freedom from Bat, to finance the purchase of the Hamlin Property.

88.     Bat misrepresented financial and other information on the loan application.

89.     Burnham retained the services of an Illinois licensed appraiser, Burks, who appraised the Hamlin Property at $270,000.00 on August 27, 2001. Burnham knew or should have known that Freedom would rely upon the appraisal to make a loan to Bat and be relied upon by assignees of those loans. Freedom made a loan to Bat in reliance upon the appraisal and Bat's ability to make the required cash at settlement payment.

90.     In reasonable reliance on the aforesaid appraisal, Freedom funded a mortgage loan to Bat for $243,000.00.

14

91.     Hlava represented Butar in the sale of the property.

92.     Hlava also acted as Exeter's Vice President at the closing of the Drake Property. Hlava/Exeter prepared a false settlement statement.

93.     Freedom then resold the mortgage loan to an investor.

94.     Bat defaulted on the loan and the investor demanded Freedom repurchase the loan.

95.     A subsequent review appraisal performed on July 1, 2002 indicated the actual fair market value of the property was only $148,000, and that Burks appraisal was defective and had not been performed in accordance with industry standards in Chicago, that the comparables Burks used were incorrect, prior sales of comparable properties at lower prices had not been disclosed as they should have been and that Burks grossly exaggerated the overall value of the property.

96.     By submitting a loan package to Freedom that contained a defective appraisal of the property, and false and/or inaccurate information regarding the borrower, Burnham breached its aforesaid warranties to Freedom.

97.     On or about August 7, 2002, Freedom made a written demand, pursuant to the Agreement, to Burnham for Burnham to purchase the loan or otherwise indemnify Freedom. Burnham refused.

## 419 NORTH DRAKE STREET LOAN TRANSACTION

98.     In 2001, Bobrowski purchased property located at 419 North Drake Street, Chicago, Illinois (the "Drake2 Property") for $40,000.

99.     Shortly after purchasing the Drake2 Property, Bobrowski sold the Drake2 Property to Uloszonekic for $59,500.

100.    On or about December 4, 2001, Burnham submitted a mortgage loan application package to Freedom from Rymarz, to finance the purchase of the Drake2 Property.

101.    Rymarz misrepresented financial and other information on the loan application.

102.    Burnham retained the services of an Illinois licensed appraiser, Brisker, who appraised the property at $297,000.00 on November 15, 2001. Burnham knew or should have known that Freedom would rely on the appraisal to make a mortgage loan and be relied upon by assignees of the loan. Freedom made the loan in reliance on the appraisal and Rymarz's ability to make the required cash at settlement payment.

103.    In reasonable reliance on Brisker's appraisal, Freedom funded a mortgage loan to Rymarz for $237,000.00.

104.    Hlava represented Uloszonekic in the sale of the property.

105.    Hlava also acted as Exeter's Vice President at the closing of the Drake Property. Hlava/Exeter prepared a false settlement statement.

106.    Freedom resold the mortgage loan to an investor.

107.    Rymarz defaulted on the loan and the investor demanded that Freedom repurchase the loan.

108.    A subsequent review appraisal performed on July 1, 2002 indicated the actual fair market value of the property was only $160,000 and that Brisker's appraisal was defective, had not been performed in accordance with industry standards in Chicago, that the comparables used by Brisker were incorrect, prior sales of comparable properties at lower prices had not been disclosed as they should have been and that Brisker had grossly exaggerated the overall value of the property.

16

109. Burnham breached its warranties to Freedom under the Agreement by submitting a loan package to Freedom that contained a defective appraisal of the property and false and/or inaccurate information regarding Rymarz.

110. On or about August 7, 2002, pursuant to the Agreement, Freedom made a written demand on Burnham to purchase the loan or otherwise indemnify Freedom. Burnham refused.

### 4112 WEST POTOMAC STREET LOAN TRANSACTION

111. On or about May 31, 2000, Grosz Piotr purchased property located at 4112 West Potomac Street for $32,000 ("Potomac Property").

112. Less than five months later, Grosz Piotr sold the Potomac Property to Barbara Odrzywolska for $192,000.00.

113. On or about January 9, 2002, Burnham submitted a mortgage loan application to Freedom from Rymarz concerning the Potomac Property.

114. Rymarz misrepresented financial and other information on the loan application.

115. Burnham retained the services of an Illinois licensed appraiser, Brisker, who appraised the property at $339,000.00 on January 20, 2002. Burnham knew or should have known that Freedom would rely upon the appraisal to make a mortgage loan and be relied upon by assignees of the loan. Freedom made the loan in reliance on the appraisal and Rymarz's ability to make the required cash at settlement payment.

116. In reasonable reliance on the appraisal, Freedom funded a mortgage loan for $271,200 to Rymarz.

117. Hlava represented Odrzywolska in the sale of the property.

118. Hlava also acted as Exeter's Vice President at the closing of the Drake Property. Hlava/Exeter prepared a false settlement statement.

119. Freedom then resold the mortgage loan to an investor.

120.  Rymarz defaulted on the loan and the investor demanded Freedom repurchase the loan.

121.  A subsequent review appraisal performed on October 15, 2002 indicated that the actual fair market value of the property was only $150,000, and that Brisker's appraisal was defective and had not been performed in accordance with industry standards in Chicago, that the comparables used by Brisker were incorrect, prior sales of comparable properties at lower prices had not been disclosed as they should have been and that Brisker grossly exaggerated the overall value of the property.

122.  Burnham breached its warranties to Freedom under the Agreement by submitting a loan package to Freedom that contained a defective appraisal of the Potomac Property, and false and/or inaccurate information regarding Rymarz.

123.  On or about August 7, 2002, pursuant to the Agreement, Freedom made a written demand on Burnham to purchase the loan or otherwise indemnify Freedom. Burnham refused.

### 7953 SOUTH ESCANABA STREET LOAN TRANSACTION

124.  On or about May 17, 2001, Butar and Leszek Dobrowski purchased property located at 7953 South Escanaba Street in Chicago, Illinois ("Escanaba Property") for $106,000.

125.  On or about January 10, 2002, Burnham submitted a mortgage loan application package to Freedom from Florkiewicz concerning the Escanaba Property.

126.  Florkiewicz misrepresented financial and other information on the loan application.

127.  Burnham retained the services of an Illinois licensed appraiser, Larry Burks, who appraised the Escanaba Property at $280,000.00 on October 10, 2001; in excess of 150% more than the sale price five months earlier. Burnham knew or should have known that Freedom would rely upon the appraisal to make a mortgage loan and be relied upon by assignees of the

loan. Freedom made the loan and relied upon the appraisal and the borrower's ability to make the required cash at settlement payment.

128.     In reasonable reliance on the appraisal, Freedom funded a mortgage loan for $224,000.

129.     Freedom then resold the mortgage loan to an investor.

130.     Florkiewicz defaulted on the loan and the investor demanded Freedom repurchase the loan.

131.     A subsequent review appraisal performed on October 15, 2002 indicated the actual fair market value of the property was only $200,000, and that Burks appraisal was defective and had not been performed in accordance with industry standards in Chicago, that the comparables used by Burks were incorrect, prior sales of comparable properties at lower prices had not been disclosed as they should have been and that Burks had grossly exaggerated the value of the property.

132.     Burnham breached its warranties to Freedom under the Agreement by submitting a loan package to Freedom that contained a defective appraisal of the property and false and/or inaccurate information regarding the borrower.

133.     On or about August 7, 2002, Freedom made a written demand on Burnham pursuant to the Agreement, to purchase the loan or otherwise indemnify Freedom. Burnham refused.

## 536 WEST 61ST PLACE LOAN TRANSACTION

134.     On or about November 27, 2001, Bogdan Pawlak purchased property located at 536 West 61st Place, Chicago, Illinois ("61st Property") for $28,000.

135.     On or about January 14, 2002, Burnham submitted a mortgage loan application package to Freedom from Florkiewicz concerning the 61st Property.

136. Florkiewicz misrepresented financial and other information on the loan application.

137. Burnham retained the services of an Illinois licensed appraiser, Jordan, who appraised the property at $135,000 on January 11, 2002. Burnham knew or should have known that Freedom would rely upon the appraisal to make a mortgage loan and be relied upon by assignees of the loan. Freedom made the loan in reliance on the appraisal and Florkiewicz's ability to make the required cash at settlement payment.

138. In reasonable reliance on the aforesaid appraisal, Freedom funded a mortgage loan for $108,000.

139. Hlava represented Pawlak in the sale of the property.

140. Hlava also acted as Exeter's Vice President at the closing of the Drake Property. Hlava/Exeter prepared a false settlement statement.

141. Freedom then resold the mortgage loan to an investor.

142. Florkiewicz defaulted on the loan and the investor demanded Freedom repurchase the loan.

143. A subsequent review appraisal performed on October 14, 2002 indicated that the actual fair market value of the property was only $90,000, and that the Jordan appraisal was defective and had not been performed in accordance with industry standards in Chicago, that the comparables used by Jordan were incorrect, prior sales of comparable properties at lower prices had not been disclosed as they should have been and that Jordan had grossly exaggerated the overall value of the property.

144. Burnham breached its warranties to Freedom pursuant to the Agreement by submitting a loan package to Freedom that contained a defective appraisal of the property, and false and/or inaccurate information regarding Florkiewicz.

145.    On or about August 7, 2002, Freedom made a written demand upon Burnham pursuant to the Agreement to purchase the loan or otherwise indemnify Freedom. Burnham refused.

## COUNT I – BREACH OF CONTRACT – BURNHAM

146.    Freedom restates paragraphs 1 through 145 of its Amended Complaint as paragraph 146 of Count I, as though fully set forth herein.

147.    Freedom and Burnham entered into the Agreement, pursuant to which Freedom purchased the seven mortgage loans at issue originated by Burnham. Each mortgage loan purchase made by Freedom was subject to Burnham's agreements concerning its business practices and fulfillment of certain conditions precedent, including, but not limited to, representations and warranties made by Burnham in the Agreement are true and correct and that Burnham is not in default of any such representations and warranties or any other agreements and obligations it has undertaken in the Agreement.

148.    Burnham breached its representations, warranties, and other obligations under the Agreement by submitting to Freedom appraisals stating falsely and/or negligently inflated values to induce Freedom to purchase mortgage loans in amounts representing over 100% of the fair market value of the mortgaged property.

149.    Burnham also breached its representations, warranties, and other obligations under the Agreement by submitting to Freedom false employment, income, asset and other personal information as to the various borrowers in order to induce Freedom to purchase the mortgage loans at issue from Burnham.

150.    Pursuant to Paragraph 6 of the Agreement, Burnham was obligated to repurchase each mortgage loan purchased by Freedom after notice of breach.

151.    Despite Freedom's notices, Burnham refused to repurchase the mortgage loans, together with all costs, expenses, premiums and attorneys' fees.

152.    As a direct and proximate result of Burnham's breaches of its representations, warranties and obligations under the Agreement, Freedom incurred and continues to incur substantial damage.

WHEREFORE, Freedom moves that this Court enter judgment in its favor and against Burnham and enter an order enforcing Burnham's repurchase obligations under the Agreement, award Freedom damages in the amount of $1,723,735.27, plus all accrued interest to the date of repurchase, interest, costs and reasonable attorneys' fees, and such other relief as the Court deems just and proper.

## COUNT II – BREACH OF CONTRACT/PIERCING THE CORPORATE VEIL – PEDDLE

153.    Freedom restates paragraphs 1 through 145 of its Amended Complaint as paragraph 153 of Count II, as though fully set forth herein.

154.    Peddle, at all relevant times, was the President of Burnham.

155.    Since the time of its incorporation in 1998, Burnham, upon information and belief, was inadequately capitalized.

156.    Since the time of its incorporation in 1998, Burnham, upon information and belief, failed to issue stock.

157.    Since the time of its incorporation in 1998, Burnham, upon information and belief, failed to observe corporate formalities.

158.    Since the time of its incorporation in 1998, Burnham, upon information and belief, did not pay dividends.

159. Since the time of its incorporation in 1998, upon information and belief, Burnham's officers and directors did not function as officers and directors in Burnham's day to-day operation.

160. Since the time of its incorporation in 1998, upon information and belief, Burnham failed to create and maintain corporate records.

161. Since the time of its incorporation in 1998, Burnham, upon information and belief, is a mere façade for the operation of Burnham's dominant stockholders.

162. Since the time of its incorporation in 1998, Burnham, upon information and belief, Peddle, Davis and/or Vchove commingled Burnham's funds with their own personal funds.

163. Since the time of its incorporation in 1998, Peddle, Davis and/or Vchove, upon information and belief, preferred themselves as creditors.

164. Since Burnham's acts in entering into the Agreement, and breaching the Agreement were really the acts of Peddle and Burnham's other officers, directors and shareholders, acts which caused Freedom to sustain in excess of $1,723,735.27 in damages, Burnham should be considered as an aggregate of persons both in equity and law, and Peddle should be held liable for Burnham's obligations.

WHEREFORE, Freedom moves that this Court enter judgment in its favor and against Peddle and enter an order against Peddle enforcing Burnham's repurchase obligations under the Agreement, award Freedom damages in the amount of $1,723,735.27, plus all accrued interest to the date of repurchase, interest, costs and reasonable attorneys' fees, and such other relief as the Court deems just and proper.

## COUNT III - BREACH OF CONTRACT/PIERCING THE CORPORATE VEIL – DAVIS

165. Freedom restates paragraphs 1 through 145 of its Amended Complaint as paragraph 165 of Count III, as though fully set forth herein.

166. Davis, at all relevant times, was the Secretary of Burnham.

167. Since the time of its incorporation in 1998, Burnham, upon information and belief, was inadequately capitalized.

168. Since the time of its incorporation in 1998, Burnham, upon information and belief, failed to issue stock.

169. Since the time of its incorporation in 1998, Burnham, upon information and belief, failed to observe corporate formalities.

170. Since the time of its incorporation in 1998, Burnham, upon information and belief, did not pay dividends.

171. Since the time of its incorporation in 1998, upon information and belief, Burnham's officers and directors did not function as officers and directors in Burnham's day-to-day operation.

172. Since the time of its incorporation in 1998, upon information and belief, Burnham failed to create and maintain corporate records.

173. Since the time of its incorporation in 1998, Burnham, upon information and belief, is a mere façade for the operation of Burnham's dominant stockholders.

174. Since the time of its incorporation in 1998, Burnham, upon information and belief, Peddle, Davis and/or Vehovc commingled Burnham's funds with their own personal funds.

175. Since the time of its incorporation in 1998, Peddle, Davis and/or Vehovc, upon information and belief, preferred themselves as creditors.

24

176.   Since Burnham's acts in entering into the Agreement, and breaching the Agreement were really the acts of Davis and Burnham's other officers, directors and shareholders, acts which caused Freedom to sustain in excess of $1,723,735.27 in damages, Burnham should be considered as an aggregate of persons both in equity and law, and Davis should be held liable for Burnham's obligations.

WHEREFORE, Freedom moves that this Court enter judgment in its favor and against Davis and enter an order against Davis enforcing Burnham's repurchase obligations under the Agreement, award Freedom damages in the amount of $1,723,735.27, plus all accrued interest to the date of repurchase, interest, costs and reasonable attorneys' fees, and such other relief as the Court deems just and proper.

## COUNT IV - BREACH OF CONTRACT/PIERCING THE CORPORATE VEIL – VEHOVC

177.   Freedom restates paragraphs 1 through 145 of its Amended Complaint as paragraph 177 of Count IV, as though fully set forth herein.

178.   Vehovc, at all relevant times, upon information and belief, was an owner and shareholder of Burnham.

179.   Since the time of its incorporation in 1998, Burnham, upon information and belief, was inadequately capitalized.

180.   Since the time of its incorporation in 1998, Burnham, upon information and belief, failed to issue stock.

181.   Since the time of its incorporation in 1998, Burnham, upon information and belief, failed to observe corporate formalities.

182.   Since the time of its incorporation in 1998, Burnham, upon information and belief, did not pay dividends.

183. Since the time of its incorporation in 1998, upon information and belief, Burnham's officers and directors did not function as officers and directors in Burnham's day-to-day operation.

184. Since the time of its incorporation in 1998, upon information and belief, Burnham failed to create and maintain corporate records.

185. Since the time of its incorporation in 1998, Burnham, upon information and belief, is a mere façade for the operation of Burnham's dominant stockholders.

186. Since the time of its incorporation in 1998, Burnham, upon information and belief, Peddle, Davis and/or Vehove commingled Burnham's funds with their own personal funds.

187. Since the time of its incorporation in 1998, Peddle, Davis and/or Vehove, upon information and belief, preferred themselves as creditors.

188. Since Burnham's acts in entering into the Agreement, and breaching the Agreement were really the acts of Vehove and Burnham's other officers, directors and shareholders, acts which caused Freedom to sustain in excess of $1,723,735.27 in damages, Burnham should be considered as an aggregate of persons both in equity and law, and Vehove should be held liable for Burnham's obligations.

WHEREFORE, Freedom moves that this Court enter judgment in its favor and against Vehove and enter an order against Vehove enforcing Burnham's repurchase obligations under the Agreement, award Freedom damages in the amount of $1,723,735.27, plus all accrued interest to the date of repurchase, interest, costs and reasonable attorneys' fees, and such other relief as the Court deems just and proper.

26

## COUNT V – FRAUD WITH RESPECT TO THE LOAN APPLICATIONS – BURNHAM, BAT, RYMARZ AND FLORKIEWICZ

189.    Freedom restates paragraphs 1 through 145 of its Amended Complaint as paragraph 189 of Count V, as though fully set forth herein.

190.    Burnham, Bat, Rymarz and Florkiewicz falsely and fraudulently, and with the intent to defraud Freedom, represented to Freedom that Butar, Bat, Rymarz and Florkiewicz made the cash at settlement payments set forth in the settlement statements and had the employment, income and assets set forth in their loan applications while knowing that the representations were false, or the representations were made with reckless disregard for their accuracy such that knowledge can be imputed to them.

191.    Burnham, Bat, Rymarz and Florkiewicz made its false representations to Freedom for the express purpose of inducing Freedom to purchase the mortgage loans at issue.

192.    Freedom reasonably relied upon the representations set forth in the settlement statements submitted by Burnham, Bat, Rymarz and Florkiewicz, and was thereby induced to purchase the mortgage loans from Burnham.

193.    Burnham, Bat, Rymarz and Florkiewicz made the misrepresentations with actual malice.

194.    As a direct and proximate result of Burnham, Bat, Rymarz and Florkiewicz's fraudulent misrepresentations, Freedom paid an amount to purchase the mortgage loans generally in excess of 100% of the fair market value of the property and now the loans are delinquent or in default.

195.    As a direct and proximate result of Burnham, Bat, Rymarz and Florkiewicz's fraudulent misrepresentations, Freedom sustained damages in excess of $1,723,735.27.

WHEREFORE, Freedom moves that this Court enter judgment in its favor and against Burnham, Bat, Rymarz and Florkiewicz, and enter an order against Burnham enforcing

Burnham's repurchase obligations under the Agreement, award Freedom damages in the amount of $1,723,735.27, plus all accrued interest to the date of repurchase, interest, costs and reasonable attorneys' fees, and such other relief as the Court deems just and proper.

## COUNT VI – NEGLIGENT MISREPRESENTATION WITH RESPECT TO THE LOAN APPLICATIONS – BURNHAM, BAT, RYMARZ AND FLORKIEWICZ

196.    Freedom restates paragraphs 1 through 145 of its Amended Complaint as paragraph 196 of Count VI, as though fully set forth herein.

197.    Burnham, Bat, Rymarz and Florkiewicz owed a duty of care to Freedom to provide loan packages that were accurate, complete and not misleading.

198.    Burnham, Bat, Rymarz and Florkiewicz were negligent and failed to exercise reasonable care in submitting to Freedom loan packages that contained false, inaccurate or misleading information regarding the borrowers' purported employment and cash at settlement payments in light of the borrowers' stated income and assets.

199.    Burnham, Bat, Rymarz and Florkiewicz knew that Freedom would rely on the statements set forth in the loan packages with regard to the borrowers' employment, cash at settlement payment, income and assets, which if erroneous would cause Freedom loss and injury.

200.    In preparing and submitting the loan packages, Burnham, Bat, Rymarz and Florkiewicz intended that Freedom would rely upon the statements set forth therein in determining whether to purchase the loans from Burnham.

201.    Freedom justifiably relied upon the statements set forth in the loan packages regarding the borrowers' employment, cash at settlement payment, income and assets.

202.    As a direct and proximate result of Burnham, Bat, Rymarz and Florkiewicz 's negligent misrepresentations, Freedom has incurred and continues to incur substantial damages.

28

WHEREFORE, Freedom moves that this Court enter judgment in its favor and against Burnham, Bat, Rymarz and Florkiewicz and enter an order against Burnham enforcing Burnham's repurchase obligations under the Agreement, award Freedom damages in the amount of $1,723,735.27, plus all accrued interest to the date of repurchase, interest, costs and reasonable attorneys' fees, and such other relief as the Court deems just and proper.

## COUNT VII – FRAUD WITH RESPECT TO THE APPRAISALS – BURNHAM, EXETER, HLAVA, BAT, RYMARZ, FLORKIEWICZ

203.    Freedom restates paragraphs 1 through 145 of its Amended Complaint as paragraph 203 of Count VII, as though fully set forth herein.

204.    Burnham, Exeter, Hlava, Bat, Rymarz and Florkiewicz falsely and fraudulently and with intent to defraud Freedom, represented to Freedom that:

> A.    The Springfield Property sold to Bat appraised for $270,000, when in fact the value of the property was $175,000;
>
> B.    The Drake Property sold to Bat appraised for $270,000 when in fact the value of the property was $169,000;
>
> C.    The Hamlin Property sold to Bat appraised for $270,000, when in fact the value of the property was $148,000;
>
> D.    The Drake2 Property sold to Rymarz appraised for $297,000, when in fact the value of the property was $160,000;
>
> E.    The Potomac Property sold to Rymarz 1 appraised for $339,000, when in fact the value of the property was $150,000;
>
> F.    The Escanaba Property sold to Florkiewicz appraised for $280,000, when in fact the value of the property was $200,000;

        G.     The 61st Property sold to Florkiewicz appraised for $135,000, when in fact the value of the property was $90,000.

205. Burnham, Exeter, Hlava, Bat, Rymarz and Florkiewicz made its false representations to Freedom for the express purpose of inducing Freedom to purchase the mortgage loans at issue.

206. Burnham, Exeter, Hlava, Bat, Rymarz and Florkiewicz made the misrepresentations with actual malice.

207. Freedom reasonably relied upon the representations set forth in the appraisals submitted by Defendants and was thereby induced to purchase the mortgage loans for the properties referred to above.

208. As a direct and proximate result, Freedom paid substantial sums to purchase the mortgage loans in amounts up to over 200% of the fair market value of the properties and now the loans are delinquent or in default.

209. As a direct and proximate result of Burnham, Exeter, Hlava, Bat, Rymarz and Florkiewicz's fraudulent misrepresentations, Freedom sustained damages in excess of $1,723,735.27.

WHEREFORE, Freedom moves that this Court enter judgment in its favor and against Burnham, Exeter, Hlava, Bat, Rymarz and Florkiewicz and enter an order against Burnham enforcing Burnham's repurchase obligations under the Agreement, award Freedom damages in the amount of $1,723,735.27, plus all accrued interest to the date of repurchase, interest, costs and reasonable attorneys' fees, and such other relief as the Court deems just and proper.

## COUNT VIII – NEGLIGENT MISREPRESENTATION WITH RESPECT TO THE APPRAISALS – BURNHAM, EXETER, HLAVA, BAT, RYMARZ AND FLORKIEWICZ

210. Freedom restates paragraphs 1 through 145 of its Amended Complaint as paragraph 210 of Count VIII, as though fully set forth herein.

211. Burnham, Exeter, Hlava, Bat, Rymarz and Florkiewicz negligently represented to Freedom that:

A. The property sold to Bat located at 735 North Springfield, Chicago, Illinois, appraised for $270,000, when in fact the value of the property was $175,000;

B. The property sold to Bat located at 708 North Drake Street, Chicago, Illinois, appraised for $270,000 when in fact the value of the property was $169,000;

C. The property sold to Bat located at 728 North Hamlin Street, Chicago, Illinois, appraised for $270,000, when in fact the value of the property was $148,000;

D. The property sold to Rymarz located at 419 North Drake Street, Chicago, Illinois, appraised for $297,000, when in fact the value of the property was $160,000;

E. The property sold to Rymarz located at 4112 West Potomac Street, Chicago, Illinois, appraised for $339,000, when in fact the value of the property was $150,000;

F. The property sold to Florkiewicz located at 7953 South Escanaba Street, Chicago, Illinois, appraised for $280,000, when in fact the value of the property was $200,000;

G. The property sold to Florkiewicz located at 536 West 61st Place, Chicago, Illinois, appraised for $135,000, when in fact the value of the property was $90,000.

212. Burnham, Exeter, Hlava, Bat, Rymarz and Florkiewicz owed a duty of care to Freedom to submit appraisals to Freedom that were accurate and in accordance with law and industry standards for the mortgage property for each of the mortgage loans Freedom purchased from Burnham.

213. Burnham, Exeter, Hlava, Bat, Rymarz and Florkiewicz were negligent and failed to exercise reasonable care by submitting appraisals to Freedom with inflated values for the mortgage loan properties.

214. Burnham, Exeter, Hlava, Bat, Rymarz and Florkiewicz knew that Freedom would rely on the appraisals, which, if erroneous, would cause Freedom loss and injury.

215. Burnham, Exeter, Hlava, Bat, Rymarz and Florkiewicz intended that Freedom rely upon the appraisals in making its decision to purchase the mortgage loans from Burnham.

216. Freedom justifiably relied upon the appraisals in purchasing the mortgage loans from Burnham.

217. As a direct and proximate cause of Freedom's reliance upon the Burnham, Exeter, Hlava, Bat, Rymarz and Florkiewicz's submission of the falsely inflated appraisals, Freedom purchased the mortgage loans in amounts representing up to over 200% of fair market value of the mortgaged properties when it had only agreed to purchase the mortgage loans in an

32

amount representing between 60% and 90% of the fair market value of the mortgage property, and now the loans are delinquent or in default and Freedom has incurred and continues to incur substantial damages as a result.

WHEREFORE, Freedom moves that this Court enter judgment in its favor and against Burnham, Exeter, Hlava, Bat, Rymarz and Florkiewicz and enter an order against Burnham enforcing Burnham's repurchase obligations under the Agreement, award Freedom damages in the amount of $1,723,735.27, plus all accrued interest to the date of repurchase, interest, costs and reasonable attorneys' fees, and such other relief as the Court deems just and proper.

## COUNT IX – FRAUD WITH RESPECT TO THE LOAN APPLICATIONS/PIERCING THE CORPORATE VEIL – PEDDLE, DAVIS AND VEHOVC

218.    Freedom restates paragraphs 1 through 145, 154-163, 166-175, 178-187 and 190-195 of its Amended Complaint as paragraph 218 of Count IX, as though fully set forth herein.

219.    Since Burnham's acts with respect to the loan applications were really the acts of Peddle, Davis and Vehovc and Burnham's other officers, directors and shareholders, acts which caused Freedom to sustain in excess of $1,723,735.27 in damages, Burnham should be considered as an aggregate of persons both in equity and law, and Peddle, Davis and Vehovc should be held liable for Burnham's obligations.

WHEREFORE, Freedom moves that this Court enter judgment in its favor and against Peddle, Davis and Vehovc and enter an order enforcing Burnham's repurchase obligations under the Agreement, award Freedom damages in the amount of $1,723,735.27, plus all accrued interest to the date of repurchase, interest, costs and reasonable attorneys' fees, and such other relief as the Court deems just and proper.

## COUNT X – NEGLIGENT MISREPRESENTATION WITH RESPECT TO THE LOAN APPLICATIONS/PIERCING THE CORPORATE VEIL – PEDDLE, DAVIS AND VEHOVC

220.    Freedom restates paragraphs 1 through 145, 154 through 163, 166 through 175, 178 through 187 and 211 through 217 of its Amended Complaint as paragraph 220 of Count X, as though fully set forth herein.

221.    Since Burnham's acts with respect to the loan applications were really the acts of Peddle, Davis and Vehovc and Burnham's other officers, directors and shareholders, acts which caused Freedom to sustain in excess of $1,723,735.27 in damages, Burnham should be considered as an aggregate of persons both in equity and law, and Peddle, Davis and Vehovc should be held liable for Burnham's obligations.

WHEREFORE, Freedom moves that this Court enter judgment in its favor and against Peddle, Davis and Vehovc and enter an order enforcing Burnham's repurchase obligations under the Agreement, award Freedom damages in the amount of $1,723,735.27, plus all accrued interest to the date of repurchase, interest, costs and reasonable attorneys' fees, and such other relief as the Court deems just and proper.

## COUNT XI – FRAUD WITH RESPECT TO THE APPRAISALS/PIERCING THE CORPORATE VEIL – PEDDLE, DAVIS AND VEHOVC

222.    Freedom restates paragraphs 1 through 145, 154 through 163, 166 through 175, 178 through 187 and 204 through 209 of its Amended Complaint as paragraph 222 of Count XI, as though fully set forth herein.

223.    Since Burnham's acts with respect to the loan applications were really the acts of Peddle, Davis and Vehovc and Burnham's other officers, directors and shareholders, acts which caused Freedom to sustain in excess of $1,723,735.27 in damages, Burnham should be

34

considered as an aggregate of persons both in equity and law, and Peddle, Davis and Vehovc should be held liable for Burnham's obligations.

WHEREFORE, Freedom moves that this Court enter judgment in its favor and against Peddle, Davis and Vehovc and enter an order enforcing Burnham's repurchase obligations under the Agreement, award Freedom damages in the amount of $1,723,735.27, plus all accrued interest to the date of repurchase, interest, costs and reasonable attorneys' fees, and such other relief as the Court deems just and proper.

## COUNT XII – NEGLIGENT MISREPRESENTATION WITH RESPECT TO THE APPRAISALS/PIERCING THE CORPORATE VEIL – PEDDLE, DAVIS AND VEHOVC

224. Freedom restates paragraphs 1 through 145, 154 through 163, 166 through 175, 178 through 187, and 211 through 217 of its Amended Complaint as paragraph 224 of Count XII, as though fully set forth herein.

225. Since Burnham's acts with respect to the loan applications were really the acts of Peddle, Davis and Vehovc and Burnham's other officers, directors and shareholders, acts which caused Freedom to sustain in excess of $1,723,735.27 in damages, Burnham should be considered as an aggregate of persons both in equity and law, and Peddle, Davis and Vehovc should be held liable for Burnham's obligations.

WHEREFORE, Freedom moves that this Court enter judgment in its favor and against Peddle, Davis and Vehovc and enter an order enforcing Burnham's repurchase obligations under the Agreement, award Freedom damages in the amount of $1,723,735.27, plus all accrued interest to the date of repurchase, interest, costs and reasonable attorneys' fees, and such other relief as the Court deems just and proper.

## COUNT XIII – FRAUD WITH RESPECT TO THE APPRAISALS – MVA AND JORDAN

226.    Freedom restates paragraphs 1 through 145 of its Amended Complaint as paragraph 226 of Count XIII, as though fully set forth herein.

227.    MVA and Jordan falsely and fraudulently and with intent to defraud Freedom, represented to Freedom in their written appraisal that:

A.  The 61st Property appraised for $135,000, when in fact the value of the property was $90,000.

228.    MVA and Jordan made its false representations to Freedom for the express purpose of inducing Freedom to purchase the mortgage loans at issue.

229.    MVA and Jordan made the misrepresentations with actual malice.

230.    Freedom reasonably relied upon the representations set forth in the appraisal and was thereby induced to purchase the mortgage loans for the 61st Property.

231.    As a direct and proximate result, Freedom paid a substantial sum to purchase the mortgage loan in an amount substantially more than the fair market value of the 61st Property and now the loan is delinquent or in default.

232.    As a direct and proximate result of MVA and Jordan's fraudulent misrepresentations, Freedom sustained damages.

WHEREFORE, Freedom moves that this Court enter judgment in its favor and against MVA and Jordan and award Freedom damages in an amount to be proven at trial, and such other relief as the Court deems just and proper.

36

## COUNT XIV – NEGLIGENT MISREPRESENTATION WITH RESPECT TO THE APPRAISALS – MVA AND JORDAN

233. Freedom restates paragraphs 1 through 145 of its Amended Complaint as paragraph 233 of Count XIV, as though fully set forth herein.

234. MVA and Jordan negligently represented to Freedom that:

A. The 61st Property appraised for $135,000, when in fact the value of the property was $90,000.

235. MVA and Jordan owed a duty of care to Freedom to prepare appraisals that were accurate and in accordance with the Uniform Standards of Professional Appraisal Practice as promulgated by the Appraisal Standards Board, the Appraisal Qualifications Board of the Appraisal Foundation and the Illinois Office of Banks and Real Estate.

236. MVA and Jordan were negligent and failed to exercise reasonable care by preparing the appraisal for the 61st Property with an inflated value for the 61st Property.

237. MVA and Jordan knew that Freedom would rely on the appraisal, which, if erroneous, would cause Freedom loss and injury.

238. MVA and Jordan intended that Freedom rely upon the appraisal in making its decision to purchase the mortgage loan from Burnham.

239. Freedom justifiably relied upon the appraisal in purchasing the mortgage loan from Burnham.

240. As a direct and proximate cause of Freedom's reliance upon MVA and Jordan's falsely inflated appraisal, Freedom purchased the mortgage loan for the 61st Property for an amount in excess of the fair market value of the 61st, and now the loan is delinquent or in default and Freedom has incurred and continues to incur substantial damages as a result.

WHEREFORE, Freedom moves that this Court enter judgment in its favor and against MVA and Jordan and award Freedom damages in an amount to be proven at trial, and such other relief as the Court deems just and proper.

### COUNT XV – FRAUD WITH RESPECT TO THE APPRAISALS – BURKS

241. Freedom restates paragraphs 1 through 145 of its Amended Complaint as paragraph 241 of Count XV, as though fully set forth herein.

242. Burks falsely and fraudulently and with intent to defraud Freedom, represented to Freedom in its written appraisals that:

A. The Springfield Property appraised for $270,000, when in fact the value of the property was $175,000;

B. The Drake Property appraised for $270,000 when in fact the value of the property was $169,000;

C. The Hamlin Property appraised for $270,000, when in fact the value of the property was $148,000;

D. The Escanaba Property appraised for $280,000, when in fact the value of the property was $200,000.

243. Burks made his false representations to Freedom for the express purpose of inducing Freedom to purchase the mortgage loans at issue.

244. Burks made the misrepresentations with actual malice.

245. Freedom reasonably relied upon the representations set forth in the appraisals and was thereby induced to purchase the mortgage loans for the Springfield, Drake, Hamlin and Escanaba properties.

246. As a direct and proximate result, Freedom paid a substantial sum to purchase the

mortgage loans in an amount substantially more than the fair market value of the Springfield, Drake, Hamlin and Escanaba properties, and now the loans are delinquent or in default.

247. As a direct and proximate result of Burks' fraudulent misrepresentations, Freedom sustained damages.

WHEREFORE, Freedom moves that this Court enter judgment in its favor and against Burks and award Freedom damages in an amount to be proven at trial, and such other relief as the Court deems just and proper.

## COUNT XVI – NEGLIGENT MISREPRESENTATION WITH RESPECT TO THE APPRAISALS – BURKS

248. Freedom restates paragraphs 1 through 145 of its Amended Complaint as paragraph 248 of Count XVI, as though fully set forth herein.

249. Burks negligently represented to Freedom that:

A. The Springfield Property appraised for $270,000, when in fact the value of the property was $175,000;

B. The Drake Property appraised for $270,000 when in fact the value of the property was $169,000;

C. The Hamlin Property appraised for $270,000, when in fact the value of the property was $148,000;

D. The Escanaba Property appraised for $280,000, when in fact the value of the property was $200,000.

250. Burks owed a duty of care to Freedom to prepare appraisals that were accurate and in accordance with the Uniform Standards of Professional Appraisal Practice as promulgated by the Appraisal Standards Board, the Appraisal Qualifications Board of the Appraisal Foundation and the Illinois Office of Banks and Real Estate.

251.    Burks was negligent and failed to exercise reasonable care by preparing the appraisals for the Springfield, Drake, Hamlin and Escanaba properties with inflated values for such properties.

252.    Burks knew that Freedom would rely on the appraisals, which, if erroneous, would cause Freedom loss and injury.

253.    Burks intended that Freedom rely upon the appraisals in making its decisions to purchase the mortgage loans from Burnham.

254.    Freedom justifiably relied upon the appraisals in purchasing the mortgage loans from Burnham.

255.    As a direct and proximate cause of Freedom's reliance upon Burks' falsely inflated appraisals, Freedom purchased the mortgage loans for the Springfield, Drake, Hamlin and Escanaba properties for an amount in excess of the fair market value of the properties, and now the loans are delinquent or in default and Freedom has incurred and continues to incur substantial damages as a result.

WHEREFORE, Freedom moves that this Court enter judgment in its favor and against Burks and award Freedom damages in an amount to be proven at trial, and such other relief as the Court deems just and proper.

## COUNT XVII – FRAUD WITH RESPECT TO THE APPRAISALS – BRISKER

256.    Freedom restates paragraphs 1 through 145 of its Amended Complaint as paragraph 256 of Count XVII, as though fully set forth herein.

257.    Brisker falsely and fraudulently and with intent to defraud Freedom, represented to Freedom in its written appraisals that:

40

A.   The Drake2 Property appraised for $297,000, when in fact the value of the property was $160,000;

B.   The Potomac Property appraised for $339,000, when in fact the value of the property was $150,000.

258.   Brisker made his false representations to Freedom for the express purpose of inducing Freedom to purchase the mortgage loans at issue.

259.   Brisker made the misrepresentations with actual malice.

260.   Freedom reasonably relied upon the representations set forth in the appraisals and was thereby induced to purchase the mortgage loans for the Drake2 and Potomac properties.

261.   As a direct and proximate result, Freedom paid a substantial sum to purchase the mortgage loans in an amount substantially more than the fair market value of the Drake2 and Potomac properties, and now the loans are delinquent or in default.

262.   As a direct and proximate result of Briskers' fraudulent misrepresentations, Freedom sustained damages.

WHEREFORE, Freedom moves that this Court enter judgment in its favor and against Brisker and award Freedom damages in an amount to be proven at trial, and such other relief as the Court deems just and proper.

## COUNT XVIII – NEGLIGENT MISREPRESENTATION WITH RESPECT TO THE APPRAISALS – BRISKER

263.   Freedom restates paragraphs 1 through 145 of its Amended Complaint as paragraph 263 of Count XVIII, as though fully set forth herein.

264.   Brisker negligently represented to Freedom that:

A.    The Drake2 Property appraised for $297,000, when in fact the value of the property was $160,000;

B.    The Potomac Property appraised for $339,000, when in fact the value of the property was $150,000.

265.    Brisker owed a duty of care to Freedom to prepare appraisals that were accurate and in accordance with the Uniform Standards of Professional Appraisal Practice as promulgated by the Appraisal Standards Board, the Appraisal Qualifications Board of the Appraisal Foundation and the Illinois Office of Banks and Real Estate.

266.    Brisker was negligent and failed to exercise reasonable care by preparing the appraisals for the Drake2 and Potomac properties with inflated values for such properties.

267.    Brisker knew that Freedom would rely on the appraisals, which, if erroneous, would cause Freedom loss and injury.

268.    Brisker intended that Freedom rely upon the appraisals in making its decisions to purchase the mortgage loans from Burnham.

269.    Freedom justifiably relied upon the appraisals in purchasing the mortgage loans from Burnham.

270.    As a direct and proximate cause of Freedom's reliance upon Briskers' falsely inflated appraisals, Freedom purchased the mortgage loan for the Drake2 and Potomac properties for an amount in excess of the fair market value of the properties, and now the loans are delinquent or in default and Freedom has incurred and continues to incur substantial damages as a result.

WHEREFORE, Freedom moves that this Court enter judgment in its favor and against Brisker and award Freedom damages in an amount to be proven at trial, and such other relief as the Court deems just and proper.

## COUNT XIX – FRAUD WITH RESPECT TO THE SETTLEMENTS – BURNHAM, EXETER and HLAVA

271. Freedom restates paragraphs 1 through 145 of its Amended Complaint as paragraph 271 of Count XIX, as though fully set forth herein.

272. Burnham, Exeter and Hlava falsely and fraudulently and with intent to defraud Freedom, represented to Freedom that each borrower made the cash at settlement payments set forth in the settlement statements.

273. Freedom relied upon the representations set forth in the settlement statements submitted by Burnham, Exeter and Hlava and was thereby induced to purchase the mortgage loans from Burnham.

274. Burnham, Exeter and Hlava made these representations with actual malice.

275. As a result, Freedom Mortgage paid an amount to purchase the mortgage loans up to over 200% of the fair market value of the properties, and now the loans are delinquent or in default, proximately and directly causing Freedom to incur damages.

WHEREFORE, Freedom moves that this Court enter judgment in its favor and against Burnham, Exeter and Hlava and enter an order against Burnham enforcing Burnham's repurchase obligations under the Agreement, award Freedom damages in the amount of $1,723,735.27, plus all accrued interest to the date of repurchase, interest, costs and reasonable attorneys' fees, and such other relief as the Court deems just and proper.

**COUNT XX – NEGLIGENT MISREPRESENTATION WITH RESPECT TO THE
SETTLEMENTS – EXETER AND HLAVA**

276.     Freedom restates paragraphs 1 through 145 of its Amended Complaint as
paragraph 276 of Count XX, as though fully set forth herein.

277.     Exeter and Hlava owed a duty of care to Freedom to conduct real estate closings
for the properties utilizing information regarding the properties and the borrowers, that was
accurate, complete, and not misleading.

278.     Exeter and Hlava were negligent and failed to exercise reasonable care in
conducting the real estate closings for the properties in question while relying on information
that was inaccurate, incomplete and misleading with regard to the appraised value of the
properties and the income and asset information for the borrowers, the defendants negligently
misrepresented said information to Freedom.

279.     Exeter and Hlava knew that Freedom would rely on the information produced by
Exeter and Hlava with regard to the real estate settlements.

280.     Freedom justifiably relied upon the information produced by Exeter and Hlava
with regard to the real estate settlements.

281.     As a direct and proximate result of Exeter and Hlava's negligent
misrepresentations, Freedom has incurred and continues to incur substantial damages as a result.

WHEREFORE, Freedom moves that this Court enter judgment in its favor and against
Exeter and Hlava and award Freedom damages in the amount of $1,723,735.27, plus all accrued
interest to the date of repurchase, interest, costs and reasonable attorneys' fees, and such other
relief as the Court deems just and proper.

### COUNT XXI – FRAUD WITH RESPECT TO THE SETTLEMENTS – BUTAR, BAT, RYMARZ, FLORKIEWICZ AND HLAVA

282. Freedom restates paragraphs 1 through 145 of its Amended Complaint as paragraph 282 of Count XXI, as though fully set forth herein.

283. Butar, Bat, Rymarz, Florkiewicz and Hlava falsely and fraudulently and with intent to defraud Freedom, represented to Freedom that the cash at settlement payments set forth in the settlement statements were made and that the borrowers and had the income, assets and liabilities set forth in their loan applications.

284. Freedom relied upon the representations set forth in the settlement statements and was thereby induced to purchase the mortgage loans from Burnham.

285. Butar, Bat, Rymarz, Florkiewicz and Hlava made these representations with actual malice.

286. As a result, Freedom Mortgage paid an amount to purchase the mortgage loans up to over 200% of the fair market value of the properties, and now the loans are delinquent or in default, proximately and directly causing Freedom to incur damages.

WHEREFORE, Freedom moves that this Court enter judgment in its favor and against Butar, Bat, Rymarz, Florkiewicz and Hlava and award Freedom damages in the amount of $1,723,735.27, plus all accrued interest to the date of repurchase, interest, costs and reasonable attorneys' fees, and such other relief as the Court deems just and proper.

### COUNT XXII – CIVIL RICO – BURNHAM, EXETER, PEDDLE, DAVIS, VEHOVC, MVA, JORDAN, BURKS, BRISKER, HLAVA, BAT, BUTAR, RYMARZ, FLORKIEWICZ, SPANN AND ADAMS

287. Freedom restates paragraphs 1 through 145 of its Amended Complaint as paragraph 287 of Count XXII, as though fully set forth herein.

288. During at least from 2001 through 2002, Burnham, Exeter, Peddle, Davis,

Vehove, MVA, Jordan, Burks, Brisker, Hlava, Bat, Butar, Rymarz, Florkiewicz, Spann and Adams (collectively the "RICO Defendants") were an enterprise engaged in a continuing scheme to defraud Freedom and whose activities affected interstate commerce.

289.    The RICO Defendants agreed to and did conduct and participate in the conduct of the enterprises' affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Freedom.

290.    With respect to the loan transactions involved in this case, the RICO Defendants schemed to induce Freedom to purchase mortgage loans from Burnham based upon falsely inflated appraisals, false information and by false loan applications and settlement statements reflecting, *inter alia,* cash at settlement payments which, upon information and belief, were not paid by the borrowers.

291.    Throughout the relevant time period, the RICO Defendants willfully or with actual knowledge of their illegal activities, committed many acts of bank fraud, indictable under 18 U.S.C. § 1344; mail fraud, indictable under 18 U.S.C. § 1341; and wire fraud indictable under 18 U.S.C. § 1343, as detailed herein; each of which constituted "racketeering activity" within the meaning of 18 U.S.C. § 1961(l), and all of which collectively constituted part of a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

292.    The RICO Defendants mailed and delivered, and the RICO Defendants reasonably foresaw that the mail or wires would be used to transmit the false and inflated appraisals, false loan applications and settlement statements to Freedom through the United States Postal Service, other private or commercial interstate carriers, and/or by facsimile over the telephone wires, and misrepresented in these documents the true equity of the properties and induced Freedom to purchase mortgage loans at greatly inflated prices and to loan money to

46

borrowers in excess of the loan-to-value ratios of the properties.

293. The RICO Defendants conducted the racketeering activity through a pattern. The RICO Defendants prepared each of the false and inflated appraisals, each of the false loan applications and settlement statements for the same purpose, for the same results, with the same participants, with the same victim and with the same methods of commission.

294. Freedom detrimentally relied on the false and inflated appraisals, false loan applications and settlement statements prepared and conveyed by the RICO Defendants to Freedom.

295. Upon receipt of these documents from the RICO Defendants, Freedom would typically agree to purchase the mortgage loans at issue for between 60% and 90% of the contract price, based upon the loan applications, settlement statements and appraisals submitted by the RICO Defendants and based upon the loan applications submitted by the RICO Defendants, representing that the balance of the purchase price for the mortgaged property had been or would be paid by the borrowers.

296. While agreeing to purchase the mortgage loans for between 60% and 90% of the appraised value of the property, Freedom actually paid up to over 200% of the fair-market value of the properties. Moreover, the mortgage loans from Burnham were made to all borrowers of whom have subsequently defaulted.

297. The acts set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

298. The RICO Defendants have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

299.    As a direct and proximate result of the RICO Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Freedom has been injured in their business and property in that it was required to repurchase all of the mortgage loans, sustaining damages of at least $1,723,735.27.

WHEREFORE, Freedom moves that this Court enter judgment in its favor and against Burnham, Exeter, Davis, Vehovc, MVA, Jordan, Burks, Brisker, Hlava, Bat, Butar, Rymarz, Florkiewicz, Spann and Adams, and enter an order against Burnham and Exeter enforcing Burnham's repurchase obligations under the Agreement, award Freedom damages in the amount of $1,723,735.27, plus all accrued interest to the date of repurchase, treble damages, reasonable attorneys' fees, expenses and costs pursuant to 18 U.S.C. § 1964(c), pre and post-judgment interest and such further relief as the Court deems just and proper.

## COUNT XXIII – BREACH OF FIDUCIARY DUTY –BURNHAM, EXETER, PEDDLE, DAVIS, VEHOVC, MVA, JORDAN, BURKS, BRISKER, HLAVA, BAT, BUTAR, RYMARZ, FLORKIEWICZ

300.    Freedom incorporates herein by reference the allegations of paragraphs 1 through 145 of its Amended Complaint as paragraph 300 of Count XXIII, as though fully set forth herein.

301.    Burnham, Exeter, Peddle, Davis, Vehovc, MVA, Jordan, Burks, Brisker, Hlava, Bat, Butar, Rymarz and Florkiewicz ("Count XXIII Defendants") owed a fiduciary duty to Freedom to provide mortgage loan packages that were accurate, complete and not misleading, to prepare property appraisals that were accurate and in accordance with the Uniform Standards of Professional Appraisal Practice as promulgated by the Appraisal Standards Board, the Appraisal Qualifications Board of the Appraisal Foundation and the Illinois Office of Banks and Real Estate, and to conduct real estate closings utilizing information that was accurate, complete and

48

not misleading.

302.    The Count XXIII Defendants breached their fiduciary duty to Freedom by submitting loan packages that contained false, inaccurate, misleading information regarding the borrower's purported cash at settlement in light of the borrower's stated income and assets and appraisals that were inaccurate and not in accordance with the Uniform Standards of Professional Appraisal Practice as promulgated by the Appraisal Standards Board, the Appraisal Qualifications Board of the Appraisal Foundation and the Illinois Office of Banks and Real Estate for the mortgage property for each of the mortgage loans Freedom purchased from Burnham, and conducting real estate closings relying on said information.

303.    As a direct and proximate result of the Count XXIII Defendants' breach of fiduciary duty, Freedom has incurred and continues to incur substantial damages.

WHEREFORE, Freedom moves that this Court enter judgment in its favor and against the Count XXIII Defendants, and enter an order against Burnham and Exeter enforcing Burnham's repurchase obligations under the Agreement, award Freedom damages in the amount of $1,723,735.27 from all of the Count XXIII Defendants, plus all accrued interest to the date of repurchase, interest, costs and reasonable attorneys' fees, and such other relief as the Court deems just and proper.

## COUNT XXIV - NEGLIGENCE -- BURNHAM

304.    Freedom incorporates herein by reference the allegations of paragraphs 1 through 145 of its Amended Complaint as paragraph 304 of Count XXIV, as though fully set forth herein.

305.    Burnham had a duty to supply accurate and truthful information to Freedom when submitting the mortgage documents to Freedom.

306. In addition, Burnham is in the business of supplying information for the guidance of others in their business transactions.

307. Burnham breached its duty of care to Freedom by intentionally making false representations to Freedom concerning the seven mortgage transactions, as previously alleged.

308. In the alternative, Burnham breached its duty of care to Freedom by making negligent misrepresentations to Freedom concerning the seven mortgage transactions, as previously alleged.

309. As a direct and proximate result of Burnham's breach, Freedom sustained damages, as previously alleged.

WHEREFORE, Freedom moves that this Court enter judgment in its favor and against Burnham, and award Freedom damages in the amount of $1,723,735.27, and such other relief as the Court deems just and proper.

## COUNT XXV - NEGLIGENCE – EXETER AND HLAVA

310. Freedom incorporates herein by reference the allegations of paragraphs 1 through 145 of its Amended Complaint as paragraph 310 of Count XXV, as though fully set forth herein.

311. In undertaking the business and legal obligations arising from its actions as closing agent for the closings of the seven properties, Exeter and Hlava had a duty to insure that Freedom's funds were not misused, stolen or otherwise unlawfully dissipated through negligence or fraud.

312. Exeter and Hlava breached their duty by intentionally making false representations to Freedom by falsely representing the borrower's employment, income and assets, by preparing false settlement statements and by falsely representing that borrowers made

50

payments at closing.

313.    In addition, Exeter and Hlava, as closing agents, are in the business of supplying information for the guidance of others in their business transactions.

314.    In the alternative to paragraph 312, Exeter and Hlava breached their duty by making negligent misrepresentations to Freedom by negligently misrepresenting the borrower's employment, income and assets, by negligently misrepresenting the accuracy of the settlement statements and by negligently misrepresenting that the borrowers made payments at closing.

315.    As a direct and proximate result of Exeter and Hlava's breach of their duty, Freedom sustained damages, as previously alleged.

WHEREFORE, Freedom moves that this Court enter judgment in its favor and against Exeter and Hlava, and award Freedom damages in an amount to be proven at trial, and such other relief as the Court deems just and proper.

## COUNT XXVI – BREACH OF CONTRACT - TICOR

316.    Freedom Mortgage incorporates herein by reference the allegations of paragraphs 1 through 145 of its Amended Complaint as paragraph 316 of Count XXVI, as though fully set forth herein.

317.    Ticor issued the insured closing letter and warranted that it would be liable for the acts and omissions of its agent, Exeter, in conducting and completing the real estate closings for the mortgage loan transactions in question.

318.    Ticor and its issuing agent Exeter failed to comply with Freedom's closing instructions in that Ticor and Exeter failed to provide original signatures on all closing documents to Freedom, and failed to provide Freedom powers of attorney prior to the closings of the properties at issue.

319. In addition, Ticor and Exeter were negligent in handling the closing documents in connection with the closing on the properties at issue, including negligent handling of the HUD-1 settlement statements, powers of attorney and real estate contracts.

320. Despite Freedom Mortgage's demands for indemnity pursuant to the insured closing letter, Ticor has refused to comply and has breached the terms of the contract.

321. Freedom performed in accordance with the terms of the insured closing letter.

322. As a direct and proximate result of Ticor's breach, Freedom has sustained damages, as previously alleged.

WHEREFORE, Freedom moves that this Court enter judgment in its favor and against Ticor, and award Freedom damages in an amount to be proven at trial, and such other relief as the Court deems just and proper.

## COUNT XXVII - NEGLIGENCE - TICOR TITLE

323. Freedom Mortgage incorporates herein by reference the allegations of paragraphs 1 through 145 of its Amended Complaint as paragraph 323 of Count XXVII, as though fully set forth herein.

324. A master-servant relationship exists between Ticor and Exeter, whereby Ticor is master and Exeter, as Ticor's authorized issuing agent, is servant.

325. Exeter's actions, as previously alleged, are within the scope of its agency of Ticor.

326. Pursuant to the doctrine of respondeat superior, Ticor is vicariously liable for the acts and omissions of its agent, Exeter.

WHEREFORE, moves that this Court enter judgment in its favor and against Ticor, and award Freedom damages in an amount to be proven at trial, and such other relief as the Court deems just and proper.

## COUNT XXVIII – CIVIL CONSPIRACY – ALL DEFENDANTS

327. Freedom incorporates herein by reference the allegations of paragraphs 1 through 145 of its Amended Complaint as paragraph 327 of Count XXVIII, as though fully set forth herein.

328. Each of the defendants conspired to participate in the mortgage fraud scheme, to defraud Freedom by way of the purchase of the seven parcels of real estate.

329. Each of the defendants committed an overt act in furtherance of the conspiracy, as previously alleged.

330. As a direct and proximate result of the fraud committed by each of the defendants, Freedom sustained damages of $1,723,735.27.

WHEREFORE, Freedom moves that this Court enter judgment in its favor and against each of the defendants, and award Freedom damages in an amount to be proven at trial, and such other relief as the Court deems just and proper.

Respectfully submitted,

FREEDOM MORTGAGE CORPORATION

By: _____
    One of Its Attorneys

David C. Kluever
Jason D. Altman
Kluever & Platt, LLC
65 East Wacker Place - Suite 1700
Chicago, IL 60601
312-236-0077

Jacob J. Meister
Law Offices of Jacob J. Meister
65 East Wacker Place – Suite 1700
Chicago, IL 60601
312-201-6555

**EXHIBIT**
H

**FREEDOM MORTGAGE**
1288 Route 73 South Suite 400
Mount Laurel, NJ 08054

Broker Agreement

Phone: (800) 220-3333
Fax: (856) 222-4294

This agreement is entered into in the State of Illinois, this 19th day of June, 2001 between Freedom Mortgage Corporation, hereinafter referred to as "Freedom Mortgage", and Burnham Mortgage, hereinafter referred to as "Broker".

Whereas, Broker wishes from time to time to sell and Freedom Mortgage wishes from time to time to buy all of Broker's rights, title and interest in and to certain Promissory Notes secured by a first or second lien on residential real property provided certain conventional mortgages conform to Freedom Mortgage's underwriting standards.

Whereas, the parties wish to establish a non-exclusive relationship between and for the benefit of Freedom Mortgage and Broker. Broker will submit to Freedom Mortgage, on behalf of Broker's real property secured loan applications, hereinafter referred to as "Applicant" complete loan application packages for review and underwriting.

Now therefore, in consideration of promises, covenants, and agreements hereinafter contained, the parties agree as follows:

1. **General Broker Responsibility:**

   Broker shall perform all of the following items at Broker's sole expense and agrees to these conditions in addition to the other promises, representations, and covenants contained herein:

   A. Submit to Freedom Mortgage completed loan application packages for applicants under such programs, procedures, and fee schedules as Freedom Mortgage periodically may establish.

   B. Furnish Freedom Mortgage applicant credit, financial and other information as Freedom Mortgage may require.

   C. Provide such information as Freedom Mortgage may reasonably request to assist Freedom Mortgage in marketing the loans to secondary markets.

   D. Perform such other services, as Freedom Mortgage shall require to close loans.

   E. Broker acknowledges that the content of loan packages submitted to Freedom Mortgage immediately become the property Freedom Mortgage, and all information contained therein may be subject to Freedom Mortgage independent verification.

   F. Broker agrees to comply with all applicable local, state and federal laws, including but not limited to, Real Estate Settlement Procedure Act, the Equal Credit Opportunity Act, the Truth in Lending Act, the Fair Credit Reporting Act and any other governmental regulatory agent requirements relevant to brokerage of real property secured loan applications.

2. **Broker Warranties:**

   Broker represents and warrants to Freedom Mortgage both at the time any loan package is submitted to Freedom Mortgage, and at the time that any loan is funded and closed, that:

   A. None of the statements or information contained in any loan package will contain any untrue or erroneous statement or admission of a material fact which would, in any way, affect Freedom Mortgage's loan application review and approval. Broker understands that by making the warranty contained in this paragraph, it is warranting the accuracy of all information contained in any loan package submitted to Freedom Mortgage.

   B. Broker is duly licensed Real Estate Broker or licensed to do business in the state(s) of Illinois, and possesses and agrees to maintain as valid, all necessary licenses, permits, and authority to engage in activities contemplated by this Agreement.

   C. Unless disclosed to Freedom Mortgage in writing before the funding of any loan, broker shall not Receive any direct or indirect payment from any third party with respect to the loan, including without limitation, payment involving escrow, appraisal or sale, and Broker shall have no direct or indirect ownership in any property acting as security for the loan being reviewed by Freedom Mortgage for purposes of purchase.

   D. Broker, if it is a corporation, is duly organized, validly existing and in good standing under appropriate state laws, and has full power and authority to won its assets and carry on its business as it is now being conduct and is duly qualified to transact business as a foreign corporation in all states where such qualification is required.

   E. All real estate appraisals made in connection with each loan shall have been performed in in accordance with Freedom Mortgage's Underwriting Guidelines and with industry standards in the appraising industry in areas where the appraised property is located. Furthermore, a Freedom Mortgage approved appraiser must perform all appraisals.

   F. That all loan applications submitted to Freedom Mortgage will be originated an prepared by trained, licensed as necessary, employees of Broker, competent in all aspects of mortgage lending activities and will be properly originated, prepared and completed in accordance with the procedures and guidelines of Freedom Mortgage, which shall be known to Broker. Further, Broker agrees to deliver to Freedom Mortgage any and all exhibits or documents contained or prepared by the Broker in connection with each loan submitted.

   G. That Broker has the requisite authority and capacity to enter into the Agreement.

*EXHIBIT P-1*

H.  The Broker shall not receive any unauthorized Broker's fees for Broker services, referral, appraisal services, or compensation as a participant, either directly or indirectly, in a loan transaction submitted to Freedom Mortgage.

I.  The Broker further warrants that it will not solicit Mortgagor(s) or mortgage portfolios for any Financial services, financial products or refinances for mortgage loans purchased or closed by Freedom Mortgage for a period of one year from the date of settlement.

3.  **Broker Independent Contractor:**

Broker acknowledges that nothing in this agreement shall be construed to create a joint venture between Broker and Freedom Mortgage. In addition, nothing in this Agreement shall be construed to make a Broker a partner, agent, representative, or employee of Freedom Mortgage, and Broker shall not hold itself out as such. Broker may not use Freedom Mortgage's name in any advertising medium. Broker agrees that it shall conduct any and all business activities with Freedom Mortgage in the capacity of an independent contractor. As an independent contractor to Freedom Mortgage, Broker shall determine the method, details and means of performing all services described within this Agreement.

4.  **Indemnification of Freedom Mortgage:**

As additional consideration to Freedom Mortgage entering into this contract with Broker, Broker shall Indemnify and hold Freedom Mortgage and directors, officers, agents, attorneys, employees, successors and assigns harmless from and against and shall reimburse the same with respect to, any and all loss, damage, liability, cost and expense, including reasonable attorney's fees, incurred by reason of, or arising out of, or in connection with, whether the result of negligence or intentional conduct or otherwise, as follows:

1.  Any breach of any representation or warranty contained in this entire Agreement.

2.  Broker's failure to perform any obligation hereunder; and

3.  Any claim by an applicant resulting from Freedom Mortgage's failure or refusal to fund a loan.

Without limiting the generality of the foregoing, Broker's indemnity shall extend to all repurchase demand of any third party to which Freedom Mortgage has sold any loan.

5.  **Freedom Mortgage has Sole Discretion to Approve Loans:**

Loan approval shall be within Freedom Mortgage's sole discretion. Broker shall not represent that Freedom Mortgage has approved or will approve any loan until Broker is so informed by Freedom Mortgage in writing. Loans shall close in the name of Freedom Mortgage and Freedom Mortgage shall appear on the Promissory Note and beneficiary. In the event that a loan application is denied, Freedom Mortgage shall cause to be delivered to Broker a statement of credit denial, termination or change. Broker agrees to inform applicant of the adverse action on the loan application in accordance with the regulation of the Equal Credit Opportunity Act.

6.  **Purchase of Loans:**

A.  In addition to its obligation to indemnify under paragraph 4, Broker shall purchase any loan at Freedom Mortgage's option if any promise or warrant contained in paragraphs 1 or 2 is breached. Freedom Mortgage shall exercise such option by written notice, which shall itemize the loan's purchase price and state whether the price should be paid to Freedom Mortgage or to any loan purchaser. Within 30 days thereafter, Broker shall pay the full purchase price any cashier's check or certified check, and Freedom Mortgage thereafter shall promptly deliver the loan documentation, including the note and deed of trust, and appropriate instruments of assignments. If the purchase price is not paid in full by such date, then Broker also shall pay a late fee of one percent (1%) of the purchase price to cover Freedom Mortgage's costs, which the parties agree is a reasonable sum considering all of the circumstances existing on the date of this agreement. Acceptance of any late fee shall not constitute a waiver of default and shall not prevent Freedom Mortgage from exercising any other rights and remedies. For purposes of this paragraph 6, loan shall mean (a) funded loans (b) the real property security therefore should Freedom Mortgage or any third party become the owner thereof through foreclosure or otherwise.

B.  The purchase price for any loan subject to purchase under this paragraph 6 shall be the following, Plus all of Freedom Mortgage's reasonable attorney fees expended in connection with the loans purchase:

(a)  If Freedom Mortgage has not sold the loan to a third party, the price shall be:
(1)  the principal loan amount outstanding plus;
(2)  the difference between Freedom Mortgage's cost of funds obtained to fund the loan calculated on a daily basis from the date the loan was funded through the date of Broker's purchase plus;
(3)  foreclosure costs, if any, less;
(4)  any interest payments made by the Applicant.

(b)  If Freedom Mortgage has sold the loan to a third party, the price shall be:
(1)  all sums required by the third party to repurchase the loan, including all penalties associated therewith, plus;
(2)  the difference between Freedom Mortgage's cost of funds required to repurchase the loan calculated on a daily basis from the date of Freedom Mortgage's repurchase through the date of Broker's purchase, plus;
(3)  foreclosure costs, if any, less;
(4)  any interest payments made by the applicant to Freedom Mortgage.

7.  **Changes in Underwriting Standards**

Broker agrees that should Freedom Mortgage's underwriting standards be amended at any subsequent time, that Brokers shall comply with all underwriting guidelines and modifications thereto. Any changes

to said underwriting will not affect loans previously submitted to Freedom Mortgage. In the event Freedom purchased a loan, which does not comply with guidelines; the exception must be pre-approved in writing by Freedom Mortgage and Freedom Mortgage may purchase such loans at Freedom Mortgage's option and sole discretion; provided, however, that any such purchase shall not constitute a waiver of the guidelines and shall not obligate Freedom Mortgage to purchase any other loans which do not conform to said guidelines.

**8.** **Inspection Rights of Freedom Mortgage**

Broker agrees to keep and maintain such books and records so as to meet and comply with Federal and State laws and regulations. Broker hereby grants permission and authority to Freedom Mortgage to audit said files and to order investigative credit reports on Broker and its principals, employees, and agents as deemed necessary in the so discretion of Freedom Mortgage. Broker understands that Freedom Mortgage will maintain an active Quality Control System and th Freedom Mortgage will routinely reverify pertinent credit documentation and appraisals submitted by Broker.

**9.** **Survival of Representation and Warranties Upon Termination:**

It is expressly understood that all representations, promises and warranties made by Broker pursuant to this agreement shall survive any termination of this Agreement, whether voluntary or for cause. Either party upon written notice to the other party may terminate this Agreement.

**10.** **Notice:**

All notices required herein shall be in writing and shall be deemed to have been given, made and received only:
   a. upon delivery, if personally delivered to a party.
   b. one business day after the date of dispatch, if by facsimile transmission.
   c. one business after deposit, if delivered by a nationally recognized courier service offering guaranteed, overnight delivery; or
   d. three business days after deposit in the United States mail, certified mail, postage prepaid, return receipt requested at the addresses appearing below.

**11.** **Disclosure of Information:**

Broker understands and agrees that Freedom Mortgage may report to others instances of Broker making any written material misstatement and/ or omission of a material fact concerning loan application, and/ or knowingly aiding an applicant to do the same. At the sole discretion of Freedom Mortgage this information may be reported to the appropriate state or federal governmental agencies and/ or other persons that Freedom Mortgage may legally provide this information to.

**12.** **Governing Law:**

Freedom Mortgage is a corporation duly organized in the State of New Jersey. This agreement and any addendums and modification henceforth executed by and agreed upon by the Broker and Freedom Mortgage are solely governed by the rules, regulations and law of the State of New Jersey and the United States.

**13.** **No Assignment of Broker's Rights or Duties:**

Broker shall not have the right to assign any of its duties, obligations, or rights under this agreement without the prior written consen of Freedom Mortgage.

**14.** **Attorney Fees:**

If any legal action proceeding is brought for the enforcement of this Agreement, or because of any alleged dispute, breach, default or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing party or parties shall be entitled to reasonable attorney's fees and other costs incurred in that auctioneer proceeding, in addition to any other relief to which it or they may be entitled.

**15.** **Entire Agreement:**

This Agreement constitutes the entire Agreement between the parties pertaining to the subject matter Contained in it and supersedes all prior and contemporary Agreements, representations and understandings. No supplement, modification or amendment shall be binding unless executed by both parties, except where Freedom Mortgage has been specifically granted the right thereunder.

**16.** **Enforceability of Agreement:**

If any provision of this Agreement is held invalid, void or unenforceable, the remaining provisions shall nevertheless continue in full force without being impaired or invalidated in any way.

**17.** **Further Acts of Parties:**

Each party shall perform any further acts and execute and deliver any documents that may be reasonably necessary to carry out the provisions of this Agreement.

**18.** **Addresses of Notices:**

All notices required to be given may be given by registered or certified mail addressed as follows:

Freedom Mortgage

Amounts owed by Broker to Freedom Mortgage under this Agreement may, at Freedom Mortgage's option and in its sole discretion, be offset by Freedom Mortgage against any payments then or thereafter owed by Freedom Mortgage to Broker.

20. **Captions:**

Any captions thereunder are convenience or reference only and are not to be construed to be confining or limiting in any way to scope or intent of the provisions hereof.

21. **Waiver:**

The waiver of any breach, term, provision or condition of this Agreement shall not be construed to be a Waiver of any other or subsequent breach, term, provision or condition. All remedies afforded by this Agreement of breach hereof shall be cumulative; that is, in addition to all of her remedies provided, or Herein, or at law, or in equity.

22. **Fraud:**

All approved Wholesale Loan Brokers must be aware that licensed mortgage broker/ banker bears the responsibility for all actions of his or her employees or licenses. The broker is responsible for the content and quality of each application taken and each loan submitted to Freedom Mortgage.

A. Type of Loan Fraud:
    (1) Submission of inaccurate information, including false statements on loan Forgery
    Of application(s) and falsification of documents purporting to substantiate credit, employment, deposit and asset information, personal information including identity, ownership/ non-ownership of real property, etc.
    (2) partially or predominately accurate information.
    (3) Incorrect statements regarding current occupancy or intent to maintain minimum continuing occupancy as stated in the security instrument.
    (4) Lack of due diligence by broker/ loan officer/ interviewer/ processor, including failure to obtain all information required by the application and failure to request information as dictated by Borrower's response to other questions.
    (5) Unquestioned acceptance of information or documentation, which is known, should be known, or should be suspected to be inaccurate.
        1. Simultaneous or consecutive processing of multiple owner-occupied loans from one applicant supplying different information on each application.
        2. Allowing an applicant or interested third party "assist with the processing of the loan
    (6) Broker's non-disclosure of relevant information.

B. Consequences:

The effects of Loan Fraud are costly to all parties involved. Freedom Mortgage stands behind the quality of its loan production. Fraudulent loans cannot be sold into the secondary market and, if sold, will require repurchase by Freedom Mortgage. Fraudulent loans damage our reputation, and with our investors and mortgage insurance providers. The price paid by those who participate in Loan Fraud is even more costly. The following is a list of potential consequences that may be incurred:

    (1) Consequences to Broker:
        a. Criminal Prosecution.
        b. Loss of Mortgage Broker/ Real Estate/ Mortgage Banker's License.
    (2) Loss of lender access due to exchange of information between lenders and mortgage insurance companies including submission of information to investors (FHLMC, FNMA, police agencies, and the department of Banking and Finance)
        a. Civil action by Freedom Mortgage.
        b. Civil action by applicant/ borrower or parties to the transaction.
        c. Loss of approval status with Freedom Mortgage.

    (3) Consequences to Borrower
        a. Acceleration of debt (FNMA/ FHLMC Mortgage/ Deed of Trust, revised 9/90). Item #6 states, "Borrower shall also be in default if Borrower, during the loan application process, gave materially false or inaccurate information or statements to lender or failed to provide lender with any material information in connection with the loan evidenced by the Note, including, but not limited to, representations concerning Borrower's occupancy of the Property as a principal residence."

    *Note: Foreclosure action will not allow the Borrower the benefit of reinstatement in order to cure the default. The Borrower must pay off the loan in full prior to the sale date of the property.

        b. Criminal prosecution.
        c. Civil action by Freedom Mortgage.
        d. Civil action by other parties to the transaction, such as seller or real estate agent/ broker.
        e. Employment termination.
        f. Loss of professional license, if any.
        g. Adverse effect on credit history.

## Signatures Required

ly signing this Agreement, I/ We agree to all the terms listed herein. Altered agreements will be reviewed on a case- by- case basis, and

**Broker of Record**

Signature: _Eric C. Vehove_    Date: _6/18/01_

Print/ Type Name: _Eric Vehove_

Title: _Co-owner_

**Company Officer or Principal**

Signature: _Derrick Davis_    Date: _6/16/01_

Print/ Type Name: _DERRICK DAVIS_

Title: _Vice President_

Signature: _____ Date: _____

Print/ Type Name: _____

Title: _____

Signature: _____ Date: _7/11/01_

Print/ Type Name: _Stanley MIDDLEMAN_

Title: _Pres_

_Freedom Mortgage_

*Please forward original application and agreement (signed and dated) to:*

**Freedom Mortgage**
**1255 Route 73 South, Suite 400**
**Mount Laurel, NJ 08054**
**Attn: Steve Herman**

Thank you for your cooperation. We look forward to doing business with you.

EXHIBIT
D

Insured Closing Letter - Exeter Title Company

http://www.illinois.ticortitle.com/order/icl_lett

 **Ticor Title Insurance Company**

203 N. LaSalle
Chicago, IL 60601
Phone (630)462-2800
Fax (630)462-3626

This faxed transmittal Insured Closing Letter is considered equivalent to an original and no further copy will be mailed.

DATE: Thursday, October 18, 2001

TO: Freedom Mortgage, ISAOA
   1000 Atrium Way, Suite 300
   Mount Laurel, NJ 08054
   FAX: 253-323-8949.

RE: Exeter Title Company
   221 North LaSalle Street, Suite 1030
   Chicago, IL 60601.
   Attn: K. Gregory Demos
   FAX: (312) 641-1241

Attention: Closing Department

Dear Sir/Madam:

When title insurance of Ticor Title Insurance Company (the "Company") is specified for your protection in connection with closings of real estate transactions in which you are to be the lessee or purchaser of an interest in land or a lender secured by a mortgage (including any other security instrument) of an interest in land, the Company, subject to the Conditions and Exclusions set forth below, hereby agrees to reimburse you for actual loss incurred by you in connection with such closings when conducted by an Issuing Agent (an agent authorized to issue title insurance for the Company) or an Approved Attorney (an attorney upon whose certification of title the Company issues title insurance) and when such loss arises out of:

1. Failure of the Issuing Agent or Approved Attorney to comply with your written closing instructions to the extent that they relate to (a) the status of the title to said interest in land or the validity, enforceability and priority of the lien of said mortgage on said interest in land, including the obtaining of documents and the disbursement of funds necessary to establish such status of title or lien, or (b) the obtaining of any other document, specifically required by you, but not to the extent that said instructions require a determination of the validity, enforceability or effectiveness of such other document, or (c) the collection and payment of funds due you, or

2. Negligence of the Issuing Agent or Approved Attorney in handling your funds or documents in connection with such closings.

If you are a lender protected under the foregoing paragraph, your borrower in connection with a loan secured by a mortgage on a one to four family dwelling shall be protected as if this letter were addressed to your borrower.

Conditions and Exclusions

A. The Company will not be liable to you for loss arising out of:

1. Failure of the Issuing Agent or Approved Attorney to comply with your closing instructions which require title insurance protection inconsistent with that set forth in the title insurance binder or commitment issued by the Company. Instructions which require the removal of specific exceptions to title or compliance with the requirements contained in said binder or commitment shall not be deemed to be inconsistent.

2. Loss or impairment of your funds in the course of collection or while on deposit with a bank due to bank failure, insolvency or suspension, except as shall result from failure of the Issuing Agent or the Approved Attorney to comply with your written closing instructions to deposit the funds in a bank which you designated by name.

*EXHIBIT P-2*

1 of 2

3. Mechanics' and materialmen's liens in connection with your purchase or lease or construction loan transactions, except to the extent that protection against such liens is afforded by a title insurance binder, commitment or policy of the Company.

B. If the closing is to be conducted by an Issuing Agent or Approved Attorney, a title insurance binder or commitment for the issuance of a policy of title insurance of the Company must have been received by you prior to the transmission of your final closing instructions to the Issuing Agent or Approved Attorney.

C. When the Company shall have reimbursed you pursuant to this letter, it shall be subrogated to all rights and remedies which you would have had against any person or property had you not been so reimbursed. Liability of the Company for such reimbursement shall be reduced to the extent that you have knowingly and voluntarily impaired the value of such right of subrogation.

D. Any liability of the Company for loss incurred by you in connection with closings of real estate transactions by an Issuing Agent or Approved Attorney shall be limited to the protection provided by this letter. However, this letter shall not affect the protection afforded by a title insurance binder, commitment or policy of the Company.

E. Claims shall be made promptly to the Company at its principal state office at 330 Naperville Road, Suite 101, Wheaton, Illinois 60187, or its principal office at 171 North Clark Street, Chicago, Illinois 60601. When the failure to give prompt notice shall prejudice the Company, then liability of the Company hereunder shall be reduced to the extent of such prejudice.

F. The protection herein offered does not extend to real property transactions in the states of Florida, Iowa, New Jersey, Nebraska, Kansas, New Mexico, New York and Texas. Insured closing letters have been regulated under the laws of those states.

The protection herein offered will be effective and will continue until cancelled by Ticor Title Insurance Company.

Any previous insured closing service letter or similar agreement is hereby canceled except as to closings of your real estate transactions regarding which you have previously sent (or within 30 days hereafter will send) written closing instructions to the Issuing Agent or Approved Attorney.

Yours truly,
Ticor Title Insurance Company

*Michael L. Hardwoof*

Resident Vice President
Illinois Agency Services