IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| FREEDOM MORTGAGE CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 03 C 6508 |
| v. | ) | |
| | ) | Judge Mark Filip |
| BURNHAM MORTGAGE INC., ET AL., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Freedom Mortgage Corp. ("Plaintiff" or "Freedom"), brings this action against

Defendants, Burnham Mortgage, Inc. ("Burnham"), Exeter Title Company ("Exeter"), Ticor Title

Insurance Company ("Ticor"), John Jeffrey Hlava ("Hlava"), and numerous others (the

"Defendants").[1] The operative complaint ("Complaint") alleges breach of contract, fraud,

negligent misrepresentation, civil RICO, breach of fiduciary duty, negligence, and civil

conspiracy claims variously against the Defendants, all arising out of an alleged mortgage fraud

scheme concerning nine mortgaged properties. (D.E. 71.)

Defendant Hlava filed a memorandum on damages contending that Freedom's damages

in this case should be limited to the amount of the deficiency judgments entered in state court

based on Freedom's credit bids at foreclosure sales with respect to the nine properties. (D.E. 74.)

Defendants Ticor and Burnham filed a memorandum on damages asserting that Freedom waived

---

[1]     Plaintiff originally filed this case in the United States District Court for the
District of New Jersey (the "New Jersey Court") on February 13, 2003. (D.E. 32.) Defendants
Burham, Exeter, and Ticor challenged the venue and/or jurisdiction of the New Jersey Court.
(*Id.*) On August 20, 2003, the New Jersey Court ordered the transfer of this case to the Northern
District of Illinois on the grounds that the New Jersey Court lacked personal jurisdiction over
Exeter and was the improper venue for the claims directed against Exeter, even though the New
Jersey Court found that jurisdiction and venue were proper as to Burnham and Ticor. (*Id.*)

any right to damages based on certain language contained in the state court orders, and, in the alternative, that Freedom's damages should be limited to $585,955.08 (as Hlava also contends, which is the aggregate amount of the deficiency judgments entered in state court based on the difference between the total due to Freedom under the mortgages and Freedom's credit bids). (D.E. 82.) Freedom filed a joint response to the damages memoranda, arguing that it sustained at least $1,136,600.78 in "actual loss" damages, and that its damages have the potential to increase if the Court finds a civil RICO violation. (D.E. 97.) Thereafter, Hlava (D.E. 108) and Ticor and Burnham (D.E. 111) filed motions for partial summary judgment on the issue of Freedom's alleged damages. Defendant Exeter filed a motion (D.E. 106) joining in the partial summary judgment motion of Defendants Ticor and Burnham. For the reasons discussed below, the Court grants the Defendants' motions (D.E. 106, 108, 111) to the extent explained below.

## I. Background

The relevant facts are taken from Defendant Hlava's Local Rule 56.1 ("L.R. 56.1) statement of material facts (D.E. 110), Defendants Ticor and Burnham's L.R. 56.1 statement of material facts (D.E. 112), Freedom's response to Hlava's statement of facts and statement of additional facts (D.E. 121), Freedom's response to Ticor and Burnham's statement of facts and statement of additional facts (D.E. 120), Hlava's response to Freedom's statement of additional facts (D.E. 143), and Ticor and Burnham's response to Freedom's statement of additional facts (D.E. 137).

### A. The Loans

Freedom is engaged in the business of making mortgage loans. (D.E. 112 ¶ 4.) Burnham is engaged in the business of originating, brokering, making, and selling mortgage loans. (D.E.

110 ¶ 2.) Exeter is the title company/closing agent for the mortgage transactions at issue. (*Id.* ¶ 3.) Hlava was an officer of Exeter and represented each of the sellers of the relevant properties. (*Id.* ¶¶ 8, 19.) Ticor provided title insurance and a closing protection letter (the "Closing Protection Letter") on the mortgage transactions. (*Id.* ¶¶ 4, 20.)[2]

On June 18, 2001, Freedom, as buyer, and Burnham, as broker, entered into a Broker Agreement (the "Broker Agreement.") (*Id.* ¶ 12.)[3] Pursuant to the Broker Agreement, Freedom purchased residential mortgage loans brokered, originated, and made by Burnham. (*Id.*) Among the residential mortgage loans Burnham brokered were the nine mortgage loans at issue in this

---

[2]     The Closing Protection Letter provides that:

When title insurance of [Ticor] is specified for your protection in connection with closings of real estate transactions in which you are to be . . . a lender secured by a mortgage . . .[Ticor], subject to the Conditions and Exclusions set forth below, hereby agree[s] to reimburse you for actual loss incurred by you in connection with such closings when conducted by an Issuing Agent (an agent authorized to issue title insurance for the Company) . . . and when such loss arises out of: 1. Negligence of the Issuing Agent . . . in handling your funds or documents in connection with such closing.

(D.E. 82 at 18; D.E. 83 and 85, Ex. B.)

[3]     The Broker Agreement provides that:

As additional consideration to Freedom Mortgage entering into this contract with Broker, Broker shall Indemnify and hold Freedom Mortgage and directors, officers, agents, attorneys, employees, successors and assigns harmless from and against and shall reimburse the same with respect to any and all loss, damage, liability, cost and expense, including reasonable attorney's fees, incurred by reason of, or arising out of, or in connection with, whether the result of negligence or intentional conduct or otherwise, as follows: (1) Any breach of any representation or warranty contained in this entire Agreement; (2) Broker's failure to perform any obligation hereunder; and (3) Any claim by an applicant resulting from Freedom Mortgage's failure or refusal to fund a loan.

(D.E. 82 at 18; D.E. 83 and 85, Ex. A.)

case.  (*Id.* ¶ 13.)

As a result, Freedom made loans (the "Loans") to certain defendant borrowers (the "Borrowers") with respect to the nine properties (the "Properties"). (D.E. 112 ¶ 5.)  Freedom evidenced the Loans by notes (the "Notes") and secured the Loans by mortgages (the "Mortgages").  (*Id.*)  After making the Loans, Freedom sold the Loans to investors.  (*Id.* ¶¶ 6, 10.)  The Borrowers subsequently defaulted on the Loans.  (*Id.*)

B.     The Alleged Scheme

With respect to the Loans, Freedom alleges that it was defrauded by each of the Defendants in a mortgage fraud scheme.  (*Id.* ¶ 7.)  For example, certain appraisers (the "Appraisers") prepared and submitted appraisals to Freedom as part of the loan underwriting process ("Pre-Funding Appraisals").  (*Id.* ¶ 8.)  Freedom claims that the Pre-Funding Appraisals were "defective and had not been performed in accordance with industry standards in Chicago, that the comparables used . . . were incorrect, prior sales of comparable properties at lower prices had not been disclosed as they should have been and that the overall value of the property had been grossly exaggerated" by the Appraisers.  (*Id.* ¶¶ 8, 11.)  Freedom alleges that it discovered the defects through appraisals of the Properties made after the funding of the loans (the "Post-Funding Appraisals").  (*Id.*)

The Borrowers are accused of misrepresenting "financial and other information on the loan applications" prior to the funding of the Loans and conspiring with the sellers of the Properties in artificially inflating the value of the Properties.  (*Id.* ¶ 9.)  Burnham also is charged with making certain representations and warranties in the Broker Agreement to induce Freedom to purchase each of the nine mortgage loans at issue, including a warranty that none of the

4

statements or information in any loan package will contain any untrue or erroneous statements and that all real estate appraisals made in connection with each loan shall have been performed in accordance with Freedom's underwriting guidelines and industry standards. (D.E. 110 ¶ 14.) According to Freedom, Burham prepared false documentation designed to make the deals appear legitimate and the Borrowers appear creditworthy. (*Id.* ¶ 15.) Burnham, in conjunction with the Borrowers and sellers, is charged with scheming with the Appraisers to issue the fraudulent Pre-Funding Appraisals of the Properties. (*Id.* ¶ 17.) Burnham also allegedly submitted mortgage loan packages that included false or inaccurate information from Hlava and the title companies regarding the Borrowers' purported cash payments at closing—the documented cash at settlement payments were in excess of what the Borrowers' actual income and assets revealed they could pay. (*Id.* ¶ 19.)

C.   The Foreclosures

In response to the default of the Loans, Mortgage Electronic Systems, Inc. a/k/a MERS ("MERS") as nominee for Freedom Mortgage, filed state foreclosure actions in the Circuit Court of Cook County against the Borrowers of the Properties (the "Foreclosures"). (D.E. 112 ¶ 12.) None of the Borrowers appeared before the Circuit Court of Cook County (D.E. 121 ¶ 2), and each of the Foreclosures included an entry of a judgment in favor of MERS as nominee for Freedom Mortgage (the "Judgment Orders"). (D.E. 112 ¶ 13).

Based on the Judgment Orders, the Properties then were sold at judicial auctions (the "Auctions"). (*Id.* ¶ 14.) Before the Auctions, however, Freedom completed the Post-Funding Appraisals on eight of the nine properties (*id.* ¶ 18) which reflected, at least in Freedom's eyes,

the extent and effect of the Defendants' fraud[4]; in fact, as to seven of the nine properties (all but the 708 N. Spalding and the 735 N. Christiana properties) Freedom had filed this suit charging the Defendants with, *inter alia*, participation in the mortgage fraud scheme before the foreclosure sales occurred. (*Id.*)

The reports of sale (the "Reports of Sale") reflect that MERS, as nominee for Freedom, was the successful "bidder" at the Auctions. (*Id.* ¶ 14.) Further reflected on the Reports of Sale were the total amounts due to Freedom at the time of Auctions (*i.e.*, judgment amount, plus interest and receiver costs), the bid amounts, and the deficiency information related to the Properties. (*Id.* ¶ 15.) After the Reports of Sale were submitted, the Circuit Court of Cook County issued final orders confirming the sale of the Properties to MERS as nominee for Freedom at the Auctions, as well as the amount of the respective deficiency judgments ("Final Orders"). (*Id.* ¶ 16.) MERS as nominee for Freedom took title to the Properties through the Final Orders. (*Id.* ¶ 17.) The following chart reflects the Report of Sale and incorporates relevant excerpts from the Final Orders:

| Property | Total Due Under Mortgages | Amount of Auction Bid | Amount of Deficiency Judgment | Excerpt from Final Orders |
|---|---|---|---|---|
| 735 N. Springfield | $273,089.18 | $133,700.00 | $139,389.18 | "That there shall be an IN REM deficiency judgment entered .. .. Plaintiff shall not collect on the Note." |
| 708 N. Drake | $290,304.86 | $290,304.86 | $0.00 | "That there shall be an IN REM deficiency judgment entered .. .. Plaintiff will not pursue collection of the note." |
| 728 N. Hamlin | $284.445.65 | $284,445.65 | $0.00 | "That the sale of the mortgaged real estate involved . . .are hereby approved, ratified and confirmed." |

---

[4]    With respect to the two properties added to this suit nearly one year after initiating the suit on December 7, 2004, one of the properties (708 N. Spaulding) apparently did not receive a Post-Funding Appraisal until after it was auctioned. (*Id.* 112 ¶ 19.)

| | | | | |
|---|---|---|---|---|
| 419 N. Drake | $268,057.07 | $139,121.50 | $128,935.57 | "[T]hat an in rem deficiency be ordered . . .The Plaintiff will not pursue any deficiency by filing a separate proceeding based upon the amount owed under the terms of the note." |
| 4112 W. Potomac | $312,457.33 | $312,457.33 | $0.00 | "[T]hat the sale of the premises involved . . .is hereby approved and confirmed." |
| 7953 S. Escanaba | $244, 211.37 | $143,500.00 | $100,711.37 | "That the Plaintiff will not pursue collection of the Note." |
| 536 W. 61st Place | $122,998.95 | $71,950.00 | $51,048.95 | "That there shall be an IN REM deficiency judgment . . . .Plaintiff will not pursue collection of the note." |
| 708 N. Spaulding | $280, 812.71 | $197,100.00 | $83,712.71 | "That there shall be an IN REM deficiency entered. . . Plaintiff will not be suing the mortgagors personally on the Note for the deficiency." |
| 735 N. Christiana | $277,309.30 | $195,152.00 | $82,157.40 | "That there shall be an IN REM deficiency judgment entered . . . Plaintiff will not pursue collection of the note." |
| **Total:** | **$2,353,686.42** | **$1,767,731.34** | **$585,955.08** | |

(*Id.* ¶¶ 16-17.)

Freedom also submits a chart showing the difference (the ostensible "net total loss")

between the amounts it is due under the Mortgages and the net cash proceeds from the cash sales

(the "Sales") of the respective Properties to third parties after the Auctions. (D.E. 120 ¶ 19.) A

summary of the chart is provided below:[5]

---

[5]     Defendants object to the chart on several evidentiary and procedural grounds, including that it is not supported by correct citations to the record or by proper legal foundation, contains improper legal conclusions, and aggregates too many different facts into a single paragraph. (D.E. 137.) The Court need not decide the admissibility of the chart, at least for present purposes, and instead assumes that the difference between the total amount due under the Mortgages and the aggregate amount bid at the Auctions is less than the difference between the total amount due under the Mortgages and Freedom's net cash proceeds from the subsequent cash Sales of the Properties to third-parties.

| Property[6] | Total Due Under Freedom Mortgage | Net Proceeds from the Sales | Title Indemnity Refund | Net Total Loss |
|---|---|---|---|---|
| 735 N. Springfield | $273,089.18 | $100,435.29 | | $172,653.89 |
| 708 N. Drake | $290,304.86 | $97,801.31 | ($1,960.00) | $190,543.55 |
| 728 N. Hamlin | $284.445.65 | $29,140.40 | ($2,791.73) | $252,513.52 |
| 419 N. Drake | $268,057.07 | $153,107.72 | | $108,454.69 |
| 4112 W. Potomac | $312,457.33 | $83,781.03 | ($2,227.07) | $226,449.23 |
| 7953 S. Escanaba | $244, 211.37 | $92,978.15 | ($6,246.36) | $144,986.86 |
| 536 W. 61st Place | $122,998.95 | $63,640.15 | | $58,520.94 |
| | | | Total: | $1,154,121.68 |

(*Id.*)

## III.   Summary Judgment Standard and Choice of Law

Federal Rule of Civil Procedure 56(b) provides that "[a] party against whom a claim

. . . is asserted . . . may, at any time, move with or without supporting affidavits for a summary

judgment in the party's favor as to all or any part." Fed. R. Civ. P. 56(b). Summary judgment is

proper where "the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any material fact and

that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The

nonmovant cannot rest on the pleadings alone, but must identify specific facts, *see Cornfield v.*

*Consol. High Sch. Dist. No. 230*, 991 F.2d 1316, 1320 (7th Cir. 1993), that raise more than a

---

[6]        The chart did not include information regarding the two additional properties incorporated into the Complaint, as amended.

scintilla of evidence to show a genuine triable issue of material fact. *See Murphy v. ITT Educ. Servs., Inc.*, 176 F.3d 934, 936 (7th Cir. 1999) (citation omitted). In making its determination "[t]he court must view all evidence in the light most favorable to the party opposing the motion for summary judgment," *Santiago v. Lane*, 894 F.2d 218, 221 (7th Cir. 1990), and draw all reasonable inferences in the nonmovant's favor. *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 659 (7th Cir. 1987).

With respect to choice of law, the parties in this case have based their briefs upon Illinois law. The Court therefore applies Illinois law. *Accord, e.g., Grundstad v. Ritt*, 166 F.3d 867, 870 (7th Cir. 1999); *Mass. Bay Ins. Co. v. Vic Koenig Leasing, Inc.*, 136 F.3d 1116, 1120 (7th Cir. 1998). The case law of other jurisdictions is cited when no binding Illinois law exists or it illuminates general principles.

The parties variously dispute whether this Court can enter "partial summary judgment" concerning damages if that "partial summary judgment" does not, at a minimum, dispose of at least one or more counts in the Plaintiff's Complaint. There is certainly caselaw that appears to support the propriety of entry of a "partial summary judgment" award concerning a damages issue. *See, e.g., Pratt Central Park Ltd. P'ship v. Dames & Moore, Inc.*, 60 F.3d 350, 353 (7th Cir. 1995) (explaining that a district court may, when it becomes clear that a contractual or legislative provision caps damages below a certain amount, "limit damages via partial summary judgment"); *Edward E. Gillen Co. v. City of Lake Forest*, 3 F.3d 192, 193 (7th Cir. 1993) (affirming district court's grant of partial summary judgment holding that most of the monetary relief sought by the plaintiff was precluded). In any event, however, regardless of whether this order is expressly denominated as a "partial summary judgment" order or not, Rule 56(d) permits

the Court to enter an order where there are no material disputed facts concerning the resolution of an issue or issues and therefore the adjudication and trial of the case can be streamlined. *See, e.g., Zapata Hermanos Sucesores, S.A. v. Hearthside Baking Co., Inc.*, 313 F.3d 385, 391 (7th Cir. 2003) (rejecting notion that a partial summary judgment motion should not be granted unless it would give rise to an appealable judgment, and stating that Rule 56(d) "expressly authorizes an order 'specifying the facts that appear without substantial controversy, including the extent to which the amount of damages or other relief'" is not reasonably controverted); Wright & Miller, *Federal Practice and Procedure*, Vol. 10B, Civil 3d § 2737 at 312-14 (1998 ed.) (explaining that under Rule 56(d) the district court may issue an interlocutory order indicating "the extent to which the amount of damages or other relief is not in controversy"); *id.* at 322-23 (explaining that the order need not accompany a final and appealable judgment). Given that, at a minimum, Rule 56(d) permits entry of an order concerning the damages questions discussed herein—and that all parties in the case expended considerable time and money to present the questions, which they agreed were central to their analysis and consideration of the case—the Court finds it justifiable procedurally to enter this order.

## III.    Discussion

At issue in the instant case is the effect of Plaintiff's credit bids at the Auctions, and the resulting deficiency judgments entered in state court, on its attempt to recover damages for fraud concerning the Loans on the Properties. Before addressing this issue, however, the Court surveys certain fundamental principles regarding mortgages, foreclosures, credit bidding, and deficiency judgments.

10

## A. Fundamental Principles

With respect to secured real property loans, in the event the borrower fails to repay the loan as agreed, the lender generally can attempt to recover the loan value. This type of transaction typically is evidenced by two documents: a promissory note and a security instrument (the mortgage), which secures the promissory note and entitles the lender to reach the asset of the borrower (that is, the real property) if the note is not paid. *See, e.g., Alliance Mortgage Co. v. Rothwell*, 900 P.2d 601, 606 (Cal. 1995). Where, as here, the borrower defaults, the lender may institute a mortgage foreclosure proceeding to terminate the borrower's interest in the property. In Illinois, the process of instituting and prosecuting a foreclosure action is set forth in the Illinois Mortgage Foreclosure Law ("IMFL"), 735 ILCS 5/15-1101, *et seq.*

In addition to foreclosure, the lender has the option to accelerate any outstanding balance on the loan or exercise other remedies provided under the loan agreement to collect the unpaid balance. Even though the lender's remedies—which often are articulated in the promissory note and various mortgage documents—may be exercised concurrently, the secured party is "limited to one satisfaction." *Skach v. Lydon*, 306 N.E. 2d 482, 485 (Ill. 1973) (citation omitted); *accord, e.g., In re Linane*, 291 B.R. 457, 460 (Bankr. N.D. Ill. 2003) ("In Illinois, the right in any foreclosure proceedings to proceed against the property and, in addition to secure a money judgment for any deficiency, provided the creditor receives only one satisfaction, is clear.") (citations and quotations omitted); *Farmer City State Bank v. Champaign Nat'l Bank*, 486 N.E.2d 301, 307 (Ill. App. Ct. 1985).

To obtain a foreclosure judgment, if the allegations are uncontested, the lender may proceed directly by motion for judgment of foreclosure. *See* 735 ILCS 5/15-1602. Where, as

11

happened here, the lender moves directly for a judgment of foreclosure in an uncontested case, the court, "upon motion supported by an affidavit stating the amount which is due the mortgagee, shall enter a judgement of foreclosure as requested in the complaint." 735 ILCS 5/15-106(a)(2) (2004). Once judgment of foreclosure is entered (and certain statutory reinstatement and redemption periods have expired or been waived[7]), the property may be sold at a judicial sale or auction. *See* 735 ILCS 5/15-1507(c)(1)(2004). The IMFL provides specific rules regarding the lender's responsibility for giving public notice of the sale or auction which are designed to stimulate competitive bidding and capture the fair market value of the property. *See* 735 ILCS 5/15-1507(c)(1)-(3); *see also, e.g., Comm. Sav. & Loan v. Cos. Nat'l Bank of Chicago*, 219 N.E.2d 103, 107 (Ill. App. Ct. 1966).

At the auction, the highest bid is "merely an irrevocable offer to purchase the property and acceptance of the offer takes place when the court confirms the sale." *Citicorp Sav. of Ill. v. First Chicago Tr. Co. of Ill.*, 645 N.E.2d 1038, 1045 (Ill. App. Ct. 1995). In other words, title to the property does not pass to the successful bidder until judicial confirmation of the sale. *Id.* "Credit bidding" is the practice of allowing a foreclosing lender to bid on the property at the auction, as Plaintiff did in this case with respect to each of the Properties. *See* Baxter, *The Law of Distressed Real Estate*, § 12.13[6] at 12-29. Unlike any other bidder, the lender is not

---

[7]    "Reinstatement" is a statutory right of the borrower to avoid foreclosure by curing all existing defaults. Section 1602 of the IMFL grants the borrower ninety days after being served with summons or by publication to reinstate a default mortgage. 735 ILCS 5/15-1602. "Redemption" is another statutory right which gives the borrower one last chance to stave off foreclosure by paying off the entire balance of the mortgage (including all costs borne by the lender) within the later of six months (and, for residential real estate, seven months) from the date of service of summons or three months from the date of entry of judgment to foreclose. 735 ILCS 5/15-1603(a).

required to pay cash, but instead is entitled to make a credit bid up to the amount of its mortgage debt including allowable expenses. *Id.* The foreclosing lender is allowed to credit bid in order to "avoid the inefficiency of requiring the lender to tender cash which would only be immediately returned to it." *Alliance,* 900 P.2d at 609. A "full credit bid" is a bid in an amount equal to unpaid principal and interest of the mortgage debt. *Id.* Most states, including Illinois, hold that a lender is deemed to have received repayment of a loan in full if, at a foreclosure, it successfully bids the full amount of the loan (the "Full Credit Bid Rule"). *See, e.g., Partel, Inc. v. Harris Tr. & Sav. Bank,* 437 N.E.2d 1225, 1227 (Ill. App. Ct. 1982) (quoting *Whitestone Sav. & Loan Assocs. v. Allstate Ins. Co.,* 270 N.E.2d 694, 696 (N.Y. 1971) (*"Whitestone"*) ("Because a mortgagee is entitled to one satisfaction of his debt and no more, the bidding in [full] of the debt to purchase the mortgaged property, thus cutting off other lower bidders, has always constituted a satisfaction of the debt.")). As stated above, Freedom successfully made full credit bids on three of the nine Properties and partial credit bids with respect to the six remaining Properties.

The IMFL details the steps to confirm the judicial sale. *See* 735 ILCS 5/15-1408(a) (2004). Once the sale is complete, and upon motion and notice, the court, as the Circuit Court of Cook County did in the case *sub judice* with respect to each of the Properties, conducts a hearing and thereafter enters an order confirming the sale. Notably, the court is not required to confirm a sale. Under the IMFL, the court can void the sale if it finds (i) notice of sale was not given; (ii) the terms of the sale were unconscionable; (iii) the sale was conducted fraudulently; or (iv) if 'justice was otherwise not done.' 735 ILCS 5/15-1508(b)(2004); *see also Citicorp Sav. of Ill,* 645 N.E.2d at 1045 (Ill. App. Ct. 1995) (refusing to confirm sale in the "interests of justice"). In addition to approving the judicial sale, the confirmation order can, as each of the Final Orders did

13

in this case, contain a judgment against the borrower under the mortgage for any deficiency. *See* 735 ILCS 5/15-1508(b)(1), (2). In the instant case, Freedom does not contend or even suggest that there was any fraud in the conducting of the sale or that any of the Defendants defrauded or impeded Freedom from making a fully informed bid at the foreclosure sales. Such a contention would appear to be impossible with regard to at least eight of the properties, as Freedom had obtained its own Post-Funding Appraisals prior to credit bidding at the sales. Indeed, with regard to seven of the properties, Freedom had filed this lawsuit alleging the mortgage fraud scheme before making any credit bid at the auctions.

The deficiency judgment is based on an amount equal to the difference between the foreclosure sale price and the debt owed. *See, e.g., In re Linane*, 291 B.R. at 460 (citing *Illini Fed. Sav. & Loan Assocs. v. Doering*, 516 N.E.2d 609, 611 (Ill. App. Ct. 1987)). In Illinois, "[t]here is no requirement that the sale price be equal to the value of the property, and there is no provision for determining the value of the deficiency. Rather, absent any fraud or irregularity in the foreclosure proceeding, the price at which the property is sold is deemed to be the conclusive measure of its value for purposes of setting a deficiency judgment." *Illini Fed. Sav. & Loan Assocs.*, 516 N.E.2d at 612. In *Illini Fed. Sav. & Loan Assocs.*, the court declined to vacate a deficiency judgment, notwithstanding defendant's argument that the sale price was inadequate, stating that "no Illinois case can be found in which the court specifically set or modified a deficiency judgment in this way," that "mere inadequacy of price alone is not sufficient cause for setting aside a judicial sale," and that "[t]here is no . . . statute in Illinois by which the value of foreclosed property may be determined for purposes of a deficiency judgment aside from the price realized at a foreclosure sale." *Id.; accord, e.g., BFP v. Resolution Tr. Corp.*, 511 U.S. 531,

14

545 (1994) ("We deem, as the law has always deemed, that a fair and proper price . . . for foreclosed property, is the price in fact received at the foreclosure sale, so long as all the requirements of the State's foreclosure law have been complied with.").

The foreclosure sale prices utilized by the Circuit Court of Cook County in this case to set the amounts of the respective deficiency judgments is the amount of Plaintiff's credit bid with respect to each of the Properties. The Illinois Supreme Court repeatedly has confirmed that a lender's bid (like any ultimate foreclosure sale price) is presumed to be the fair and proper price for the foreclosed property, and therefore, the equivalent and satisfaction of the lender's lien in the property. *See, e.g., Gaskin v. Smith*, 30 N.E.2d 624, 627 (Ill. 1940) ("[The senior lender] was a competent bidder at such sale, and therefore had it in his power to bid the property up to its fair cash value; and if he failed to do so a presumption arises, from which he cannot escape, that the property sold for what it was reasonably worth . . . The mortgagee under whose decree the mortgaged property is sold, in the absence of all irregularity and unfairness in the sale, must be conclusively held to the price bid as a full equivalent for and satisfaction of his lien, and, having received the proceeds of the sale, he becomes a mere stranger to the property."); *see also, e.g., Johnson v. Zahn,* 44 N.E.2d 15, 17 (Ill. 1942) ("By the decree for foreclosure and sale [the lender] had an opportunity to satisfy the debt due her out of the property. It was in her power to bid the fair cash value of the property and [the lender] having bid thereon, the presumption is that she did bid such value. By the sale the mortgage debt was extinguished."); *Nudelman v. Carolson*, 32 N.E.2d 142, 145-46 (Ill. 1941) ("If the lender does not protect his rights by bidding the fair value of the property he can not be heard to complain that his bid was too low, for it is conclusive against him.") (citing *Ogle v. Koerner*, 29 N.E. 563, 565 (Ill. 1940)).

15

"It is the policy of the law to give stability and permanency to judicial sales, and, since it has long been recognized that property does not bring its full value at forced sales, and that price depends on many circumstances from which the debtor must expect to suffer a loss, . . . [there is] no reason for upsetting a judicial sale unless there are other irregularities." *Illini Fed. Sav. & Loan Assocs.*, 516 N.E. at 611-12 (citations and quotations omitted). Accordingly, entry of the order of confirmation marks the end of the foreclosure process, gives validity to the sale, and affirms the right of the purchaser (in this case, typically MERS as nominee for Freedom) to take title to the property. 735 ILCS 5/15-1509(a).

**B.    Legal Analysis**

1.    The Parties' Arguments and The Credit Bidding Analysis

With the foregoing in mind, the Court turns to the issues raised in the instant case. Defendants argue that Freedom cannot recover damages in excess of the deficiency judgments based on Illinois law and legal principles concerning the finality of foreclosure sales, including the Full Credit Bid Rule; principles of collateral estoppel and *res judicata*; and waiver language in the Final Orders. (*See, e.g.*, D.E. 74 and 82.) Plaintiff naturally disagrees. Notwithstanding the parties' lengthy briefing, there apparently are no published cases interpreting Illinois law that have decided the issue squarely before the court—that is, following a final order of foreclosure, whether a lender can obtain damages for fraud in the inducement against borrowers and third parties over and above the deficiency judgment set forth in the final order.

Nonetheless, there are at least three appellate decisions from other jurisdictions, all of which support the Defendants' position. For example, in *Chrysler Capital Realty, Inc. v. Grella*, 942 F.2d 160 (2d Cir. 1991), the Second Circuit held that, under Michigan law, a lender who

16

successfully bid the entire amount of the indebtedness at a foreclosure sale of the mortgage property could not maintain an action for damages against the borrower, despite allegations that the actual value of the property at the time of sale was much less than the indebtedness and the lender had been fraudulently induced into the mortgage transaction. *Id.* at 163-64. The lender had argued that, even though the Full Credit Bid Rule barred lenders from trying to prove actual damages in subsequent actions based on notes or collateral agreements under Michigan law, the Rule does not preclude lenders from pursuing fraud or other tort claims. *Id.* at 162. The lender claimed that applying the Full Credit Bid Rule to such claims would insulate a borrower's fraudulent activities and would inflict an injustice on lenders. *Id.* The Second Circuit declined to carve out any exception to the Full Credit Bid Rule, even when the lender alleges that the underlying transaction was induced by fraud, with the Second Circuit finding that "the important policy of finality in foreclosure sales must prevail in these circumstances . . .. [to] protect[] [borrowers] from deficiency actions after a foreclosure sale and bring[] certainty to the foreclosure proceedings." *Id.* at 163.

Moreover, in rejecting the plaintiff-lender's claim that such a rule would promote unfairness and reward fraudulent activities, the Second Circuit responded that, "the [lender] may always limit his damages from the fraud by bidding for the security no more than its fair market value at the time of the foreclosure sale." *Id.* Regarding the fairness of the different alternatives, *Chrysler Capital* stated that, to the contrary, "[t]o allow [a lender], after effectively cutting off or discouraging lower bidders, to take the property—and then establish that it was worth less than the bid—encourages fraud, creates uncertainty as to the [borrower's] rights, and most unfairly deprives the sale of whatever leaven comes from other bidders." *Id.* (quoting *Whitestone*, 270

17

N.E.2d at 697).

The *Chrysler Capital* opinion is quite instructive, and definitely cuts in favor of the Defendants' position here. In *Chrysler Capital*, a distinguished panel of the Second Circuit, which included Circuit Judges Newman and Pratt, as well as District Judge Sweet of the Southern District of New York, found that the principles behind the Full Credit Bid precluded the lender-plaintiff from avoiding the effect of its credit bid at the foreclosure sale, notwithstanding that the plaintiff-lender claimed that the defendant had fraudulently induced it to enter into the loan at issue. (The Second Circuit also applied its holding to the plaintiff-lender's contract claim. *See id.*, 942 F.2d at 162.) Furthermore, the Second Circuit rejected the plaintiff-lender's assertion that its holding would countenance unfairness and promote fraud, and held that the plaintiff-lender simply could protect its position by tendering an appropriate credit bid at the foreclosure sale. (In *Chrysler Capital*, as in this case, there was no suggestion that the putative fraud had not been discovered at the time of the auctions at which the credit bids were tendered by the plaintiff-lender.)

The appellate courts of California have also addressed the issue of tort damages following a foreclosure sale, specifically within the setting of non-borrower third-party defendants, and have traced a similar path as did the Second Circuit. As with the Second Circuit's decision, the reasoning of these cases cuts in favor of the Defendants here.

In *Alliance Mortgage Co. v. Rothwell*, 900 P.2d 601 (Cal. 1995), the lender brought an action against its real estate broker, title insurers, appraiser, and others for losses it sustained in making loans to fictitious borrowers in reliance on alleged fraudulent misrepresentations of the various defendants regarding the value of the properties. *Id.* at 603-05. (The suit included claims

18

for intentional misrepresentation, civil racketeering, breach of fiduciary duty, and breach of contract. *See id.*, 900 P.2d at 605.) The lender-plaintiff claimed that "it did not discover the fraud until *after* it acquired title to the properties" by making its successful credit bids at the foreclosure sales. *Id.* at 614 (emphasis added). The California Supreme Court held that, notwithstanding the Full Credit Bid Rule, the lender's purchase of the property by full credit bid at the foreclosure sale did not necessarily preclude the lender from maintaining the action for fraudulent inducement against third parties because the lender-plaintiff did not discover the fraud or the effect of the fraud until *after* the credit bids had been made. *Id.* at 614-15.

The court explained that "by making a successful full credit bid or bid in any amount, the lender is making a generally irrevocable offer to purchase the property for that amount. The lender, perhaps more than a third party purchaser with fewer resources with which to gain insight into the property, generally bears the burden and risk of making an informed bid." *Id.* at 613. The court further explained that being mislead by one's own agents concerning the value of the property securing a loan is not within the realm of risk undertaken in making a credit bid, at least where the fraud was not discovered prior to the auction and credit bidding process. *Id.* at 613-14. Thus, where the lender-plaintiff could show that its credit bids "were a proximate result of defendants' fraud, and that in the absence of such fraud it would not, in all reasonable probability, have made the [credit] bids," then the lender-plaintiff would not be precluded from recovering damages without regard to the specific amount of the credit bids. *Id.* at 614; *see also id.* (explaining that the lender-plaintiff in *Alliance* "did not discover the fraud until after it acquired title to the properties" via the auctions and credit bids).

By way of contrast, where the lender's credit bids "were not proximately caused by

19

defendants' fraudulent misrepresentations . . ., the full credit bid rule applies, and [the lender]'s bid would then constitute an irrevocable offer to purchase the property for that amount. Hence, under these circumstances, [the lender] would not be entitled to recover the difference between its bid . . . and the actual value of the property." *Id.* In other words, unless the lender can plausibly prove that its bid was the proximate result of the third party's fraud, the lender's recovery is limited to its credit bid; the lender cannot recover the difference between its bid and the actual value of the property.[8] This approach also cuts in favor of the Defendants, because in this case, Freedom was aware of the alleged fraudulent loan scheme of the Defendants and/or its effects before tendering credit bids in at least eight of the nine auctions at issue.

Similarly, in *Track Mortgage Group, Inc. v. Crusader Insurance Co.*, 120 Cal. Rptr. 2d 228 (Cal. Ct. App. 2002), the lender, who was listed as the loss payee on the borrower's property insurance policy, prevailed in its action on the issue of the property insurer's liability on claims of breach of contract and bad faith failure to pay for vandalism loss in an action brought after the lender made a full credit bid for the property at a foreclosure sale. *Id.*, 120 Cal. Rptr. 2d at 231-232. Relying on *Alliance Mortgage Co.*, the California appeals court held that, without regard to the insurance company's liability, the lender could not collect contract or tort damages from the insurance company. *Id.* at 233; *accord id.* at 231 ("[W]e hold the lender's tort damages are . . . limited by the credit bid rule absent a showing that the insurance company's conduct caused the lender to make the credit bid."). The court explained that the "lender's only interest in the property is the repayment of the debt secured by its mortgage; the insurer's liability to indemnify

---

[8]     *Alliance Mortgage Co.* held, however, that under such circumstances, a plaintiff-lender will still be able to recover other damages flowing from the defendants' fraud. *See Alliance Mortgage Co.*, 900 P.2d at 614.

the lender cannot exceed that amount . . . . The lender's interest having been satisfied, any other payment would result in a double recovery." *Id.* at 234 (citing *Alliance*, 900 P.2d at 608-10)). Of particular importance for present purposes, the *Track Mortgage Group* court reemphasized that the Full Credit Bid Rule applies absent a showing that the lender was fraudulently or otherwise proximately induced by the defendant to make the bid at the relevant auction sale. *Id.* at 235. *Track Mortgage Group* also stated that its application of the credit bid rule did not produce any unfairness to the plaintiff: "If Track believed the property was worthless at the time of the foreclosure, it could have bid a nominal amount . . . ." *Id.*

Like *Chrysler Capital*, *Whitestone*, *Alliance Mortgage Co.*, and *Track Mortgage Group, Inc.*, cases interpreting the IMFL recognize the importance of finality with respect to foreclosure sales and successful credit bids. *See, e.g., Partel, Inc.*, 437 N.E.2d at 1227; *In re Linane*, 291 B.R. at 460; *Illini Fed. Sav. & Loan Assocs.*, 516 N.E.2d at 612; *Gaskin*, 30 N.E.2d at 627. Illinois courts not only adopt the Full Credit Bid Rule (*see, e.g., Partel*, 437 N.E.2d at 1227), but also they hold that the amount of a successful bid (even a partial one) at the foreclosure proceeding is deemed to be the conclusive measure of the property's value for purposes of determining the value of any deficiency. *See, e.g., Illini Fed. Sav. & Loan Assocs.*, 516 N.E.2d at 612; *Johnson*, 44 N.E.2d at 17.

Both of the California appellate decisions (*Alliance Mortgage Co.* and *Track Mortgage Group, Inc.*) address the precise issue before the Court—the extent to which a lender-plaintiff who has previously tendered successful credit bids at a foreclosure sale can pursue tort damages against non-debtor third parties following the sale(s). The Second Circuit's decision in *Chrysler Capital* similarly looks at the effect of a lender-plaintiff's credit bid at a foreclosure auction with

regard to available damages against an alleged fraudster concerning the mortgage transaction. (There would seem to be no legitimate distinction to draw among alleged fraudsters, concerning whether one was a party to the foreclosures or not, particularly where they are all alleged to be coconspirators, as is the case here. *See generally, e.g., JTC Petroleum Co. v. Piasa Motor Fuels, Inc.*, 190 F.3d 775 (7th Cir. 1999) (coconspirator accountability analyzed under agency principles).) These cases instruct that, absent proof that a lender's credit bid was the proximate result of fraud, the bid stands as against third parties (not, as Plaintiff contends, only against borrowers or junior creditors). *See, e.g., Alliance*, 900 P.2d at 612; *see also Western Employers Ins. v. Bank of Ravenswood*, 512 N.E.2d 9, 10-11 (Ill. App. Ct. 1987) (holding that if loss covered by an insurance policy occurs before full debt bid at foreclosure sale, the mortgagee lender-plaintiff loses right to recover against insurance company because its debt was satisfied). In this case, Freedom was not stuck with appraisals potentially tainted by fraud. Except with respect to one property, Freedom had the benefit of the Post-Funding Appraisals *prior* to placing its credit bids, and typically had filed the instant suit alleging fraud before the credit bids were made. There simply has not been, nor could there be on the record before the Court, any allegations that the credit bids were proximately caused by any of the Defendants' fraudulent misrepresentations.[9] In other words, Freedom knew the actual values of the Properties, and had

---

[9]     *Compare SMFC Funding Corp. v. United Fin. Mortgage Corp.*, 24 F. Supp. 2d 858 (N.D. Ill. 1998). In *SMFC Funding Corp.*, a lender sued its mortgage broker for breach of contract for selling it a loan that was not of "investment quality" as defined by the contract. *Id.* at 859. The borrower had defaulted, and the lender subsequently purchased the property at the foreclosure sale with a credit bid for less than the full amount of the debt and later resold the property for less than the credit bid. *Id.* The lender argued that its damages against the broker were the amount of the unpaid principal balance, plus certain costs set off by the amount it recouped when it resold the property, rather than setting off the credit bid (which was higher) at the foreclosure sale. *Id.* at 862. The district court concluded that the broker's argument that the

the power to bid the way it wanted to protect its interests. *Accord, e.g., Gaskin*, 30 N.E.2d at

624.[10]

In an apparent attempt to make an end run around the well-established rule in Illinois

providing that a lender's credit bid conclusively establishes the fair market value of the property,

Plaintiff contends that the rule derives from cases decided prior to amendments made to the

IMFL in 1987. (D.E. 122 at 13-18.) Specifically, prior to the 1987 amendments, the IMFL had a

post-foreclosure sale redemption period, where the amount bid at the sale established the amount

which borrowers and junior creditors were required to pay to redeem property from foreclosure.

The 1987 amendments replaced the post-foreclosure sale redemption period with a pre-

foreclosure sale redemption procedure. Plaintiff argues that all of the cases holding that a

lender's credit bid conclusively establishes value were based on the prior version of the IMFL

and only address property value for purposes of determining the amount a borrower or junior

---

lender should be held to its credit bid rather than the amount for which it actually sold the
property "appears to have considerable merit," except that in this specific instance, "for purposes
of making the credit bid, the [lender ] got stuck with the unreliable appraisal value provided by
[the mortgage broker defendant]." *Id.* As stated above, Plaintiff in this case was not stuck with
the allegedly tainted Pre-Funding Appraisals; it had the benefit of reliable appraisal information
when making the credit bids.

[10]    Freedom argues that the Defendants are trying to claim that Freedom was
negligent in mitigating its damages, and that a "victim's negligence is not a defense to an
intentional tort, such as fraud." (D.E. 122 at 3 (*citing Williams Elecs. v. Garrity*, 366 F.3d 569,
573 (7th Cir. 2004) and *Thor Power Tool Co. v. Monroe Weintraub*, 791 F.2d 579, 585 (7th Cir.
1986).) This argument is not persuasive: Defendants have never argued that Freedom was
negligent. Instead, Defendants are invoking unanimous precedent from the Second Circuit and
the California appellate courts which holds (based on principles that are similarly reflected in
Illinois law) that when Freedom was successful with respect to its credit bids, the value of the
Properties was established under Illinois law. As discussed above, only allegations of fraud as
the proximate cause of the bid (not as the proximate cause of the Loans), which are not and
cannot be present here, have justified disturbing this postulation.

creditor is required to pay to redeem the property.

Plaintiff's argument, however, appears to be off the mark—cases decided *after* the 1987 amendment to the IMFL continue to hold that a successful credit bid conclusively establishes value and are not limited to cases involving borrowers and/or junior creditors. *See, e.g., Western Employers Ins. v. Bank of Ravenswood*, 512 N.E.2d 9, 10-11 (Ill. App. Ct. 1997) (holding that where loss covered by insurance policy occurs prior to the credit bid at the foreclosure sale, the lender cannot recover against the insurance company because the debt has been satisfied) (following the New York Court of Appeals's decision in *Whitestone, supra*). Moreover, and independently, none of the cases from other jurisdictions described above regarding the limiting effect of a successful credit bid on subsequent tort damages (*i.e., Chrysler Capital Realty, Inc., Alliance Mortgage Co., Track Mortgage Corp.*) considers the issue of redemption. The Court therefore respectfully rejects Plaintiff's "historical" argument.

To the extent Plaintiff attempts to rely on cases permitting actions against guarantors on obligations to satisfy deficiency judgments realized upon foreclosure sale (*see, e.g., LPXXVI, LLC v. Goldstein*, 811 N.E. 2d 286 (Ill. App. Ct. 2004), *Du Quoin State Bank v. Daulby*, 450 N.E.2d 347 (Ill. App. Ct. 1983), and *Emerson v. LaSalle National Bank*, 352 N.E.2d 45 (Ill. App. Ct. 1976)), the attempt is rejected as misplaced.[11] In each of these cases, the court held that the

---

[11] Freedom suggests that *McHenry Savings Bank v. Pioneer Nat'l Title Ins. Co.*, 540 N.E.2d 357 (Ill. App. Ct. 1989) is similar to the instant case and materially aids the analysis. The Court respectfully disagrees. *McHenry* never mentions or discusses credit bidding at all. The case deals with whether, and to what extent, a mortgagee which never obtained security in a property, but instead got only an equitable mortgage, could sue on a contract with the title insurance company. The analysis substantially turned on the language of the specific contract at issue in that case, and thus is of limited relevance here. *See id.* at 359 ("The question of whether plaintiff has suffered a loss as defined in the policy is not a question of fact, but rather, a matter of interpretation of the policy."). Again, nothing in the case addresses credit bidding, and the

mortgage foreclosure action did not have a *res judicata*[12] effect on the subsequent action against the guarantor, finding that the two actions did not constitute the same cause of action for *res judicata* purposes. *See, e.g., Goldstein*, 811 N.E. 2d at 289. Thus, the second suit was not barred.

The decisions substantially hinge on the fact that a guaranty is a "third contract," separate from the note and the mortgage, and that liability of guarantors is determined from the instrument of guaranty itself. *See, e.g., Du Quoin State Bank*, 450 N.E.2d at 349. In *Du Quoin*, for example, the guaranty contract provided that "liability hereunder shall in no wise be affected or impaired by * * * any sale * * * or other disposition of any said indebtedness." *Id.* at 347. *Du Quoin* concluded that this language indicated that "the parties intended the guaranty to prevent the bank from suffering any actual loss in connection with its loans " without regard to any subsequent foreclosure sale. *Id.* at 349. In addition, at least one of the cases relies on the fact that an *in personam* judgment against a guaranty could not be obtained as part of an action based on a statutory short-form foreclosure complaint under the then-governing version of the IMFL. *See Emerson*, 352 N.E.2d at 50; *see also* 735 ILCS 5/15-1501(a) and (b)(5) (current version of the IMFL provides that guarantors are permissible, if not necessary, parties to a foreclosure proceeding).[13]

---

case is factually remote from this one in terms of any issues actually litigated.

[12]     The elements that need to be satisfied in order to invoke the doctrine of *res judicata* are, "(1) a final judgment on the merits rendered by a court of competent jurisdiction; (2) an identity of cause of action; and (3) an identity of parties or their privies." *Marvel of Ill., Inc. v. Marvel Contaminant Control Indus., Inc.*, 744 N.E.2d 312, 318 (Ill. App. Ct. 2001).

[13]     Section 5/15-1501 of the IMFL provides, in relevant part:

In the instant case, the Court is not holding that the Plaintiff is barred from pursuing a carry-on fraud or contract action, to the extent one is otherwise maintainable in the law, because of the existence of a prior foreclosure suit such that *res judicata* is in play. (Such a claim at least putatively might be available to the Borrower-defendants—the Court takes no view—but none of them have moved for summary judgment so the Court does not pass on the question). Instead, the Court is holding, consistent with the Second Circuit's decision in *Chrysler Capital* and the California appellate courts' decisions referenced above, that Plaintiff is bound by the amount of its credit bid when seeking recovery for its claims against the Defendants, including the movant Defendants here.[14]

---

(a) Necessary Parties. For the purposes of Section 2-405 of the Code of Civil Procedure, only (i) the mortgagor and (ii) other persons (but not guarantors) who owe payment of indebtedness or the performance of other obligations secured by the mortgage and against whom personal liability is asserted shall be necessary parties defendant in a foreclosure. The court may proceed to adjudicate their respective interests, but any disposition of the mortgaged real estate shall be subject to (i) the interests of all other persons not made a party or (ii) interests in the mortgaged real estate not otherwise barred or terminated in the foreclosure.

(b) Permissible Parties. Any party may join as a party any other person, although such person is not a necessary party, including, without limitation, the following: . . . (5) Guarantors, provided that in a foreclosure any such guarantor also may be joined as a party in a separate count in an action on such guarantor's guaranty.

735 ILCS 5/15-1501(a) and (b).

[14]     The Court reserves for the moment the question of whether Freedom is bound by the credit bids concerning three properties—419 N. Drake, 7953 S. Escanaba, and 735 N. Springfield in Chicago. In verified complaints in the foreclosure actions, the plaintiff in these suits is identified as "'MERS' Mortgage Electronic Registration Systems, Inc. as nominee for Freedom Mortgage Corporation dba Freedom Home Mortgage Corporation." According to those verified complaints, "Plaintiff [*i.e.*, MERS] is the owner and legal holder of the note, mortgage and indebtedness." The respective judgments of foreclosure and sale, and reports of sales and orders confirming the sales, continue to show MERS as the plaintiff-nominee. Nonetheless, in its summary judgment papers, Freedom offered affidavit testimony attesting, notwithstanding the

The Court further notes that there is no dispute that the Defendants seeking summary judgment in the instant case are not guarantors with respect to the Loans. (*See, e.g.*, D.E. 74 at 8; D.E. 82 at 19; D.E. 97 at 9.) Given that the guaranty cases rely on specific language in the governing guaranty agreements, which were found to unambiguously memorialize the parties' intent for the guarantor to cover any loss in connection with the loans without regard to any satisfaction of indebtedness at a foreclosure sale, *see, e.g.*, *Du Quoin*, 450 N.E.2d at 349, there is no basis to apply the guaranty cases to the instant case. In addition, unlike the guaranty case which relied on a statute preventing lenders from including guarantors in foreclosure actions, *see, e.g.*, *Emerson*, 352 N.E.2d at 50, the current version of the IMFL does not prevent the joinder of non-guaranty third parties to foreclosure actions.

### 2. Collateral Estoppel

Defendants also argue that collateral estoppel, or issue preclusion, provides an independent basis on which to grant their motions concerning damages. *See, e.g.*, *Talarico v. Dunlap*, 685 N.E.2d 325, 328 (Ill. 1997) ("Defensive use of the collateral estoppel doctrine applies when, as in this case, a defendant seeks to prevent a plaintiff from asserting a claim the

---

allegations in the verified complaints in the foreclosure actions: that Freedom transferred the original notes and mortgages for these three properties to DLJ Mortgage Capital, Inc.; that Freedom did not participate at any stage of the foreclosure litigation in directing MERS; and that Freedom had no involvement with the respective three properties or the related foreclosures until after the court orders approving the respective selling officer's report of sale and distribution and order for possession were entered. (*See* D.E. 120 ¶¶ 21-32; D.E. 121 ¶¶ 3-14.) Given Freedom's affidavits and assertions of fact in the summary judgment papers, the Court regards as an open question the extent of Freedom's involvement in the underlying foreclosure actions and credit bids concerning the three parties. Because the parties do not explore the question of whether Freedom is bound by the credit bids if it did not participate in the underlying foreclosures on these three properties, and because the resolution of relevant issue(s) may well turn on factual disputes, the Court does not pass on the matter in the absence of adversarial briefing of the matter.

plaintiff has previously litigated and lost."). Issue "[p]reclusion in federal litigation following a judgment in a state court depends on the Full Faith and Credit Statute, 28 U.S.C. § 1738, which requires the federal court to give the judgment the same effect as the rendering state would." *GASH Assocs. v. Village of Rosemont, Ill.*, 995 F.2d 726, 728 (7th Cir. 1993) (citing *Marrese v. American Academy of Orthopaedic Surgeons*, 470 U.S. 373 (1985)).

Under Illinois law, collateral estoppel may be invoked where (a) there is a final judgment on the merits in the prior adjudication; (b) the issue decided in the prior adjudication is identical with the one presented in the suit in question; and (c) the party against whom estoppel is asserted was a party or in privity with a party to the prior adjudication. *See, e.g.*, *Talarico*, 685 N.E.2d at 328. If these elements are satisfied, collateral estoppel will be applied unless it will result in unfairness to the party being estopped. *Id.*

There is no dispute that the Final Orders constitute final judgments for preclusion purposes. In addition, while the issue of Defendants' liability for fraud was not decided in state court, as discussed above, the Final Orders decided the issue of Freedom's recoverable loss in connection with the Properties. To the extent Freedom argues that it had no incentive to litigate in the state court foreclosure proceedings, or that it would be unfair to apply collateral estoppel because it would be permitting Defendants to get away with fraud, the Court is persuaded by the teaching of the Second Circuit on this issue and therefore respectfully disagrees with Freedom's assertions. *See Chrysler Capital*, 942 F.2d at 163-64 (citing and quoting *Whitestone*, 270 N.E.2d at 697); *accord Track Mortgage Group*, 120 Cal. Rptr.2d at 235. Freedom had every reason to seek in the judgments all the fees and costs and bid the fair market value of each property, regardless of the fact that the Final Orders ultimately were entered by default. Indeed, in six of

28

the nine auctions, Freedom did not tender a full credit bid; instead, it typically bid substantially less than a full credit bid, with the deficiency judgments reflecting discounted bids ranging from some $51,000 to $139,000 in reductions.

Given that this fraud action was filed *prior* to entry of virtually all of the Final Orders, and, for that matter, *prior* to virtually all of the Auctions, there is not a reasonable question whether this action was foreseeable at the time of the Foreclosures. Plaintiff's claim of unfairness also is not well-taken; it knew about the deflated property values (as a result of its own untainted appraisals) prior to placing the credit bids and it has not alleged any facts tending to prove that its bids were the proximate result of any fraud. With respect to the final collateral estoppel element (the party or privity requirement), the Court finds that the requirement is satisfied with respect to six of the nine properties. However, as previously explained, there is a legitimate factual question about Freedom's relationship to three of the foreclosure actions and related credit bids—*i.e.*, those relating to the properties at 419 N. Drake, 7953 S. Escanaba, and 735 N. Springfield in Chicago. Accordingly, the Court does not find that collateral estoppel principles apply as to those three properties and the credit bids entered in conjunction with and embodied in the three foreclosure judgments.[15]

---

[15]     As explained in footnote 14, the Court reserves the question of whether Freedom was actually the credit bidder, through MERS, for the three properties at 419 N. Drake, 7953 S. Escanaba, and 735 N. Springfield in Chicago. Accordingly, that reservation carries through to the collateral estoppel analysis and specifically to the question of whether Freedom was in privity with MERS in conjunction with the prior foreclosures and accompanying judgments.

## IV.    Conclusion

For the reasons stated above, the Court grants Defendants' motions (D.E. 106, 108, and 111) to the extent explained herein.  At least for the properties on which there is not a question of privity, Freedom will not be able to recover damages to the extent that it tendered successful credit bids in the Illinois foreclosures.  The question of whether other recoveries are possible (*e.g.*, attorneys fees or punitive damages) in connection with the other claimed damages will be resolved as the case proceeds forward, as there are open factual questions and legal questions that have been explored at only a cursory level in the briefing concerning such issues.

So ordered.

_Mark Filip_
Mark Filip
United States District Judge
Northern District of Illinois

Date: _3-13-06_