**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| FREEDOM MORTGAGE CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 03 C 6508 |
| | ) | |
| v. | ) | |
| | ) | |
| BURNHAM MORTGAGE, INC., EXETER TITLE | ) | |
| COMPANY, TICOR TITLE INSURANCE | ) | |
| COMPANY, JAMES C. PEDDLE, DERRICK | ) | |
| DAVIS, ERIC C. VEHOC, MARKET VALUE | ) | |
| APPRAISAL, INC., MAYA N. JORDAN, LARRY | ) | |
| D. BURKS, KEVIN R. BRISKER, JOHN JEFFREY | ) | **Ticor Title's Partial** |
| HLAVA, ADAM BAT, ADAM BUTAR, | ) | **Answer to the Fifth** |
| ZBIGNIEW RYMARZ, WALDEMAR | ) | **Amended Complaint** |
| FLORKIEWICZ, DOROTHY SPANN, | ) | |
| CHARLENE ADAMS, KUBA JASNY a/k/a | ) | |
| GROSZ PIOTR, BARBARA ODRZYWOLSKA, | ) | |
| MAREK MAKA a/k/a LESZEK DOBROWSKI, | ) | |
| BOGDAN PAWLAK, KRYSTIAN ZEBROWSKI, | ) | |
| and PIOTR ULOSZONEKIC, | ) | |
| | ) | |
| Defendants. | ) | |

**TICOR TITLE INSURANCE'S PARTIAL VERIFIED ANSWER TO THE FIFTH
AMENDED COMPLAINT**

Ticor Title Insurance ("Ticor"), by and through its attorneys, submits the following
partial answer to the Fifth Amended Complaint filed by Freedom Mortgage:

1.      Freedom Mortgage Corporation ("Freedom") is a New Jersey corporation with its
principal place of business in New Jersey.  Freedom is engaged, inter alia, in the business of
making mortgage loans.

**ANSWER:**    Upon information and belief, Ticor admits the allegations contained in
paragraph 1.

2.      Burnham Mortgage, Inc. ("Burnham") is an Illinois corporation with its principal place of business in Chicago, Illinois.  Burnham is engaged in the business of originating, brokering, making and selling mortgage loans.  Burnham originated, brokered and sold at least nine mortgage loans to Freedom.

**ANSWER:**     Upon information and belief, Ticor admits that Burnham is an Illinois corporation with its principal place of business in Chicago, Illinois.  Ticor is without knowledge as to the truth or falsity of the remaining allegations contained in paragraph 2 and, therefore, denies those allegations.

3.      Exeter Title Company ("Exeter") is an Illinois corporation with its principal place of business in Chicago, Illinois.  Exeter is a title company and was the title company/closing agent for the mortgage transactions at issue originated by Burnham and purchased by Freedom. For each such transaction, Exeter prepared the documents of conveyance, including deeds, conducted settlements of the sale and financing transactions and disbursed purchase money, including down payments and loan proceeds.

**ANSWER:**     Upon information and belief, Exeter is an Illinois corporation with its principal place of business in Chicago, Illinois.  Upon information and belief, Exeter was the closing agent for the transactions and properties described herein.  Ticor denies that Exeter was a "title company" to the extent that it creates the incorrect inference that Exeter acted as title underwriter in the underlying transactions.  Ticor is without knowledge as to the truth or falsity of the remaining allegations contained in paragraph 3 and, therefore, denies those allegations.

4.      Ticor Title Insurance Company ("Ticor") is a California Corporation with offices in Chicago, Illinois and which regularly transacts business in Chicago, Illinois.  Ticor is engaged in the business of providing title insurance.  Ticor provided title insurance and a closing protection letter on the mortgage loan transactions at issue originated by Burnham and purchased by Freedom.  Ticor is also the principal of Exeter.

**ANSWER:**      Ticor admits that it is a California corporation with offices in Chicago, Illinois and, further, that it regularly transacts business in Chicago, Illinois.  Ticor admits that it is in the business of providing title insurance.  Ticor denies that it is the principal of Exeter. Ticor admits that it provided title insurance and issued a closing protection letter regarding the mortgage loan transactions and properties referenced in Freedom's complaint.  Ticor is without knowledge as to the truth or falsity of the remaining allegations contained in paragraph 4.

5.      James C. Peddle ("Peddle") is the President of Burnham and, upon information and belief, the alter ego of Burnham.  Davis is a citizen of the State of Illinois, residing at 1364 North Mohawk, North Cleveland Avenue, Chicago, Illinois.

**ANSWER:**      Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 5 and, therefore, denies said allegations.

6.      Derrick Davis ("Davis") is the Secretary of Burnham and, upon information and belief, the alter ego of Burnham.  Peddle is a citizen of the State of Illinois, residing at 1368 North Mohawk, Chicago, Illinois.

**ANSWER:**      Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 6 and, therefore, denies said allegations.

7.      Eric C. Vehovc ("Vehovc") is, upon information and belief, a shareholder of Burnham and, upon information and belief, the alter ego of Burnham.  Vehovc is a citizen of the State of Illinois residing at 345 North LaSalle Street, Unit 1201, Chicago, Illinois.

**ANSWER:**   Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 7 and, therefore, denies said allegations.

8.      Market Value Appraisal, Inc. ("MVA") is an Illinois corporation with its principal place of business in Chicago, Illinois.  MVA is engaged in the business of preparing and providing appraisal for real property.

**ANSWER:**   Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 8 and, therefore, denies said allegations.

9.      Maya Jordon ("Jordan") is the President of MVA and, upon information and belief, the alter ego of MVA.  Jordon is a citizen of the State of Illinois residing at 6849 South Cornell Avenue, Apt. 3N, Chicago, Illinois.

**ANSWER:**   Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 9 and, therefore, denies said allegations.

10.      Larry D. Burks ("Burks") is an individual engaged in the business of preparing appraisal for real property.  Burks is a citizen of the State of Illinois, residing at 15243 South Woodlawn Ave., Dolton, Illinois.

**ANSWER:**   Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 10 and, therefore, denies said allegations.

11.     Kevin R. Brisker ("Brisker") is an individual engaged in the business of preparing and providing appraisals for real property.  Brisker is a citizen of the State of Illinois, residing at 1016 E. 168th St., South Holland, Illinois.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 11 and, therefore, denies said allegations.

12.     John Jeffrey Hlava ("Hlava") is an individual and an attorney licensed to practice law in the State of Illinois.  Hlava is a citizen of the State of Illinois, residing at 1226 Forest Avenue, Oak Park, Illinois.  Hlava was an officer of Exeter.

**ANSWER:**     Upon information and belief, Ticor admits that Hlava was an attorney licensed to practice law.  Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 12 and, therefore, denies said allegations.

13.     Adam Bat ("Bat") is a citizen of the State of Illinois, residing at 1658 North Milwaukee, #407, Chicago, Illinois.  Bat may also be known as Adam Butar, Zbigniew Rymarz or Waldemar Florkiewicz.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 13 and, therefore, denies said allegations.

14.     Adam Butar ("Butar") is, upon information and belief, a citizen of the state of Illinois.  Butar may also be known as Adam Bat, Zbigniew Rymarz or Waldemar Florkiewicz.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 14 and, therefore, denies said allegations.

15.     Zbigniew Rymarz ("Rymarz") is a citizen of the State of Illinois, residing at 10203 McNierney Drive, Franklin Park, Illinois.  Rymarz may also be known as Adam Bat, Adam Butar, or Waldemar Florkiewicz.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 15 and, therefore, denies said allegations.

16.     Waldemar Florkiewicz ("Florkiewicz") is a citizen of the State of Illinois, residing at 6648 W. Foster, Chicago, Illinois.  Florkiewicz may also be known as Adam Bat, Adam Butar, or Zbigniew Rymarz.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 16 and, therefore, denies said allegations.

17.     Dorothy Spann ("Spann") is a citizen of the State of Illinois, residing at 1050 North Central, Chicago, Illinois 60651.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 17 and, therefore, denies said allegations.

18.     Charlene Adams ("Adams") is, upon information and belief, a citizen of the State of Illinois.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 18 and, therefore, denies said allegations.

19.     Kuba Jasny a/k/a Grosz Piotr ("Piotr") is, upon information and belief, a citizen of the State of Illinois.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 19 and, therefore, denies said allegations.

20.     Barbara Ordzywolska ("Ordzywolska") is a citizen of the State of Illinois, residing at 8901 Western, Des Plaines, Illinois.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 20 and, therefore, denies said allegations.

21.     Marek Maka a/k/a Leszek Dobrowski ("Dobrowski") is a citizen of the State of Illinois, residing at 5502 S. Union, 2nd Floor, Chicago, Illinois.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 21 and, therefore, denies said allegations.

22.     Bogdan Pawlak ("Pawlak") is a citizen of the State of Illinois, residing at 6524 N. Nashville Ave., Chicago, Illinois.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 22 and, therefore, denies said allegations.

23.     Krystian Zebrowski ("Zebrowski", upon information and belief, is a citizen of the State of Illinois, residing in Chicago, Illinois.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 23 and, therefore, denies said allegations.

24.     Piotr Uloszonekic ("Uloszonekic"), upon information and belief, is a citizen of the State of Illinois, residing in Chicago, Illinois.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 24 and, therefore, denies said allegations.

25.     Anatoli Louchak, (Louchak"), a non-party, upon information and belief, had his identify [sic] stolen and or [sic] misused to obtain certain mortgage loans by some of the Defendants herein.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations

contained in paragraph 25 and, therefore, denies said allegations.

## JURISDICTION AND VENUE

26.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. §1332(a).  The matter in controversy is between citizens of different states, and the amount in controversy exceeds the sum and value of $75,000.00, exclusive of interest and costs.  This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. §1954.  This Court has original jurisdiction over this action pursuant to 28 U.S.C. §1331.

**ANSWER:**     Ticor admits the allegations contained in paragraph 26.

27.     Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(a) in that all of the defendants reside in this judicial district and a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

**ANSWER:**     Ticor admits the allegations contained in paragraph 27.

## BACKGROUND FACTS & DAMAGE ISSUES RESOLVED BY THE SEVENTH CIRCUIT

28.     On June 18, 2001, Freedom, as Buyer, and Burnham, as Broker, entered into a Broker Agreement (the "Agreement"). The Agreement is attached and incorporated herein as Exhibit A. Pursuant to the Agreement's terms and conditions, Freedom purchased, from time to time, residential mortgage loans brokered, originated and made by Burnham.

**ANSWER**:     Ticor is without knowledge as to the truth or falsity of the allegations

contained in paragraph 28 and, therefore, denies said allegations.

29.     Among the residential mortgage loans Burnham brokered, originated and made, were the nine mortgage loans at issue in this case, purchased by Freedom from Burnham.

**ANSWER**:     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 29 and, therefore, denies said allegations.

30.     Each mortgage loan Freedom purchased was subject to Burnham's agreements concerning its business practices and fulfillment of certain conditions precedent including, but not limited to, Burnham's warranties and representations in the Agreement.

**ANSWER**:     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 30 and, therefore, denies said allegations.

31.     Burnham made the following agreements, covenants, representations and warranties to Freedom to induce Freedom to purchase each of the nine mortgage loans at issue:

      a.     Burnham shall be the originator of all loans offered for purchase under the Agreement and Burnham shall obtain appraisal, credit and other documentation required by Freedom for each Mortgage Loan for which an individual borrower has authorized Burnham to provide financing.

      b.     Burnham warrants that none of the statements or information contained in any loan package will contain any untrue or erroneous statements or admissions of material fact which would in any way affect Freedom's loan application review and approval and that Burnham warrants the accuracy of all information contained in any loan package submitted to Freedom.

      c.     Burnham warrants that unless disclosed to Freedom in writing for the funding of any loan, Burnham shall not receive any direct or indirect payment from any third party with respect to the loan, including without limitation, payment involving escrow, appraisal or sale and Burnham shall have no direct or indirect ownership in any property acting as security for the loan being reviewed by Freedom for purposes of purchase.

      d.     Burnham warrants that all real estate appraisals made in connection with each loan shall have been performed in

accordance with Freedom's underwriting guidelines and with industry standards in the appraising industry.

e. Burnham warrants that all loan applications submitted to Freedom will be originated and prepared by trained, licensed as necessary employees of Burnham, competent in all aspects of mortgage lending activities and will be properly originated, prepared and completed in accordance with the procedures and guidelines of Freedom.

f. Burnham warrants that Burnham shall not accept any undisclosed fees for Burnham's services, appraisal services or compensation as a participant, either directly or indirectly in a loan transaction submitted to Freedom.

**ANSWER**: Ticor is without knowledge as to the truth or falsity of the allegations contained within paragraph 31 and, therefore, denies said allegations. .

32. Pursuant to paragraph 4 of the Agreement, Burnham also represented that it would indemnify and hold Freedom harmless with regard to any and all loss, damage, liability, cost and expense, including reasonable attorneys' fees incurred by reason of or arising out of or in connection with any breach of any representation or warranty contained in the Agreement or Burnham's failure to perform any obligation under the Agreement, with said indemnity including all repurchase demands of any third parties to which Freedom had sold any loans.

**ANSWER**: Ticor is without knowledge as to the truth or falsity of the allegations contained within paragraph 32 and, therefore, denies said allegations.

33. Pursuant to paragraph 6 of the Agreement, Burnham agreed that, upon written request, it would repurchase from Freedom any loan that was not in compliance with Burnham's warranties contained therein, with the purchase price equal to the unpaid principal balance of the loan, including accrued but unpaid interest due Freedom on the date of repurchase, premiums paid for any loan advances owing, foreclosure costs, and any other costs including reasonable attorneys' fees incurred by Freedom regarding the repurchase.

**ANSWER**: Ticor is without knowledge as to the truth or falsity of the allegations contained within paragraph 33 and, therefore, denies said allegations.

34.     Burnham was obligated to repurchase nine of the loans at issue due to, among other things: (1) Burnham's submission to Freedom of false and/or negligently inflated appraisals on the mortgaged property which served as security for the loans; (2) Burnham's submission of loan packages to Freedom with fictitious employment, income and asset information for the borrowers; and (3) Burnham's failure to confirm the source of cash payments at settlement made by borrowers, where such cash payments were excessive in light of the borrowers' income and assets.

**ANSWER**:     Ticor is without knowledge as to the truth or falsity of the allegations

contained within paragraph 34 and, therefore, denies said allegations.

35.     As more fully set forth herein, Burnham's breach of its obligations under the Agreement was part of a mortgage fraud scheme to fraudulently induce Freedom to purchase residential mortgage loans at greatly inflated prices.

**ANSWER**:     Ticor is without knowledge as to the truth or falsity of the allegations

contained within paragraph 35 and, therefore, denies said allegations.

36.     Judge Filip "concluded that, as a matter of Illinois law, even though only Freedom and the buyers were parties to the foreclosures, Freedom cannot recover damages from any third party by contending that the property was worth less than the amount of the credit bid." *Freedom Mortg. Corp. v. Burnham Mortg., Inc.*, 569 F.3d 667,670 (7th Cir. 2009). "Freedom is stuck with the value of its credit bids. But this does not eliminate damages. Deficiency judgments remain, and the non-borrower defendants cannot shelter behind the clause in these judgments precluding collection from the borrowers.. .Nothing in the rule that a credit bid establishes the collateral's value blocks any of these remedies." *Id*. at 672. Moreover, "[w]rongly believing that Freedom's claim was entirely blocked by the very fact of the credit bids, the district court did not tackle" several issues relating to the insurer's liability to Freedom under the contracts. *Id*. "We cannot imagine any argument for allowing a separate action on a guaranty, while precluding a separate action against people who induced the loan through fraud." *Id*. "[A]s a matter of Illinois law, a lender may sue a guarantor separately, [so] why not a mortgage broker, title insurer, appraiser, or other potentially liable entity." *Id*. at 671.

**ANSWER:**     In that paragraph 36 purports to be a statement of law, no answer is

necessary or required.

## THE SCHEME

37.     Mortgage fraud schemes involve mortgage brokers, real estate appraisers and title companies, among others. The brokers, sometimes known as "flippers," search for houses at bargain basement prices. As the flippers search for houses, they also troll for first-time homebuyers or aspiring landlords (hereinafter collectively referred to as "borrowers").

**ANSWER:** In that paragraph 37 is one of argument and non-factual background, no answer is necessary or required.

38.     The borrowers and sellers, including Bat, Butar, Rymarz, Florkiewicz, Spann and Adams, would purchase the houses and engage in a practice of selling the properties to one another over a short period of time for highly inflated values.

**ANSWER:** Ticor is without knowledge of the allegations contained in paragraph 38 and, therefore, denies said allegations and demands strict proof thereof.

39.     Through the use of fake, borrowed, stolen or counterfeit identification documents, borrowers and sellers of the real estate properties identified herein may actually have been the same person or persons.

**ANSWER:** Ticor is without knowledge of the allegations contained in paragraph 39 and, therefore, denies said allegations and demands strict proof thereof.

40.     Burnham then prepared documents that typically involved submissions to Freedom of loan packages that included false documentation designed to make the deal appear legitimate and the borrowers creditworthy. These records inflated the borrowers' cash at settlement payment, income and assets. Each of the transactions involved purported cash at settlement made by borrowers well in excess of the borrowers' stated income and assets, that were either not made by the borrowers or were made with the lender's or the broker's funds, despite settlements representing that the cash came from the borrower.

**ANSWER:** Ticor is without knowledge of the allegations contained in paragraph 40 and, therefore, denies said allegations and demands strict proof thereof.

41.     Freedom will not provide a mortgage to finance the purchase of real estate unless an appraiser has prepared an appraisal wherein the appraiser values the house at or above the purchase price.

**ANSWER:**     Ticor is without knowledge of the allegations contained in paragraph 41 and, therefore, denies said allegations and demands strict proof thereof.

42.     Burnham led Freedom to believe that it contracted with and hired appraisers who had appraised the properties at issue in an amount that would cover a loan to value ratio of between 60% and 90% of the purchase price. However, unbeknownst to Freedom, the appraisals of the properties at issue were knowingly and intentionally falsified so that the loans to value ratios were well in excess of 100% of the actual property values.

**ANSWER:**     Ticor is without knowledge of truth or falsity of the allegations contained in paragraph 42 and, therefore, denies said allegations and demands strict proof thereof.

43.     Burnham, in conjunction with the borrowers and sellers, schemed with appraisers, specifically, MVA, Jordan, Burks and Brisker, to issue fraudulent appraisals of the properties. MVA, Jordan, Burks and Brisker issued written appraisal reports which appraised the properties at values far in excess of their market values.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 43 and, therefore, denies said allegations and demands strict proof thereof.

44.     Burnham, in conjunction with the borrowers, sellers and appraisers, fraudulently and/or negligently induced Freedom to purchase mortgage loans that greatly exceeded the value of the underlying property. Burnham, the borrowers, sellers and appraisers used falsified documents and false information to obtain mortgage loans for the buyers. Burnham, the borrowers and the sellers supplied some of the borrowers with fictitious employment, income, asset and personal information, so that the borrowers appeared to qualify for the mortgages.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 44 and, therefore, denies said allegations and demands strict proof thereof.

45.     Burnham also submitted mortgage loan packages to Freedom which included false or inaccurate information from the title companies and Hlava, regarding the borrowers' purported cash at settlement payments at closing, where such cash at settlement payments were in excess of what the borrowers' income and assets revealed they could pay.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 45 and, therefore, denies said allegations and demands strict proof thereof.

46.     Burnham and the borrowers and sellers submitted inflated appraisals so the properties could be sold for more than the properties were worth and secure mortgages for more than the properties' value.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 46 and, therefore, denies said allegations and demands strict proof thereof.

47.     Prior to the loans closing, Burnham advised Hlava, Ticor and Exeter of the documents needed to settle the loans and the terms that would have to appear on the settlement statements to make the settlement statements appear as if a bona fide transaction was conducted based on the inflated appraisal value of the properties, including a false cash at settlement payment.

**ANSWER:**   To the extent that the allegations contained in paragraph 47 are directed against other parties, no answer is necessary or required.  To the extent that the allegations contained in paragraph 47 are directed against Ticor, Ticor denies the allegations.

48.     Hlava, Ticor and Exeter participated in the scheme by preparing and submitting settlement statements that reflected cash at settlement payments made by borrowers when, in fact, such borrowers made no such cash at settlement payments and/or the funds were taken from the lender's funds. Hlava, Ticor and Exeter knew of the fraudulent scheme because they were experienced in real estate transactions in Chicago, Illinois; knew that the values assigned to the properties could not be true; knew that the borrowers' cash at settlement payments were either not produced by the buyers or were questionable; failed to notify Freedom of prior titles not being of record or of being recorded on the same day as subsequent sales; failed to comply with Freedom's closing instructions, failed to obtain original signatures on all closing documents; failed to provide Freedom powers of attorney prior to the closing of the herein referenced properties and disbursed funds to persons or entities in a manner that violated applicable standards of care in the industry.

**ANSWER:**   To the extent that the allegations contained in paragraph 47 are directed against other parties, no answer is necessary or required.  To the extent that the allegations contained in paragraph 48 are directed against Ticor, Ticor denies the allegations.

49.     The settlement statements certified that it was a true and accurate account of the funds which were received and have been or will be disbursed by a representative of Exeter as part of the settlement of the real estate transaction.

**ANSWER:**   Ticor is without knowledge as to the truth or falsity of the allegations contained within paragraph 49 and, therefore, denies said allegations.

50.     Contrary to the settlement statements, the only funds actually available at settlement were those provided by Freedom under the first lien purchase money loan.

**ANSWER:**   Ticor is without knowledge as to the truth or falsity of the allegations contained within paragraph 50 and, therefore, denies said allegations.

51.     Burnham retained Exeter and Hlava (who was a Vice President of Exeter) (collectively "Exeter/Hlava") to perform the title searches and loan closing functions on the nine mortgage loan transactions at issue.

**ANSWER:**   Ticor is without knowledge as to the truth or falsity of the allegations contained within paragraph 51 and, therefore, denies said allegations.

52.     Exeter/Hlava had actual or constructive knowledge through public loan records about the prior sale prices of the properties in question and that the properties were being sold and mortgaged for highly inflated values.

**ANSWER:**   Ticor is without knowledge as to the truth or falsity of the allegations contained within paragraph 52 and, therefore, denies said allegations.

53.     Exeter had actual knowledge that its Vice President, Hlava, prepared the deeds and represented each of the respective sellers in the loan transactions at issue, and that he collected a fee for doing so.

**ANSWER:**   Ticor is without knowledge as to the truth or falsity of the allegations contained within paragraph 53 and, therefore, denies said allegations.

54.     Exeter knew or should have known that Hlava had a conflict of interest in representing sellers of properties where the sale prices were highly inflated while at the same time exposing his principal, Exeter, to risk for issuing marked-up title reports, title insurance binders and closing documents on conveyances and mortgages for properties with falsely inflated prices.

**ANSWER:**   Ticor is without knowledge as to the truth or falsity of the allegations contained within paragraph 54 and, therefore, denies said allegations.

55.     In addition, Hlava also participated in the scheme by representing as an attorney each of the sellers of the properties.

**ANSWER:**   Ticor is without knowledge as to the truth or falsity of the allegations contained within paragraph 55 and, therefore, denies said allegations.

56.     Ticor provided title insurance and a Closing Protection Letter (the "Closing Protection Letter"). The Letter is attached and incorporated herein as Exhibit B.

**ANSWER:**   Ticor admits the allegations contained within paragraph 56.

57.     Ticor agreed to reimburse the lessee or purchaser of an interest in land or a lender secured by a mortgage of an interest in land for all actual loss incurred in connection with closings conducted by title companies when the loss arose out of:

> 1.     Failure of the Issuing Agent or Approved Attorney to comply with your written closing instructions to the extent that they relate to (a) the status of the title to said interest in land or validity, enforceability and priority of the lien of said mortgage on said interest in land, including the obtaining of documents and the disbursement of funds necessary to establish such status of title or lien, or (b) the obtaining of any other document specifically required by you, but not to the extent that said instructions require a determination of the validity, enforceability or effectiveness of such other document, or (c) the collection and payment of funds due you, or

      2.      Negligence of the Issuing Agent or Approved Attorney in handling your funds or documents in connection with such closings.

**ANSWER:** Ticor admits that Freedom partially included language from the Closing Protection Letter. Ticor denies that Freedom fully included all relevant language from the Closing Protection Letter. Ticor denies the remaining allegations contained in paragraph 57.

58.    The Closing Protection Letter applies to Freedom because Freedom is a lender secured by a mortgage of an interest of land.

**ANSWER:** Ticor admits that the closing protection letter was provided to Freedom. Ticor denies the remaining allegations contained in paragraph 58.

59.    As a direct and proximate result of the aforesaid scheme, Freedom purchased loans in amounts that were well over 100% of the fair market value of the mortgaged property involved, while certain defendants earned fees and profits.

**ANSWER:** Ticor is without knowledge as to the truth or falsity of the allegations contained within paragraph 59 and, therefore, denies said allegations.

60.    On or about August 12, 2002 and June 14, 2004 pursuant to the Closing Protection Letter, Freedom made written demands on Ticor to indemnify Freedom for the loss it sustained, true and correct copies of which are attached hereto as collective Exhibit C.

**ANSWER:** Ticor admits that Freedom tendered the correspondence attached to the complaint as Exhibit C to Ticor. Ticor denies the remaining allegations contained in paragraph 60. Further answering, the above-referenced letters contain no demands relevant to 4112 W. Potomac or 7953 S. Escanaba.

61.     On or about November 14, 2002, Ticor sent Freedom a letter in which it refused to indemnify Freedom for its losses, a true and correct copy of which is attached hereto as Exhibit D.

**ANSWER:**     Ticor admits that the correspondence attached to Exhibit D was

sent by Ticor to Freedom.  Ticor denies the remaining allegations contained in paragraph

61.

## 735 NORTH SPRINGFIELD LOAN TRANSACTION

62.     On or about July 25, 2001, Spann purchased property known as 735 North Springfield, Chicago, Illinois (the "Springfield Property") for $40,000.00.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations

contained in paragraph 62 and, therefore, denies said allegations.

63.     Five days later, on July 30, 2001, Spann sold the Springfield Property to Butar for $120,000.00.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations

contained in paragraph 63 and, therefore, denies said allegations.

64.     Less than two months later, on or about September 8, 2001, Burnham submitted a loan application package to Freedom from Bat to finance the purchase of the Springfield Property. A true and correct copy of the Springfield Property Loan Application is attached hereto as Exhibit E.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations

contained in paragraph 64 and, therefore, denies said allegations.

65.     Bat misrepresented financial and other information on the loan application.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 65 and, therefore, denies said allegations.

66.     Burnham retained the services of Burks, an Illinois licensed appraiser.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 66 and, therefore, denies said allegations.

67.     On August 27, 2001, Burks appraised the property at $270,000.00.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 67 and, therefore, denies said allegations.

68.     Burnham knew that Freedom would rely upon the appraisal to make a mortgage loan and that the assignees of the loan would rely on the appraisal.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 68 and, therefore, denies said allegations.

69.     On October 22, 2001, Freedom loaned Bat $243,000.00 in reliance on the appraisal and Bat's ability to pay the cash required at settlement.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 69 and, therefore, denies said allegations.

70.     Hlava represented Butar in the sale of the property.

**ANSWER:** Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 70 and, therefore, denies said allegations.

71. Hlava also acted as Exeter's Vice President at the closing of the Springfield Property. Hlava/Exeter and other unknown persons prepared a false settlement statement and/or were negligent in handling funds and preparing the settlement statement and related real estate closing documents on the Springfield Property.

**ANSWER:** Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 71 and, therefore, denies said allegations.

72. Pursuant to the Closing Protection Letter, Ticor agreed to indemnify Freedom for any loss or damages sustained from the negligence of Hlava, Exeter and other unknown persons in connection with the real estate closing.

**ANSWER:** Ticor denies the allegations contained within paragraph 72.

73. On or about December 7, 2001, Freedom sold the mortgage loan to DLJ Mortgage Capital Inc.

**ANSWER:** Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 73 and, therefore, denies said allegations.

74. Bat defaulted on the loan and on or about July 11, 2002, DLJ Mortgage Capital Inc., demanded Freedom repurchase the loan.

**ANSWER:** Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 74 and, therefore, denies said allegations.

75. Freedom was required to repurchase the loan pursuant to a repurchase agreement for $268,803.33 which was paid in installments between November 2002 and November 2003.

**ANSWER:** Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 75 and, therefore, denies said allegations.

76.     The property was appraised on April 9, 2002 and found to be worth only approximately $175,000.

**ANSWER:** Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 76 and, therefore, denies said allegations.

77.     Burks' appraisal was intentionally defective and not performed in accordance with industry standards in Chicago in that the comparable properties used by Burks were incorrect, that prior sales of comparable properties at lower prices had not been disclosed as they should have been, and that Burks grossly exaggerated and fraudulently misrepresented the property's value.

**ANSWER:** Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 77 and, therefore, denies said allegations.

78.     By submitting a loan package to Freedom that contained a defective appraisal of the property and false and inaccurate information regarding Bat, Burnham breached the warranties granted Freedom pursuant to the Agreement.

**ANSWER:** Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 78 and, therefore, denies said allegations.

79.     At the closing, Hlava, Ticor and Exeter and other unknown persons prepared and submitted settlement statements that reflected settlement cash payments made by Bat when, in fact, Bat made no such cash payment or the funds were taken from Freedom's funds, failed to comply with Freedom's closing instructions and disbursed Freedom's funds to persons and/or entities in a manner that violated the standard or care in the industry. A true and correct copy of the Springfield Property Settlement Statement is attached hereto as Exhibit F.

**ANSWER:** To the extent that the allegations contained in paragraph 79 are directed at parties other that Ticor, Ticor is without knowledge as to the truth or falsity of the allegations

and, therefore, denies said allegations.  To the extent that the allegations contained in paragraph 79 are directed at Ticor, Ticor denies said allegations.

80.     On or about August 7, 2002, pursuant to the Agreement, Freedom made a written demand upon Burnham to purchase the loan or otherwise indemnify Freedom. Burnham refused.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 80 and, therefore, denies said allegations.

81.     On or about August 12, 2002, pursuant to the Closing Protection Letter, Freedom made a written demand on Ticor to indemnify Freedom for the loss or damages sustained. Ticor refused.

**ANSWER:**     Ticor repeats its answer to paragraph 60 regarding the correspondence between Freedom and Ticor.  Ticor denies the remaining allegations contained in paragraph 81.

82.     The total due under the loan to Bat for the Springfield Property was $273,089.18.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 82 and, therefore, denies said allegations.

83.     On or about April 3, 2003, the Springfield Property was sold at a foreclosure sale with a bid of $133,700.00.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 83 and, therefore, denies said allegations.

84.     The costs of sale were approximately $9,664.71.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 84 and, therefore, denies said allegations.

## 708 NORTH DRAKE STREET LOAN TRANSACTION

85.     On or about May 10, 2001, Butar purchased property known as 708 North Drake, Chicago, Illinois (the "Drake Property") for $81,500.00.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 85 and, therefore, denies said allegations.

86.     Four months later, on or about September 15, 2001, Burnham submitted a mortgage loan application package to Freedom from Bat to finance the purchase of the Drake Property from Butar. A true and correct copy of the Drake Property Loan Application is attached hereto as Exhibit G.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 86 and, therefore, denies said allegations.

87.     Bat misrepresented financial and other information on the loan application.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 87 and, therefore, denies said allegations.

88.     Burnham retained the services of Burks, who appraised the property at $270,000.00 on August 27, 2001.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 88 and, therefore, denies said allegations.

89.     Burnham knew that Freedom would rely upon the appraisal to make a mortgage loan and would be relied upon by assignees of those loans.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 89 and, therefore, denies said allegations.

90.     On October 22, 2001, Freedom made the loan to Bat in reliance upon the appraisal and Bat's ability to make the required cash at settlement payment.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 90 and, therefore, denies said allegations.

91.     In reasonable reliance on Burks' appraisal of the Drake Property, Freedom funded a loan for $243,000.00 to Bat.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 91 and, therefore, denies said allegations.

92.     Hlava represented Butar in the sale of the property.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 92 and, therefore, denies said allegations.

93.     Hlava also acted as Exeter's Vice President at the closing of the Drake Property. Hlava/Exeter and other unknown persons prepared a false settlement statement and/or were negligent in handling funds and preparing the settlement statement and related real estate closing documents.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 93 and, therefore, denies said allegations.

94.     Pursuant to the Closing Protection Letter, Ticor agreed to indemnify Freedom for any loss or damages sustained from the negligence of Hlava and/or Exeter and other unknown persons in connection with the real estate closing on the Drake Property.

**ANSWER:**     Ticor denies the allegations contained in paragraph 94.

95.     On or about January 4, 2002, Freedom sold the mortgage loan to DLJ Mortgage Capital, Inc.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 95 and, therefore, denies said allegations.

96.     Bat defaulted on the loan and on or about June 11, 2002, DLJ Mortgage Capital, Inc. demanded that Freedom repurchase the loan.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 96 and, therefore, denies said allegations.

97.     Freedom was required to repurchase the loan pursuant to a repurchase agreement for $269,052.14 which was paid in installments between November 2002 and November 2003.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 97 and, therefore, denies said allegations.

98.     A subsequent review appraisal performed on July 1, 2002 revealed that the actual fair market value of the Drake Property was only approximately $169,000.00, and that Burks' appraisal was defective, had not been performed in accordance with industry standards in Chicago, that the comparables used by Burks were incorrect, prior sales of comparable properties at lower prices had not been disclosed as they should have been, and that Burks grossly exaggerated the overall value of the Drake Property.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 98 and, therefore, denies said allegations.

99.     By submitting a loan package to Freedom that contained a defective appraisal of the Drake Property and false and/or inaccurate information regarding Bat, Burnham breached its aforesaid warranties to Freedom.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 99 and, therefore, denies said allegations.

100.     At the closing, Hlava, Ticor and Exeter and other unknown persons prepared and submitted settlement statements that reflected settlement cash payments made by Bat when, in fact, Bat made no such cash payment or the funds were taken from Freedom's funds, failed to comply with Freedom's closing instructions and disbursed Freedom's funds to persons and/or entities in a manner that violated the standard or care in the industry. A true and correct copy of the Drake Property Settlement Statement is attached hereto as Exhibit H.

**ANSWER:**     To the extent that the allegations contained in paragraph 100 are directed at parties other that Ticor, Ticor is without knowledge as to the truth or falsity of the allegations and, therefore, denies said allegations.  To the extent that the allegations contained in paragraph 100 are directed at Ticor, Ticor denies said allegations.

101.     On or about August 7, 2002, Freedom made a written demand on Burnham, pursuant to the Agreement, to purchase this loan or otherwise indemnify Freedom. Burnham refused.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 101 and, therefore, denies said allegations.

102.     On or about August 12, 2002, pursuant to the Closing Protection Letter, Freedom made a written demand on Ticor to indemnify Freedom for the loss or damages sustained. Ticor refused.

**ANSWER:**     Ticor repeats its answer to paragraph 60 regarding the correspondence between Freedom and Ticor.  Ticor denies the remaining allegations contained in paragraph 102.

103.    The total due under the loan to Bat for the Drake Property was $290,304.86.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 103 and, therefore, denies said allegations.

104.    On or about April 6, 2003, the Drake Property was sold at a foreclosure sale with a bid of $290,304.86.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 104 and, therefore, denies said allegations.

105.    The costs of sale on the Drake property was $13,868.69.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 105 and, therefore, denies said allegations.

106.    Freedom received $1,960.00 in title indemnity refunds on the Drake Property.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 106 and, therefore, denies said allegations.

## 728 NORTH HAMLIN STREET LOAN TRANSACTION

107.    On or about March 21, 2001, Bat purchased property known as 728 North Hamlin Street, Chicago, Illinois (the "Hamlin Property") for $40,000.00.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 107 and, therefore, denies said allegations.

108.    Less than five months later, on August 16, 2001, Bat sold the Hamlin Property to Butar for $70,000.00.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 108 and, therefore, denies said allegations.

109.    One month later, on or about September 20, 2001, Burnham submitted a loan application package to Freedom from Bat to finance the purchase of the Hamlin Property. A true and correct copy of the Hamlin Property Loan Application is attached hereto as Exhibit I.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 109 and, therefore, denies said allegations.

110.    Bat misrepresented financial and other information on the loan application.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 110 and, therefore, denies said allegations.

111.    Burnham retained the services of Burks who appraised the Hamlin Property at $270,000.00 on August 27, 2001.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 111 and, therefore, denies said allegations.

112.    Burnham knew or should have known that Freedom would rely upon the appraisal to make a loan to Bat and would be relied upon by assignees of those loans.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 112 and, therefore, denies said allegations.

113.    On or about November 1, 2001, Freedom made a loan to Bat in reliance upon the appraisal and Bat's ability to make the required cash at settlement payment.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 113 and, therefore, denies said allegations.


114.    In reasonable reliance on the aforesaid appraisal, Freedom funded a mortgage loan to Bat for $243,000.00.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 114 and, therefore, denies said allegations.


115.    Hlava represented Butar in the sale of the property.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 115 and, therefore, denies said allegations.


116.    Hlava also acted as Exeter's Vice President at the closing of the Hamlin Property. Hlava/Exeter and other unknown persons prepared a false settlement statement and/or were negligent in handling funds and preparing the settlement statement and related real estate closing documents.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 116 and, therefore, denies said allegations.


117.    Pursuant to the Closing Protection Letter, Ticor agreed to indemnify Freedom for any loss or damages sustained from the negligence of Hlava, Exeter and other unknown persons in connection with the real estate closing on the Hamlin Property.

**ANSWER:**    Ticor denies the allegations contained in paragraph 117.

118.    On December 14, 2001, Freedom sold the mortgage loan to DLJ Mortgage Capital, Inc.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 118 and, therefore, denies said allegations.

119.    Bat defaulted on the loan and on or about June 11, 2002, DLJ Mortgage Capital, Inc., demanded Freedom repurchase the loan.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 119 and, therefore, denies said allegations.

120.    Freedom was required to repurchase the loan pursuant to a repurchase agreement for $268,999.86 which was paid in installments between November 2002 and November 2003.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 120 and, therefore, denies said allegations.

121.    A subsequent review appraisal performed on July 1, 2002 indicated the actual fair market value of the property was only $ 148,000.00, and that Burks appraisal was defective and had not been performed in accordance with industry standards in Chicago, that the comparables Burks used were incorrect, prior sales of comparable properties at lower prices had not been disclosed as they should have been, and that Burks grossly exaggerated the overall value of the property.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 121 and, therefore, denies said allegations.

122.    By submitting a loan package to Freedom that contained a defective appraisal of the property and false and/or inaccurate information regarding the borrower, Burnham breached its aforesaid warranties to Freedom pursuant to the Agreement.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 122 and, therefore, denies said allegations.

123.    At the closing, Hlava, Ticor and Exeter and other unknown persons prepared and submitted settlement statements that reflected settlement cash payments made by Bat when, in fact, Bat made no such cash payment or the funds were taken from Freedom's funds, allowed Bat to executed the Settlement Statement on behalf of Butar, failed to comply with Freedom's closing instructions and disbursed Freedom's funds to persons and/or entities in a manner that violated the standard or care in the industry. A true and correct copy of the Hamlin Property Settlement Statement is attached hereto as Exhibit J.

**ANSWER:**    To the extent that the allegations contained in paragraph 123 are directed at parties other that Ticor, Ticor is without knowledge as to the truth or falsity of the allegations and, therefore, denies said allegations.  To the extent that the allegations contained in paragraph 123 are directed at Ticor, Ticor denies said allegations.

124.    On or about August 7, 2002, Freedom made a written demand, pursuant to the Agreement, to Burnham for Burnham to purchase the loan or otherwise indemnify Freedom. Burnham refused.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 124 and, therefore, denies said allegations.

125.     On or about August 12, 2002, pursuant to the Closing Protection Letter, Freedom made a written demand on Ticor to indemnify Freedom for the loss or damages sustained. Ticor refused.

**ANSWER:**     Ticor repeats its answer to paragraph 60 regarding the correspondence between Freedom and Ticor.  Ticor denies the remaining allegations contained in paragraph 125.

.

126.     The total due under the loan to Bat for the Hamlin Property was $284,445.65.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 126 and, therefore, denies said allegations.

127.     On or about July 23, 2003, the Hamlin Property was sold at a foreclosure sale with a credit bid of $284,445.65.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 127 and, therefore, denies said allegations.

128.     The costs of sale were $9,077.87.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 128 and, therefore, denies said allegations.

129.     Freedom received $2,791.73 in title indemnity refunds on the Hamlin Property.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 129 and, therefore, denies said allegations.

## 419 NORTH DRAKE STREET LOAN TRANSACTION

130.    In 2001, Bobrowski purchased property located at 419 North Drake Street, Chicago, Illinois (the "Drake2 Property") for $40,000.00.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 130 and, therefore, denies said allegations.

131.    Shortly after purchasing the Drake2 Property, Bobrowski sold the Drake2 Property to Uloszonekic for $59,500.00.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 131 and, therefore, denies said allegations.

132.    On or about December 4, 2001, Burnham submitted a mortgage loan application package to Freedom from Rymarz, to finance the purchase of the Drake2 Property. A true and correct copy of the Drake2 Property Loan Application is attached hereto as Exhibit K.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 132 and, therefore, denies said allegations.

133.    Rymarz misrepresented financial and other information on the loan application.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 133 and, therefore, denies said allegations.

134.    Burnham retained the services of an Illinois licensed appraiser, Brisker, who appraised the property at $291,000.00 on November 15, 2001.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 134 and, therefore, denies said allegations.

135.     Burnham knew or should have known that Freedom would rely on the appraisal to make a mortgage loan and would be relied upon by assignees of the loan. Freedom made the loan in reliance on the appraisal and Rymarz's ability to make the required cash at settlement payment.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 135 and, therefore, denies said allegations.

136.     In reasonable reliance on Brisker's appraisal, on or about December 27, 2001 Freedom funded a mortgage loan to Rymarz for $237,600.00.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 136 and, therefore, denies said allegations.

137.     Hlava represented Uloszonekic in the sale of the property.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 137 and, therefore, denies said allegations.

138.     Hlava also acted as Exeter's Vice President at the closing of the Drake2 Property. Hlava/Exeter and other unknown persons prepared a false settlement statement and/or were negligent in handling funds and preparing the settlement statement and related real estate closing documents.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 138 and, therefore, denies said allegations.

139.     Pursuant to the Closing Protection Letter, Ticor agreed to indemnify Freedom for any loss or damages sustained from the negligence of Hlava, Exeter and other unknown persons in connection with the real estate closing of the Drake2 Property.

**ANSWER:**     Ticor denies the allegations contained in paragraph 139.

140.     On or about February 8, 2002, Freedom sold the mortgage loan to DLJ Mortgage Capital, Inc.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 140 and, therefore, denies said allegations.

141.     Rymarz defaulted on the loan and on or about June 20, 2002, DLJ Mortgage Capital, Inc., demanded that Freedom repurchase the loan.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 141 and, therefore, denies said allegations.

142.     Freedom was required to repurchase the loan pursuant to a repurchase agreement for $261,561.41 which was paid in installments between November 2002 and November 2003.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 142 and, therefore, denies said allegations.

143.     A subsequent review appraisal performed on July 1, 2002 indicated the actual fair market value of the property was only approximately $160,000.00 and that Brisker's appraisal was defective, had not been performed in accordance with industry standards in Chicago, that the comparables used by Brisker were incorrect, prior sales of comparable properties at lower prices had not been disclosed as they should have been, and that Brisker had grossly exaggerated the overall value of the property.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 143 and, therefore, denies said allegations.

144.    Burnham breached its warranties to Freedom under the Agreement by submitting a loan package to Freedom that contained a defective appraisal of the property and false and/or inaccurate information regarding Rymarz.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 144 and, therefore, denies said allegations.

145.    At the closing, Hlava, Ticor and Exeter and other unknown persons prepared and submitted settlement statements that reflected settlement cash payments made by Rymarz when, in fact, Rymarz made no such cash payment or the funds were taken from Freedom's funds, failed to comply with Freedom's closing instructions and disbursed Freedom's funds to persons and/or entities in a manner that violated the standard or care in the industry. A true and correct copy of the Drake2 Property Settlement Statement is attached hereto as Exhibit L.

**ANSWER:**    To the extent that the allegations contained in paragraph 145 are directed at parties other that Ticor, Ticor is without knowledge as to the truth or falsity of the allegations and, therefore, denies said allegations.  To the extent that the allegations contained in paragraph 145 are directed at Ticor, Ticor denies said allegations.

146.    On or about August 7, 2002, pursuant to the Agreement, Freedom made a written demand on Burnham to purchase the loan or otherwise indemnify Freedom. Burnham refused.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 146 and, therefore, denies said allegations.

147.    On or about August 12, 2002, pursuant to the Closing Protection Letter, Freedom made a written demand on Ticor to indemnify Freedom for the loss or damages sustained. Ticor refused.

**ANSWER:**    Ticor repeats its answer to paragraph 60 regarding the correspondence between Freedom and Ticor.  Ticor denies the remaining allegations contained in paragraph 147.

148.     The total due under the loan to Bat for the Drake2 Property was $268,057.07.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 148 and, therefore, denies said allegations.

149.     On or about April 8, 2003, the Drake2 Property was sold at a foreclosure sale with a bid of $139,121.50.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 149 and, therefore, denies said allegations.

150.     The costs of sale on the Drake2 Property was $ 16,992.00.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 150 and, therefore, denies said allegations.

## 4112 WEST POTOMAC STREET LOAN TRANSACTION

151.     On or about May 31, 2000, Piotr purchased property located at 4112 West Potomac Street for $32,000.00 (the "Potomac Property").

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 151 and, therefore, denies said allegations.

152.     Less than five months later, on August 23, 2000, Piotr sold the Potomac Property to Odrzywolska for $192,000.00.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 152 and, therefore, denies said allegations.

153.    On or about January 9, 2002, Burnham submitted a mortgage loan application to Freedom from Rymarz concerning the Potomac Property. A true and correct copy of the Potomac Property Loan Application is attached hereto as Exhibit M.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 153 and, therefore, denies said allegations.

154.    Rymarz misrepresented financial and other information on the loan application.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 154 and, therefore, denies said allegations.

155.    Burnham retained the services of Brisker who appraised the property at $339,000.00 on January 20, 2002.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 155 and, therefore, denies said allegations.

156.    Burnham knew or should have known that Freedom would rely upon the appraisal to make a mortgage loan and would be relied upon by assignees of the loan.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 156 and, therefore, denies said allegations.

157.    Freedom made the loan in reliance on the appraisal and Rymarz's ability to make the required cash at settlement payment.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 157 and, therefore, denies said allegations.

158.     On or about February 15, 2002, in reasonable reliance on the appraisal, Freedom funded a mortgage loan for $271, 200.00 to Rymarz.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 158 and, therefore, denies said allegations.


159.     Hlava represented Odrzywolska in the sale of the property.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 159 and, therefore, denies said allegations.


160.     Hlava also acted as Exeter's Vice President at the closing of the Potomac Property.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 160 and, therefore, denies said allegations.


161.     Hlava/Exeter and other unknown persons prepared a false settlement statement and/or were negligent in handling funds and preparing the settlement statement and related real estate closing documents.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 161 and, therefore, denies said allegations.


162.     Pursuant to the Closing Protection Letter, Ticor agreed to indemnify Freedom for any loss or damages sustained from the negligence of Hlava, Exeter and other unknown persons in connection with the real estate closing.

**ANSWER:**     Ticor denies the allegations contained in paragraph 162.


163.     On or about April 26, 2002, Freedom sold the mortgage loan to DLJ Mortgage Capital, Inc.

**ANSWER:** Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 163 and, therefore, denies said allegations.


164.    Rymarz defaulted on the loan and on or about September 10, 2002, DLJ Mortgage Capital, Inc. demanded Freedom repurchase the loan.

**ANSWER:** Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 164 and, therefore, denies said allegations.


165.    Freedom was required to repurchase the loan pursuant to a repurchase agreement for $294,632.59 which was paid in installments between November 2002 and November 2003.

**ANSWER:** Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 165 and, therefore, denies said allegations.


166.    A subsequent review appraisal performed on October 15, 2002 indicated that the actual fair market value of the property was only approximately $150,000.00 and that Brisker's appraisal was defective and had not been performed in accordance with industry standards in Chicago, that the comparables used by Brisker were incorrect, prior sales of comparable properties at lower prices had not been disclosed as they should have been, and that Brisker grossly exaggerated the overall value of the property.

**ANSWER:** Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 166 and, therefore, denies said allegations.


167.    Burnham breached its warranties to Freedom under the Agreement by submitting a loan package to Freedom that contained a defective appraisal of the Potomac Property and false and/or inaccurate information regarding Rymarz.

**ANSWER:** Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 167 and, therefore, denies said allegations.

168.    At the closing, Hlava, Ticor and Exeter and other unknown persons prepared and submitted settlement statements that reflected settlement cash payments made by Rymarz when, in fact, Rymarz made no such cash payment or the funds were taken from Freedom's funds, failed to comply with Freedom's closing instructions and disbursed Freedom's funds to persons and/or entities in a manner that violated the standard or care in the industry. A true and correct copy of the Potomac Property Settlement Statement is attached hereto as Exhibit N.

**ANSWER:**    To the extent that the allegations contained in paragraph 168 are directed at parties other that Ticor, Ticor is without knowledge as to the truth or falsity of the allegations and, therefore, denies said allegations.  To the extent that the allegations contained in paragraph 168 are directed at Ticor, Ticor denies said allegations.


169.    On or about August 7, 2002, pursuant to the Agreement, Freedom made a written demand on Burnham to purchase the loan or otherwise indemnify Freedom. Burnham refused.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 169 and, therefore, denies said allegations.


170.    On or about August 12, 2002, pursuant to the Closing Protection Letter, Freedom made a written demand on Ticor to indemnify Freedom for the loss or damages sustained. Ticor refused.

**ANSWER:**    Ticor repeats its answer to paragraph 60 regarding the correspondence between Freedom and Ticor.  Ticor denies the remaining allegations contained in paragraph 170.


171.    The total due under the loan to Rymarz for the Potomac Property was $312,457.33.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 171 and, therefore, denies said allegations.

172.    On or about April 15, 2003, the Potomac Property was sold at a foreclosure sale with a bid of $312,457.33.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 172 and, therefore, denies said allegations.

173.    The costs of sale on the Potomac Property was $14,502.53.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 173 and, therefore, denies said allegations.

174.    Freedom received $2, 2227.07 in title indemnity refunds on the Potomac Property.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 174 and, therefore, denies said allegations.

## 7953 SOUTH ESCANABA STREET LOAN TRANSACTION

175.    On or about May 17, 2001, Butar and Dobrowski purchased property located at 7953 South Escanaba Street in Chicago, Illinois (the "Escanaba Property") for $106,000.00.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 175 and, therefore, denies said allegations.

176.    On or about January 10, 2002, Burnham submitted a mortgage loan application package to Freedom from Florkiewicz concerning the Escanaba Property. A true and correct copy of the Escanaba Property Loan Application is attached hereto as Exhibit O.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 176 and, therefore, denies said allegations.

177. Florkiewicz misrepresented financial and other information on the loan application.

**ANSWER:** Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 177 and, therefore, denies said allegations.

178. Burnham retained the services of Burks who appraised the Escanaba property at $280,000.00 on October 10, 2001, in excess of 150% more than the sale price five months earlier.

**ANSWER:** Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 178 and, therefore, denies said allegations.

179. Burnham knew or should have known that Freedom would rely upon the appraisal to make a mortgage loan and would be relied upon by assignees of the loan.

**ANSWER:** Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 179 and, therefore, denies said allegations.

180. Freedom made the loan and relied upon the appraisal and the borrower's ability to make the required cash at settlement payment.

**ANSWER:** Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 180 and, therefore, denies said allegations.

181. On or about March 4, 2002, in reasonable reliance on the appraisal, Freedom funded a mortgage loan to Florkiewicz for $224,000.00.

**ANSWER:** Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 181 and, therefore, denies said allegations.

182.    Burnham breached its warranties to Freedom under the Agreement by submitting a loan package to Freedom that contained a defective appraisal of the Potomac Property, and false and/or inaccurate information regarding Florkiewicz.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 182 and, therefore, denies said allegations.

183.    Hlava represented Florkiewicz in the sale of the property.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 183 and, therefore, denies said allegations.

184.    Hlava also acted as Exeter's Vice President at the closing of the Escanaba Property. Hlava/Exeter and other unknown persons prepared a false settlement statement and/or were negligent in handling funds and preparing the settlement statement and related real estate closing documents.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 184 and, therefore, denies said allegations.

185.    On or about April 26, 2002, Freedom sold the mortgage loan to DLJ Mortgage Capital, Inc.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 185 and, therefore, denies said allegations.

186.    Florkiewicz defaulted on the loan and on or about September 10, 2002, DLJ Mortgage Capital, Inc. demanded Freedom repurchase the loan.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 186 and, therefore, denies said allegations.

187.    Freedom was required to repurchase the loan pursuant to a repurchase agreement for $243,354.36 which was paid in installments between November 2002 and November 2003.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 187 and, therefore, denies said allegations.

188.    A subsequent review appraisal performed on October 15, 2002 indicated the actual fair market value of the property was approximately $200,000.00, and that Burks appraisal was defective and had not been performed in accordance with industry standards in Chicago, that the comparables used by Burks were incorrect, prior sales of comparable properties at lower prices had not been disclosed as they should have been, and that Burks had grossly exaggerated the value of the property.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 188 and, therefore, denies said allegations.

189.    Burnham breached its warranties to Freedom under the Agreement by submitting a loan package to Freedom that contained a defective appraisal of the property and false and/or inaccurate information regarding the borrower.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 189 and, therefore, denies said allegations.

190.    At the closing, Hlava, Ticor and Exeter and other unknown persons prepared and submitted settlement statements that reflected settlement cash payments made by Florkiewicz when, in fact, Florkiewicz made no such cash payment or the funds were taken from Freedom's funds, failed to comply with Freedom's closing instructions and disbursed Freedom's funds to persons and/or entities in a manner that violated the standard or care in the industry. A true and correct copy of the Escanaba Property Settlement Statement is attached hereto as Exhibit P.

**ANSWER:**    To the extent that the allegations contained in paragraph 190 are directed at parties other that Ticor, Ticor is without knowledge as to the truth or falsity of the allegations and, therefore, denies said allegations.  To the extent that the allegations contained in paragraph 190 are directed at Ticor, Ticor denies said allegations.

191.    On or about August 7, 2002, Freedom made a written demand on Burnham pursuant to the Agreement, to purchase the loan or otherwise indemnify Freedom. Burnham refused.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 191 and, therefore, denies said allegations.

192.    On or about August 12, 2002, pursuant to the Closing Protection Letter, Freedom made a written demand on Ticor to indemnify Freedom for the loss or damages sustained. Ticor refused.

**ANSWER:**    Ticor repeats its answer to paragraph 60 regarding the correspondence between Freedom and Ticor.  Ticor denies the remaining allegations contained in paragraph 192.

193.    The total due under the loan to Florkiewicz for the Escanaba Property was $244,211.37.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 193 and, therefore, denies said allegations.

194.    The Escanaba Property was sold at a foreclosure sale with a bid of $143,500.00.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 194 and, therefore, denies said allegations.

195.    The costs of sale were $22,115.75.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 195 and, therefore, denies said allegations.

196.     Freedom received $6, 246.36 in title indemnity refunds on the Escanaba Property.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 196 and, therefore, denies said allegations.


## 536 WEST 61ST PLACE LOAN TRANSACTION

197.     On or about November 27, 2001, Pawlak purchased property located at 536 West 61st Place, Chicago, Illinois (the "61st Property") for $28,000.00.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 197 and, therefore, denies said allegations.


198.     On or about January 14, 2002, Burnham submitted a mortgage loan application package to Freedom from Florkiewicz concerning the 61st Property. A true and correct copy of the 61st Property Loan Application is attached hereto as Exhibit Q.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 198 and, therefore, denies said allegations.


199.     Florkiewicz misrepresented financial and other information on the loan application.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 199 and, therefore, denies said allegations.


200.     Burnham retained the services of an Illinois licensed appraiser, Jordan, who appraised the property at $135,000.00 on January 11, 2002.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 200 and, therefore, denies said allegations.

201.    Burnham knew or should have known that Freedom would rely upon the appraisal to make a mortgage loan and be relied upon by assignees of the loan.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 201 and, therefore, denies said allegations.


202.    Freedom made the loan in reliance on the appraisal and Florkiewicz's ability to make the required cash at settlement payment.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 202 and, therefore, denies said allegations.


203.    On February 12, 2002, in reasonable reliance on the aforesaid appraisal, Freedom funded a mortgage loan to Florkiewicz for $108,000.00.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 203 and, therefore, denies said allegations.


204.    Hlava represented Pawlak in the sale of the property.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 204 and, therefore, denies said allegations.


205.    Hlava also acted as Exeter's Vice President at the closing of the 61st Property. Hlava/Exeter and other unknown persons prepared a false settlement statement and/or were negligent in handling funds and preparing the settlement statement and related real estate closing documents.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 205 and, therefore, denies said allegations.

206.     Pursuant to the Closing Protection Letter, Ticor agreed to indemnify Freedom for any loss or damages sustained from the negligence of Hlava, Exeter and other unknown persons in connection with the real estate closing.

**ANSWER:**     Ticor denies the allegations contained within paragraph 206.


207.     On or about April 26, 2002, Freedom sold the mortgage loan to DLJ Mortgage Capital, Inc.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 207 and, therefore, denies said allegations.


208.     Florkiewicz defaulted on the loan and on or about September 10, 2002, DLJ Mortgage Capital, Inc. demanded Freedom repurchase the loan.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 208 and, therefore, denies said allegations.


209.     Freedom was required to repurchase the property pursuant to a repurchase agreement for $117,331.57 which was paid in installments between November 2002 and November 2003.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 209 and, therefore, denies said allegations.


210.     A subsequent review appraisal performed on October 14, 2002 indicated that the actual fair market value of the property was only approximately $90,000.00, and that the Jordan appraisal was defective and had not been performed in accordance with industry standards in Chicago, that the comparables used by Jordan were incorrect, prior sales of comparable properties at lower prices had not been disclosed as they should have been, and that Jordan had grossly exaggerated the overall value of the property.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 210 and, therefore, denies said allegations.

211.    Burnham breached its warranties to Freedom pursuant to the Agreement by submitting a loan package to Freedom that contained a defective appraisal of the property and false and/or inaccurate information regarding Florkiewicz.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 211 and, therefore, denies said allegations.

212.    At the closing, Hlava, Ticor and Exeter and other unknown persons prepared and submitted settlement statements that reflected settlement cash payments made by Florkiewicz when, in fact, Florkiewicz made no such cash payment or the funds were taken from Freedom's funds, failed to comply with Freedom's closing instructions and disbursed Freedom's funds to persons and/or entities in a manner that violated the standard or care in the industry. A true and correct copy of the 61st Property Settlement Statement is attached hereto as Exhibit R.

**ANSWER:**    To the extent that the allegations contained in paragraph 212 are directed at parties other that Ticor, Ticor is without knowledge as to the truth or falsity of the allegations and, therefore, denies said allegations.  To the extent that the allegations contained in paragraph 212 are directed at Ticor, Ticor denies said allegations.

213.    On or about August 7, 2002, pursuant to the Agreement, Freedom made a written demand on Burnham to purchase the loan or otherwise indemnify Freedom. Burnham refused.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 213 and, therefore, denies said allegations.

214.    On or about August 12, 2002, pursuant to the Closing Protection Letter, Freedom made a written demand on Ticor to indemnify Freedom for the loss or damages sustained. Ticor refused.

**ANSWER:**    Ticor repeats its answer to paragraph 60 regarding the correspondence between Freedom and Ticor.  Ticor denies the remaining allegations contained in paragraph 214.

215.    The total due under the loan to Rymarz for the 61st Property was $ 122,998.95.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 215 and, therefore, denies said allegations.


216.    On or about June 26, 2003, the 61st Property was sold at a foreclosure sale with a bid of $71,950.00.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 216 and, therefore, denies said allegations.


217.    The costs of sale were $9,859.85.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 217 and, therefore, denies said allegations.


## 708 N. SPAULDING LOAN TRANSACTION

218.    On or about May 7, 2001, Michael Henry sold property located at 708 N. Spaulding, Chicago, Illinois ("Spaulding Property") to Zebrowski for $105,000.00.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 218 and, therefore, denies said allegations.


219.    On or about October 21, 2001, Burnham submitted a mortgage loan application package to Freedom from Anatoli Louchak or some other unknown person ("Louchak") concerning the Spaulding Property. A true and correct copy of the Spaulding Property Loan Application is attached hereto as Exhibit S.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 219 and, therefore, denies said allegations.

220.    Louchak misrepresented financial and other information on the loan application.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 220 and, therefore, denies said allegations.

221.    Burnham retained the services of Brisker who appraised the property at $270,000 on October 27, 2001.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 221 and, therefore, denies said allegations.

222.    Burnham knew or should have known that Freedom would rely upon the appraisal to make a mortgage loan and would be relied upon by assignees of the loan.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 222 and, therefore, denies said allegations.

223.    Freedom made the loan in reliance on the appraisal and Louchak's ability to make the required cash at settlement payment.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 223 and, therefore, denies said allegations.

224.    On or about November 27, 2001, in reasonable reliance on the aforesaid appraisal, Freedom funded a mortgage loan to Louchak for $243,000.00.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 224 and, therefore, denies said allegations.

225.     Hlava represented Zebrowski in the sale of the property.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 225 and, therefore, denies said allegations.

226.     Hlava acted as Exeter's Vice President at the closing of the Spaulding Property. Hlava/Exeter and other unknown persons prepared a false settlement statement and/or were negligent in handling funds and preparing the settlement statement and related real estate closing documents.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 226 and, therefore, denies said allegations.

227.     Pursuant to the Closing Protection Letter, Ticor agreed to indemnify Freedom for any loss or damages sustained from the negligence of Hlava, Exeter and other unknown persons in connection with the real estate closing.

**ANSWER:**     Ticor denies the allegations contained in paragraph 227.

228.     On or about January 2, 2002, Freedom sold the mortgage loan to DLJ Mortgage Capital, Inc..

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 228 and, therefore, denies said allegations.

229.     Louchak defaulted on the loan and on or about March 16, 2002, DLJ Mortgage Capital, Inc. demanded Freedom repurchase the loan.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 229 and, therefore, denies said allegations.

230. Freedom was required to repurchase the loan pursuant to a repurchase agreement for an excess of $243,000.00 which was accomplished pursuant to negotiated setoff agreements between Freedom and DLJ Mortgage Capital, Inc.

**ANSWER:** Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 230 and, therefore, denies said allegations.

231. A subsequent review appraisal performed on July 6, 2003 indicated that the actual fair market value of the property was only approximately $ 118,000.00, and that the Brisker appraisal was defective and had not been performed in accordance with industry standards in Chicago, that Brisker's overall description of the neighborhood was neither complete nor accurate, that Brisker's overall description of the Spaulding property was not complete and accurate, and that the comparables used by Brisker were incorrect and that Brisker had grossly exaggerated the overall value of the property.

**ANSWER:** Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 231 and, therefore, denies said allegations.

232. Burnham breached its warranties to Freedom pursuant to the Agreement by submitting a loan package to Freedom that contained a defective appraisal of the property, and false and/or inaccurate information regarding Louchak.

**ANSWER:** Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 232 and, therefore, denies said allegations.

233. At the closing, Hlava, Ticor and Exeter and other unknown persons prepared and submitted settlement statements that reflected settlement cash payments made by Loucbak when, in fact, Loucbak made no such cash payment or the funds were taken from Freedom's funds, failed to comply with Freedom's closing instructions and disbursed Freedom's funds to persons and/or entities in a manner that violated the standard or care in the industry. A true and correct copy of the Spaulding Property Settlement Statement is attached hereto as Exhibit T.

**ANSWER:** To the extent that the allegations contained in paragraph 233 are directed at parties other that Ticor, Ticor is without knowledge as to the truth or falsity of the allegations

and, therefore, denies said allegations. To the extent that the allegations contained in paragraph 233 are directed at Ticor, Ticor denies said allegations.

234. On or about August 7, 2002, pursuant to the Agreement, Freedom made a written demand on Burnham to purchase the loan or otherwise indemnify Freedom. Burnham refused.

**ANSWER:** Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 234 and, therefore, denies said allegations.

235. On or about August 12, 2002, pursuant to the Closing Protection Letter, Freedom made a written demand on Ticor to indemnify Freedom for the loss or damages sustained. Ticor refused.

**ANSWER:** Ticor repeats its answer to paragraph 60 regarding the correspondence between Freedom and Ticor. Ticor denies the remaining allegations contained in paragraph 235.

236. The total due under the loan to Louchak for the Spaulding Property was $280,812.71.

**ANSWER:** Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 236 and, therefore, denies said allegations.

237, On or about September 6, 2002, the Spaulding Property was sold at a foreclosure sale with a bid of $197,100.00.

**ANSWER:** Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 237 and, therefore, denies said allegations.

238.     The costs of sale were $15, 281.49.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 238 and, therefore, denies said allegations.


## 735 N. CHRISTIANA LOAN TRANSACTION

239.     On or about September 26, 2001, Margaret and Albert Moore, Jr. sold property located at 735 N. Christiana, Chicago, Illinois ("Christiana Property") to Uloszonekic for $91,500.00.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 239 and, therefore, denies said allegations.


240.     Two months later Uloszonekic sold the Christiana Property to Louchak or some other unknown person for $270,000.00.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 240 and, therefore, denies said allegations.


241.     On or about October 15, 2001, Burnham submitted a mortgage loan application package to Freedom from Louchak concerning the Christiana Property. A true and correct copy of the Christina Property Loan Application is attached hereto as Exhibit U.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 241 and, therefore, denies said allegations.


242.     Louchak misrepresented financial and other information on the loan application.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 242 and, therefore, denies said allegations.

243.    Burnham retained the services of Brisker who appraised the property at $270,000.00 on October 27, 2001.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 243 and, therefore, denies said allegations.


244.    Burnham knew or should have known that Freedom would rely upon the appraisal to make a mortgage loan and would be relied upon by assignees of the loan.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 244 and, therefore, denies said allegations.


245.    Freedom made the loan in reliance on the appraisal and Louchak's ability to make the required cash at settlement payment.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 245 and, therefore, denies said allegations.


246.    On or about November 27, 2001, in reasonable reliance on the aforesaid appraisal, Freedom funded a mortgage loan to Louchak for $243,000.00.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 246 and, therefore, denies said allegations.


247.    Hlava represented Uloszonekic in the sale of the Christiana Property.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 247 and, therefore, denies said allegations.

248.     Hlava also acted as Exeter's Vice President at the closing of the Christiana Property. Hlava/Exeter and other unknown persons prepared a false settlement statement and/or were negligent in handling funds and preparing the settlement statement and related real estate closing documents.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 248 and, therefore, denies said allegations.

249.     On or about January 2, 2002, Freedom sold the mortgage loan to DLJ Mortgage Capital, Inc.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 249 and, therefore, denies said allegations.

250.     Louchak defaulted on the loan and on or about March 16, 2002, DLJ Mortgage Capital, Inc., demanded Freedom repurchase the loan.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 250 and, therefore, denies said allegations.

251.     Freedom was required to repurchase the loan pursuant to a repurchase agreement for in excess of $244,000.00 which was accomplished pursuant to negotiated setoff agreements between Freedom and DLJ Mortgage Capital, Inc.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 251 and, therefore, denies said allegations.

252.     A subsequent review appraisal performed on September 14, 2002 indicated that the actual fair market value of the property was only approximately $155,000.00, and that the Brisker appraisal was defective and had not been performed in accordance with industry standards in Chicago, that Brisker's overall description of the neighborhood was neither complete nor accurate, that Brisker's overall description of the site was not complete or accurate, and that the comparables used by Brisker were incorrect and that Brisker had grossly exaggerated the overall value of the property.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations

contained in paragraph 252 and, therefore, denies said allegations.

253.     Burnham breached its warranties to Freedom pursuant to the Agreement by submitting a loan package to Freedom that contained a defective appraisal of the property, and false and/or inaccurate information regarding Louchak.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations

contained in paragraph 253 and, therefore, denies said allegations.

254.     At the closing, Hlava, Ticor and Exeter and other unknown persons prepared and submitted settlement statements that reflected settlement cash payments made by Louchak when, in fact, Louchak made no such cash payment or the funds were taken from Freedom's funds, failed to comply with Freedom's closing instructions and disbursed Freedom's funds to persons and/or entities in a manner that violated the standard or care in the industry. A true and correct copy of the Christina Property Settlement Statement is attached hereto as Exhibit V.

**ANSWER:**     To the extent that the allegations contained in paragraph 254 are directed

at parties other that Ticor, Ticor is without knowledge as to the truth or falsity of the allegations

and, therefore, denies said allegations.  To the extent that the allegations contained in paragraph

254 are directed at Ticor, Ticor denies said allegations.

255.     On or about August 7, 2002, pursuant to the Agreement, Freedom made a written demand on Burnham to purchase the loan or otherwise indemnify Freedom. Burnham refused.

**ANSWER:**     Ticor is without knowledge as to the truth or falsity of the allegations

contained in paragraph 255 and, therefore, denies said allegations.

256.    On or about August 12, 2002, pursuant to the Closing Protection Letter, Freedom made a written demand on Ticor to indemnify Freedom for the loss or damages sustained. Ticor refused.

**ANSWER:**    Ticor repeats its answer to paragraph 60 regarding the correspondence between Freedom and Ticor.  Ticor denies the remaining allegations contained in paragraph 256.

257.    The total due under the loan to Louchak for the Christina Property was $277,309.30.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 257 and, therefore, denies said allegations.

258.    The Christiana Property was sold at a foreclosure sale with a bid of $195,152.00.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 258 and, therefore, denies said allegations.

259.    The costs of sale were $10,186.59.

**ANSWER:**    Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 259 and, therefore, denies said allegations.

260.    The following represents the monetary deficiencies due and owing under the promissory notes associated with the nine properties at issue as determined by Freedom's credit bids at the foreclosure sales:

| Property | Total Due | Amount of Auction Bid | Deficiency |
|---|---|---|---|
| 708 N. Drake | $290,304.86 | $290,304.80 | $0.00 |

| Property | Total Due | Amount of Auction Bid | Deficiency |
|---|---|---|---|
| 728 N. Hamlin | $284,445 | $284,445.65 | $0.00 |
| 4112 W. Potomac | $312,457.33 | $312,457.33 | $0.00 |
| 536 W. 61st Place | $122,998.95 | $71,950.00 | $51,048.95 |
| 708 N. Spaulding | $280,812.71 | $197,100.00 | $83,712.71 |
| 735 N. Christiana | $277,309.30 | $195,152.00 | $82,157.40 |
| 735 N. Springfield | $273,089.18 | $133,700.00 | $139,389.18 |
| 419 N. Drake | $268,057.07 | $139,121.50 | $128,935.57 |
| 7953 S. Escanaba | $244,211.37 | $143,500.00 | $100,711.37 |

**ANSWER:** Ticor is without knowledge as to the truth or falsity of the allegations contained in paragraph 260 and, therefore, denies said allegations.


## COUNT I-BREACH OF CONTRACT-BURNHAM

In that this Count is not directed against Ticor, no answer is necessary or required of Ticor.


## COUNT II - BREACH OF CONTRACT/PIERCING THE CORPORATE VEIL-PEDDLE

In that this Count is not directed against Ticor, no answer is necessary or required of Ticor.


## COUNT III - BREACH OF CONTRACT/PIERCING THE CORPORATE VEIL-DAVIS

In that this Count is not directed against Ticor, no answer is necessary or required of Ticor.

## COUNT IV - BREACH OF CONTRACT/PIERCING THE CORPORATE VEIL-VEHOVC

In that this Count is not directed against Ticor, no answer is necessary or required of Ticor.

## COUNT V - FRAUD WITH RESPECT TO THE LOAN APPLICATIONS – BURNHAM, BAT, RYMARZ AND FLORKIEWICZ

In that this Count is not directed against Ticor, no answer is necessary or required of Ticor.

## COUNT VI - NEGLIGENT MISREPRESENTATION WITH RESPECT TO THE LOAN APPLICATIONS - BURNHAM. BAT. RYMARZ AND FLORKIEWICZ

In that this Count is not directed against Ticor, no answer is necessary or required of Ticor.

## COUNT VII-FRAUD WITH RESPECT TO THE APPRAISALS - BURNHAM. EXETER, HLAVA. BAT. RYMARZ AND FLORKIEWICZ

In that this Count is not directed against Ticor, no answer is necessary or required of Ticor.

## COUNT VIII - NEGLIGENT MISREPRESENTATION WITH RESPECT TO THE APPRAISALS - BURNHAM. EXETER. HLAVA. BAT. RYMARZ AND FLORKIEWICZ

In that this Count is not directed against Ticor, no answer is necessary or required of Ticor.

### COUNT IX-FRAUD WITH RESPECT TO THE LOAN APPLICATIONS/PIERCING THE CORPORATE VEIL - PEDDLE. DAVIS AND VEHOVC

In that this Count is not directed against Ticor, no answer is necessary or required of Ticor.

### COUNT X - NEGLIGENT MISREPRESENTATION WITH RESPECT TO THE LOAN APPLICATIONS/PIERCING THE CORPORATE VEIL - PEDDLE, DAVIS AND VEHOVC

In that this Count is not directed against Ticor, no answer is necessary or required of Ticor.

### COUNT XI - FRAUD WITH RESPECT TO THE APPRAISALS/PIERCING THE CORPORATE VEIL - PEDDLE. DAVIS AND VEHOVC

In that this Count is not directed against Ticor, no answer is necessary or required of Ticor.

### COUNT XII - NEGLIGENT MISREPRESENTATION WITH RESPECT TO THE APPRAISALS/PIERCING THE CORPORATE VEIL - PEDDLE. DAVIS AND VEHOVC

In that this Count is not directed against Ticor, no answer is necessary or required of Ticor.

### COUNT XIII - FRAUD WITH RESPECT TO THE APPRAISALS - MVA AND JORDAN

In that this Count is not directed against Ticor, no answer is necessary or required of Ticor.

## COUNT XIV - NEGLIGENT MISREPRESENTATION WITH RESPECT TO THE APPRAISALS - MVA AND JORDAN

In that this Count is not directed against Ticor, no answer is necessary or required of Ticor.

## COUNT XV - FRAUD WITH RESPECT TO THE APPRAISALS – BURKS

In that this Count is not directed against Ticor, no answer is necessary or required of Ticor.

## COUNT XVI - NEGLIGENT MISREPRESENTATION WITH RESPECT TO THE APPRAISALS – BURKS

In that this Count is not directed against Ticor, no answer is necessary or required of Ticor.

## COUNT XVII - FRAUD WITH RESPECT TO THE APPRAISALS – BRISKER

In that this Count is not directed against Ticor, no answer is necessary or required of Ticor.

## COUNT XVIII - NEGLIGENT MISREPRESENTATION WITH RESPECT TO THE APPRAISALS – BRISKER

In that this Count is not directed against Ticor, no answer is necessary or required of Ticor.

## COUNT XIX - FRAUD WITH RESPECT TO THE REAL ESTATE CLOSING AND RELATED SETTLEMENT STATEMENTS - BURNHAM. EXETER and HLAVA

In that this Count is not directed against Ticor, no answer is necessary or required of Ticor.

## COUNT XX - NEGLIGENT MISREPRESENTATION WITH RESPECT TO THE REAL ESTATE CLOSING AND RELATED SETTLEMENT STATEMENTS - EXETER AND HLAVA

In that this Count is not directed against Ticor, no answer is necessary or required of Ticor.

## COUNT XXI - FRAUD WITH RESPECT TO THE REAL ESTATE CLOSINGS AND RELATED SETTLEMENT STATEMENTS - BUTAR. BAT. RYMARZ. FLORK1EWICZ AND HLAVA

In that this Count is not directed against Ticor, no answer is necessary or required of Ticor.

## COUNT XXII - CIVIL RICO – BURNHAM, EXETER, PEDDLE, DAVIS, VEHOVC, MVA, JORDAN, BURKS, BRISKER, HLAVA, BAT, BUTAR, RYMARZ, FLORKIEWICZ, SPANN, ADAMS, PIOTR, ODRZWOLSXA, DOBROWSKI, ZEBROWSKI AND ULOSZONEKIC

In that this Count is not directed against Ticor, no answer is necessary or required of Ticor.

### COUNT XXIII - BREACH OF FIDUCIARY DUTY – BURNHAM, EXETER, PEDDLE, DAVIS, VEHOVC, MVA, JORDAN, BURKS, BRISKER, HLAVA, BAT. BUTAR, RYMARZ, FLORKIEWICZ

In that this Count is not directed against Ticor, no answer is necessary or required of Ticor.

### COUNT XXIV - NEGLIGENCE – BURNHAM

In that this Count is not directed against Ticor, no answer is necessary or required of Ticor.

### COUNT XXV - NEGLIGENCE - EXETER AND HLAVA

In that this Count is not directed against Ticor, no answer is necessary or required of Ticor.

### COUNT XXVI - BREACH OF CONTRACT - TICOR

440. Freedom restates the allegations contained in the preceding paragraphs of its Fifth Amended Complaint as if though fully set forth herein.

**ANSWER:** Ticor restates its answers to the paragraphs directed against Ticor, namely its answers to paragraphs 1 through 260. Ticor does not restate answers to paragraphs 261 through 439 in that these paragraphs were not directed against Ticor.

441. Ticor issued the Closing Protection Letter and warranted that it would be liable for the acts and omissions of its agent, Exeter, in conducting and completing the real estate closings for the mortgage loan transactions in question.

**ANSWER:** Ticor denies the allegations contained in paragraph 441. Further answering, the closing protection letter speaks for itself.

442. Ticor and its agent Exeter failed to comply with Freedom's closing instructions in that Ticor and Exeter failed to provide original signatures on all closing documents to Freedom, and failed to provide Freedom powers of attorney prior to the closings of the properties at issue.

**ANSWER:** Upon information and belief, to the extent that the allegations contained in paragraph 442 relate to Exeter, Ticor denies the allegations. To the extent that the allegations contained in paragraph 442 relate to Ticor, Ticor denies the allegations.

443. In addition, Ticor and Exeter were negligent in handling the closing documents in connection with the closing on the properties at issue, including negligent handling of the HUD-1 settlement statements, powers of attorney and real estate contracts.

**ANSWER:** Upon information and belief, to the extent that the allegations contained in paragraph 443 relate to Exeter, Ticor denies the allegations. To the extent that the allegations contained in paragraph 443 relate to Ticor, Ticor denies the allegations.

444. Despite Freedom Mortgage's demands for indemnity pursuant to the Closing Protection Letter, Ticor has refused to comply and has breached the terms of the contract.

**ANSWER:** Ticor denies the allegations contained in paragraph 444.

445. Freedom performed in accordance with the terms of the Closing Protection Letter.

**ANSWER:** Ticor denies the allegations contained in paragraph 445.

446. As a direct and proximate result of Ticor's breach, Freedom has sustained damages, as previously alleged.

**ANSWER:** Ticor denies the allegations contained in paragraph 446.

WHEREFORE, Ticor respectfully requests judgment in its favor and against Freedom. Ticor further requests such other relief as this Court deems just and equitable.

### COUNT XXVII - NEGLIGENCE VICARIOUS LIABILITY - TICOR TITLE

Contemporaneous with the filing of this answer, Ticor is filing a motion to dismiss Count XXVII.

### COUNT XXVIII - CIVIL CONSPIRACY - BURNHAM. EXETER. PEDDLE, DAVIS, VEHOVC, MVA. JORDAN. BURKS. BRISKER. HLAVA, BAT. BUTAR. RYMARZ. FLORKIEWICZ

In that this Count is not directed against Ticor, no answer is necessary or required of Ticor.

### COUNT XXIX - NEGLIGENT RETENTION - TICOR TITLE

Contemporaneous with the filing of this answer, Ticor is filing a motion to dismiss Count XXIX.

### COUNT XXX - NEGLIGENT SUPERVISION - TICOR TITLE

Contemporaneous with the filing of this answer, Ticor is filing a motion to dismiss Count XXX.

### COUNT XXXI - VEXATIOUS REFUSAL TO PAY INSURANCE CLAIM - TICOR

Contemporaneous with the filing of this answer, Ticor is filing a motion to dismiss Count XXXI.

Page 69 of 72

## COUNT XXXII - VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE PRACTICES ACT -TICOR

Contemporaneous with the filing of this answer, Ticor is filing a motion to dismiss Count

XXXII.


Respectfully submitted:


By:     /s/ Barbara Andersen

Barbara Andersen
Latimer LeVay Jurasek
55 West Monroe, Suite 1100
Chicago, IL 60603
(312) 256-0997 (direct dial)
(312) 422-8000 (office)
(312) 422-8001 (fax)
bandersen@lljlaw.com

## SERVICE LIST

**Freedom Mortgage Corp. v. Burnham Mortgage Inc., et al.**

**Case No. 03 C 6508**

On October 30, 2009, I filed the partial answer to the Fifth Amended Complaint and served same of the following attorneys of record:

Daniel M. Purdom
dpurdom@hinshawlaw.com,courtfiling@hinshawlaw.com,svalentine@hinshawlaw.com

Thomas B. Underwood    tbu@pw-law.com

David R. Carlson    dcarlson@baughdaltonlaw.com,alay@baughdaltonlaw.com

Robert Andrew Chapman
rchapman@chapmanspingola.com,mvarnava@chapmanspingola.com

Vincent Thomas Borst    vtborst@borstcollins.com

Kenneth D. Peters    kpeters@dresslerpeters.com

David A. Baugh    dbaugh@baughdaltonlaw.com,alay@baughdaltonlaw.com

Daniel Rozenstrauch    drozenstra@sbcglobal.net

David Matthew Rownd    drownd@tcfhlaw.com,drownd@thompsoncoburn.com

Christopher C. Kendall    ckendall@ckendall.com

Thomas James Kanyock    tjkanyock@vfrlitigation.com,lmgehrs@vfrlitigation.com

Joseph Henry McMahon
jmcmahon@hinshawlaw.com,courtfiling@hinshawlaw.com,vbright@hinshawlaw.com

Michael Duane Sanders    mds@pw-law.com

Michael Thomas Layden    mlayden@rjpltd.com,jharms@rjpltd.com,rlavko@rjpltd.com

Renee O'Neill Kelly    roneill@hinshawlaw.com

Christian J. Jorgensen    jorgensen@dresslerpeters.com

Peter Michael Spingola     pspingola@chapmanspingola.com,mvarnava@chapmanspingola.com

Barbara Andersen     bandersen@lljlaw.com

Dennis A. Dressler     ddressler@dresslerpeters.com

Kristin G Bagull     kbagull@mbwulaw.com

James Leo Oakley     joakley@fagelhaber.com,efiledocket@fagelhaber.com

Stephen Devereux Vernon
svernon@hinshawlaw.com,courtfiling@hinshawlaw.com,pmichael@hinshawlaw.com

Gara M. Sliwka     gsliwka@baughdaltonlaw.com

Brian Richard Zeeck     bzeeck@hinshawlaw.com


                                        _/s/ Barbara Andersen_____