IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FREEDOM MORTGAGE CORPORATION,    )
    )
    Plaintiff,    )    No.    03 C 6508
    v.    )
    )    Judge Robert W. Gettleman
BURNHAM MORTGAGE, INC., EXETER TITLE )
COMPANY, TICOR TITLE INSURANCE    )
COMPANY, JAMES C. PEDDLE, DERRICK    )
DAVIS, ERIC C. VEHOVC, MARKET VALUE    )
APPRAISAL, INC., MAYA N. JORDAN, LARRY )
D. BURKES, KEVIN R. BRISKER, JOHN    )
JEFFREY HLAVA, ADAM BAT, ADAM    )
BUTAR, ZBIGNIEW RYMARZ, WALDEMAR    )
FLORKIEWICZ, DOROTHY SPANN,    )
CHARLENE ADAMS, KUBA JASNY, a/k/a    )
Grosz Piotr, BARBARA ODRZYWOLSKA,    )
MAREK MAKA, a/k/a Leszek Dobrowski,    )
BOGDAN PAWLAK, KRYSTIAN ZEBROWSKI, )
and PIOTR ULOSZONEKIC,    )
    )
    Defendants.    )

## MEMORANDUM OPINION AND ORDER

Freedom Mortgage Corporation ("Freedom") has filed a thirty-two-count[1] Fifth Amended

Complaint against Burnham Mortgage, Inc. ("Burnham"), Exeter Title Company ("Exeter"),

Ticor Title Insurance Company ("Ticor"), John Jeffrey Hlava ("Hlava"), and numerous others

(the "Defendants"), asserting claims for breach of contract, fraud, negligent misrepresentation,

civil RICO, breach of fiduciary duty, negligence, civil conspiracy, negligent retention, negligent

supervision, vexatious refusal to pay insurance claim, and violation of the Illinois Consumer

Fraud and Deceptive Practices Act, all arising out of an alleged mortgage fraud scheme

concerning nine mortgaged properties.

---

[1]The Fifth Amended Complaint has 519 paragraphs and 81 pages.

Hlava, an attorney and officer of Exeter, has filed a motion to dismiss all claims against him, arguing that he owed no duty of care to Freedom and that Freedom has failed to adequately allege the necessary elements. The nine claims against Hlava are Fraud with Respect to the Appraisals (Count VII), Negligent Misrepresentation with Respect to the Appraisals (Count VIII), Fraud with Respect to the Real Estate Closing and Related Settlement Statements (Count XIX), Negligent Misrepresentation with Respect to the Real Estate Closing and Related Settlement Statements (Count XX), Fraud with Respect to the Real Estate Closings and Related Settlement Statements (Count XXI), Civil RICO (Count XXII), Breach of Fiduciary Duty (Count XXIII), Negligence (Count XXV), and Civil Conspiracy (Count XXVIII).

Exeter has filed a motion to dismiss all eight claims against it: Fraud with Respect to the Appraisals (Count VII), Negligent Misrepresentation with Respect to the Appraisals (Count VIII), Fraud with Respect to the Real Estate Closing and Related Settlement Statements (Count XIX), Negligent Misrepresentation with Respect to the Real Estate Closing and Related Settlement Statements (Count XX), Civil RICO (Count XXII), Breach of Fiduciary Duty (Count XXIII), Negligence (Count XXV), and Civil Conspiracy (Count XXVIII). In addition, Exeter argues that Freedom's request for attorney's fees and prejudgment interest should be stricken from Counts VII, VIII, XIX,[2] XX, XXIII, XXV,[3] and XXVIII.

Ticor has filed a motion to dismiss all claims against it except for breach of contract: Negligence Vicarious Liability (Count XXVII), Negligent Retention (Count XXIX), Negligent

---

[2]Although Exeter lists Count "IXX" in its brief, the court assumes this was a typographical error and Exeter's intent was to include Count XIX (Fraud with Respect to the Real Estate Closing and Related Settlement Statements).

[3]Although Exeter does not list Count XXV (Negligence) with regard to prejudgment interest, the court assumes this omission was unintentional.

Supervision (Count XXX), Vexatious Refusal to Pay Insurance Claim (Count XXXI), and Violation of the Illinois Consumer Fraud and Deceptive Practices Act (Count XXXII).

Ticor has also filed a motion for partial summary judgment as to Freedom's Fifth Amended Complaint.[4] Ticor argues that Freedom's inclusion of three properties in its complaint (708 N. Drake, 728 N. Hamlin, and 4112 W. Potomac) is improper in light of prior rulings of the district court and the Seventh Circuit.

For the reasons discussed below: Hlava's motion to dismiss is granted as to Count XXII (Civil RICO) and denied as to Counts VII, VIII, XIX, XX, XXI, XXIII, XXV, and XXVIII; Exeter's motion to dismiss is granted as to Count XXII (Civil RICO) and denied as to Counts VII, VIII, XIX, XX, XXIII, XXV, and XXVIII; Ticor's motion to dismiss is granted as to Counts XXVII, XXIX, XXX, XXXI, and XXXII; Ticor's motion for partial summary judgment is granted; Freedom's request for attorney's fees is stricken from Counts VII, VIII, XIX, XX, XXIII, XXV, and XXVIII; and Freedom's request for prejudgment interest is stricken from Counts VIII, XX, XXV, and XXVIII.

## FACTS

The facts alleged in the complaint are taken as true for purposes of the instant motion. Bontkowski v. First Nat'l Bank of Cicero, 998 F.2d 459, 461 (7th Cir. 1993). This action was originally filed in the United States District Court for the District of New Jersey on February 13, 2003, and was transferred to the Northern District of Illinois on August 20, 2003. The case was assigned to Judge Mark Filip,[5] who left the bench in March 2008.

---

[4]Exeter has adopted and joined Ticor's motion and reply briefs.
[5]The case was originally assigned to Judge Norgle and reassigned to Judge Filip in May 2004.

The facts underlying this action were stated in detail in Judge Filip's memorandum opinion and order, <u>Freedom Mortg. Corp. v. Burnham Mortg., Inc.</u>, 2006 WL 695467 (N.D. Ill. Mar. 13, 2006), and will not be repeated here. On March 5, 2008, prior to Judge Filip's resignation from the bench, he issued an order (Docket No. 240) striking the pending motions without prejudice because the case was to be reassigned to another district judge. The case was thereafter reassigned to this court.

Subsequently, the court found that Judge Filip's March 13, 2006, opinion barred the federal suit under claim preclusion and the Rooker-Feldman doctrine, and the Defendants' motions for summary judgment were granted. On June 23, 2009, the Seventh Circuit reversed and remanded, finding that Freedom's claim was not entirely blocked by its credit bids and noting that the district court "should not [allow the suit] to grow a beard." <u>Freedom Mortg. Corp. v. Burnham Mortg., Inc.</u>, 569 F.3d 667, 672 (7th Cir. 2009). This opinion rules on a new complaint and four motions filed since then, giving the suit a clean shave.

<b><u>DISCUSSION</u></b>

**MOTIONS TO DISMISS - Hlava, Exeter, and Ticor**

**Legal Standard**

The purpose of a motion to dismiss is to test the sufficiency of the complaint, not to rule on its merits. <u>Gibson v. City of Chicago</u>, 910 F.2d 1510, 1520 (7th Cir. 1990). When considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the court accepts all well-pleaded allegations of the complaint as true and draws all reasonable inferences in the plaintiff's favor. <u>McMillan v. Collection Prof'ls, Inc.</u>, 455 F.3d 754, 758 (7th Cir. 2006). Nevertheless, the

complaint must plead sufficient facts to suggest plausibly that the plaintiff is entitled to relief. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555-56 (2007).

Allegations of fraud are subject to a heightened pleading standard. Fed. R. Civ. P. 9(b). Fraud must be pled with particularity, which means the complaint must allege the "who, what, when, where and how" of the fraud. DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir. 1990). At the motion to dismiss stage, Rule 9(b) requires only that the plaintiff identify the alleged misrepresentations, not actually prove that the statement was false. See Bankers Trust Co. v. Old Republic Ins., Co., 959 F.2d 677, 683 (7th Cir. 1992). This standard also applies to allegations of predicate acts of fraud in the RICO context. See Slaney v. Int'l. Amateur Athletic Fed'n, 244 F.3d 580, 597-99 (7th Cir. 2001); Haroco, Inc. v. Am. Natl. Bank and Trust Co., 747 F.2d 384, 405 (7th Cir. 1984) (finding that the plaintiff adequately specified the transactions, the false representations, and the identities of those involved). The pleadings must be specific enough to put defendants on notice of the conduct alleged.

**Attorney's Fees and Prejudgment Interest**

"The law in Illinois clearly is that absent a statute or a contractual agreement attorney fees and the ordinary expenses and burdens of litigation are not allowable to the successful party." Kerns v. Engelke, 76 Ill. 2d 154, 166 (Ill. 1979) (citation omitted); see also House of Vision, Inc. v. Hiyane, 42 Ill. 2d 45, 51-52 (Ill. 1969). In addition, "[i]t is clear that Illinois statutes do not authorize prejudgment interest in tort cases. 'Absent such statutory authority, the 'recovery of prejudgment interest in this state cannot be sustained.'"[6] N. Trust Co. v. County of Cook, 135 Ill. App. 3d 329, 336 (1 Dist. 1985) (quoting Gardner v. Geraghty, 98 Ill. App. 3d 10,

---

[6]The recovery of prejudgment interest may also be pursuant to an agreement between the parties.

14 (1 Dist. 1981)).  "However, where a fiduciary or confidential relationship exists and is violated, interest upon a recovery may be permitted irrespective of a statute.  Courts have allowed interest on recoveries only in cases where equitable considerations so warrant."  In re Marriage of Pitulla, 202 Ill. App. 3d 103, 118 (1 Dist. 1990) (citing La Barbera v. La Barbera, 116 Ill. App. 3d 959, 968 (1 Dist. 1983)). Further, prejudgment interest is available in fraud cases.  Obermaier v. Obermaier, 128 Ill. App. 3d 602, 610 (1 Dist. 1984).

In its response, Freedom states that Illinois law permits the recovery of attorney's fees as an element of punitive damages.  However, Freedom has not sought punitive damages.

Accordingly, Freedom's request for attorney's fees is stricken from Counts VII, VIII, XIX, XX, XXIII, XXV, and XXVIII, and Freedom's request for prejudgment interest is stricken from Counts VIII, XX, XXV, and XXVIII, and the court will revisit Freedom's request for prejudgment interest with regard to Counts VII (Fraud with Respect to the Appraisals), XIX (Fraud with Respect to the Real Estate Closing and Related Settlement Statements), and XIII (Breach of Fiduciary Duty) if and when appropriate.

**Negligent Misrepresentation (Counts VIII and XX) and Negligence (Count XXV)**

Failure to State a Claim

Hlava and Exeter argue that they did not owe a duty of care to Freedom.  Freedom responds that these defendants' duty to Freedom arose from Hlava's attorney-client relationships and Exeter's contractual relationships with Burnham and Ticor (i.e., Exeter's position as closing agent).  Freedom alleges that Burnham retained Hlava to perform title searches and closing functions, and that Hlava was hired by Ticor to be its approved attorney and issuing agent. Freedom further alleges that Burnham and Ticor retained Exeter to perform closing functions.

"The general rule in Illinois is that an attorney owes a duty of care only to his client and not to third parties." Kopka v. Kamensky & Rubenstein, 354 Ill. App. 3d 930, 934 (1 Dist. 2004) (citing Pelham v. Griesheimer, 92 Ill. 2d 13, 19 (Ill. 1982)). However, an attorney owes a duty to a third party if he was hired for the purpose of benefitting the third party. Id. This is a narrow exception; "the *primary* purpose and intent of the attorney-client relationship itself [must be] to benefit or influence the third party." United Laboratories, Inc. v. Savaiano, 2008 WL 148964, at *6 (N.D. Ill. Jan. 7, 2008) (quoting Pelham, 92 Ill. 2d at 21) (emphasis in original).

Freedom cites two legal malpractice cases, DeLuna v. Burciaga, 223 Ill. 2d 49 (Ill. 2006), and Jewish Hosp. of St. Louis, Mo. v. Boatmen's Nat'l Bank of Belleville, 261 Ill. App. 3d 750 (5 Dist. 1994), in which an attorney was found to owe a duty to a third party. However, both cases are readily distinguishable from the instant case. DeLuna involved a wrongful death action, and the court relied on a statute that explicitly identified the third party as an intended beneficiary.[7] DeLuna, 223 Ill. 2d at 79. Jewish Hosp. involved the drafting of a will, and the court found that the plaintiffs "were clearly designated as beneficiaries in the will, and [the attorney] knew this as he prepared the will." Jewish Hosp., 261 Ill. App. 3d at 760. It is clear in the instant case that Freedom's status as an intended beneficiary is not similarly unambiguous.

The Illinois "supreme court has strongly embraced the concept that third-party-beneficiary status should be easier to establish when the scope of the attorney's representation involves matters that are nonadversarial, such as in the drafting of a will, rather than when the scope of the representation involves matters that are adversarial." Id. at 761. Thus, the court

---

[7]"A wrongful-death action, if filed, must 'be brought by and in the names of the personal representatives of [the] deceased person…for the exclusive benefit of the surviving spouse and next of kin.' 740 ILCS 180/2. Plaintiffs, as the surviving children of Alicia DeLuna, were her next of kin, and the wrongful-death action was indisputably brought for their benefit."

must consider whether Hlava's representation of Burnham and Ticor was nonadversarial such that its purpose and intent was to benefit or influence Freedom.

Freedom sufficiently pleads that the purpose and intent of Hlava's representation of Burnham and Ticor were to influence Freedom. Burnham and Ticor hired Hlava presumably to act in their best interests, but Hlava's work was nonadversarial in the sense that an attorney's services as a closing agent are typically relied upon by all parties to a real estate transaction. Freedom pleads, and the court finds plausible in the context of a motion to dismiss, that the primary purpose and intent of Hlava's work was to influence Freedom with respect to the real estate transactions.

In Guaranty Residential Lending, Inc. v. Int'l Mortgage Ctr., Inc., 305 F. Supp. 2d 846, 864 (N.D. Ill. 2004), the court addressed a claim for negligent misrepresentation:

> [S]ince Rule 9(b) does not apply to claims of negligent misrepresentation, it is sufficient to conclusorily allege that the duty exists. However, if the facts that are alleged show that no such duty existed, plaintiff has pleaded itself out of court on this count.

The Guaranty Residential court found that the closing manager and her employer title company could be liable for negligence in determining the identity of a person whose signature was being notarized. Id. at 865. The defendants' duties arose from closing instructions, and the court found that the defendants had violated their duty to obtain valid identification. Id. In the instant case, Freedom alleges that Hlava and Exeter had a duty to submit accurate information and appropriately handle the real estate transactions. Freedom further alleges that Hlava and Exeter failed to comply with closing instructions and obtain signatures on closing documents. The facts alleged therefore state a plausible claim that Hlava and Exeter owed a duty of care to Freedom.

Citing Guaranty Residential, Exeter argues that a closing agent has no duty to provide information regarding the value of collateral for a loan. Discussing negligent misrepresentation regarding the value of the collateral, the court reasoned (id. at 866):

> It is alleged that these two defendants actually knew all the Subject Properties were overvalued. However, plaintiff makes no argument as to why a closing agent would have a duty to provide information regarding the value of collateral. Therefore any negligent misrepresentation claim against these two defendants based on the misrepresented value of the Subject Properties would be limited to possible liability based on the acts of coconspirators in furtherance of the conspiracy.

Although the Guaranty Residential plaintiff did not argue that a closing agent has a duty with regard to appraisals, Freedom argues in Count VIII that Hlava and Exeter as closing agents had a duty "to submit appraisals to Freedom that were accurate and *in accordance with law and industry standards*" (emphasis added). Any duty owed to Freedom by Hlava and Exeter in their capacity as closing agents must derive from the closing instructions, and not generally from law and industry standards. See e.g., Bescor, Inc. v. Chicago Title & Trust Co., 113 Ill. App. 3d 65, 69 (1 Dist. 1983) ("[A]n escrowee, like a trustee, owes a fiduciary duty to act only according to the terms of the escrow instructions."); Johnson v. Maki & Associates, Inc., 289 Ill. App. 3d 1023, 1028 (2 Dist. 1997).

Because Freedom has alleged in its complaint that Hlava and Exeter provided false and inaccurate information in mortgage loan packages and failed to comply with closing instructions, it is plausible that the closing instructions implicate a duty with regard to the appraisals. Although Exeter further argues that it took no part in the appraisals (subverting Count VIII), Freedom alleges otherwise. The details concerning Exeter's involvement in the appraisals present an issue of fact precluding dismissal at the pleading stage.

Regarding Count XX, Exeter argues that Freedom fails to show that its reliance on the closing and related settlement statements induced Freedom to act. Freedom alleges that it "justifiably relied upon the information produced by Exeter and Hlava with regard to the real estate settlements," and that "[a]s a direct and proximate result[,] Freedom has incurred and continues to incur substantial damages." Assuming Exeter made negligent misrepresentations as alleged in Count XX, the settlement statements were part of the alleged scheme to defraud Freedom, and Freedom presumably relied on their preparation in executing the transactions, causing damages.

Similarly, Freedom has sufficiently alleged causation to support a claim for negligence in Count XXV. Freedom alleges that "[a]s a direct and proximate result of Exeter and Hlava's breach of their duty, Freedom sustained damages." Exeter's work was part of the alleged scheme to defraud Freedom, and Exeter's alleged breach of its duty would have furthered the scheme and its transactions, plausibly causing Freedom's damages.

The allegations in Count XXV are similar to those in Counts VIII and XX. "It is well-settled that duplicative counts in a complaint may be properly dismissed." DeGeer v. Gillis, __ F. Supp. 2d __, 2010 WL 1609914, at *8 (N.D. Ill. Apr. 21, 2010). The DeGeer court reasoned: "True, the allegations in Counts II and IV are not identical. The relevant inquiry, however, is not whether the allegations are the same, but whether the claims are based on the same operative facts and the same injury." Id.

In the instant case, Freedom alleges that Hlava and Exeter were negligent by making "false representations" and "negligent misrepresentations." However, the court declines to dismiss Count XXV as duplicative because the elements of negligence and negligent

10

misrepresentation are materially different under Illinois law.  See, e.g., Radke's Inc. v. Guarantee Trust Life Ins. Co., 2010 WL 1687857, at *4 (C.D. Ill. Mar. 29, 2010).

To state a claim for negligence, a plaintiff must establish: (1) a duty of care owed by the defendant; (2) a breach of that duty; (3) an injury proximately caused by that breach; and (4) damages.  See, e.g., Calles v. Scripto-Tokai Corp., 224 Ill. 2d 247, 270 (Ill. 2007).  To state a claim for negligent misrepresentation, a plaintiff must establish: (1) a false statement of material fact; (2) intention to induce the other party to act; (3) action by the other party in reliance on the truth of the statements; and (4) damage to the other party resulting from such reliance.  Kopley Group V., L.P. v. Sheridan Edgewater Properties, Ltd., 376 Ill. App. 3d 1006, 1017 (1 Dist. 2007) (quoting Board of Educ. of City of Chicago v. A, C and S, Inc., 131 Ill. 2d 428, 452 (Ill. 1989) (explaining that negligent misrepresentation is the same as fraudulent representation except for the lack of intent)).  "Plaintiffs can pursue different causes of action based on the same set of facts, though they can recover only once for the injury."  Radke's, 2010 WL 1687857, at *4.  Consequently, the court denies the motion to dismiss Count XXV on the ground that it is duplicative.

Moorman Doctrine[8]

Hlava and Exeter argue that Freedom's negligent misrepresentation and negligence claims are barred by the Moorman doctrine, and no exception applies. In Moorman Mfg. Co. v. Nat'l Tank Co., 91 Ill. 2d 69, 91 (Ill. 1982), the Illinois Supreme Court held that a plaintiff "cannot recover for solely economic loss under the tort theories of strict liability, negligence, and innocent misrepresentation." The Illinois Supreme Court has recognized three exceptions: (1) where the plaintiff sustained damage, such as personal injury or property damage, resulting from a sudden or dangerous occurrence; (2) where the plaintiff's damages were proximately caused by defendant's intentional, false representation; and (3) where the plaintiff's damages were proximately caused by a negligent misrepresentation by a defendant in the business of supplying information for the guidance of others in their business transactions. Id. at 86, 88-89. Freedom does not allege personal injury, property damage, or fraud with respect to the Counts VIII, XX, and XXV, leaving the third exception. Hlava and Exeter argue that they were not in the business of supplying information, while Freedom naturally disagrees. Hlava and Exeter further argue that the information supplied was incidental to a contractual duty or the performance of an act.

In MW Mfrs, Inc. v. Friedman Corp., 1998 WL 417501, at * 4 (N.D. Ill. July 21, 1998), the court noted:

> The Illinois Supreme Court's test for determining whether a defendant "is in the business of supplying information for the guidance of others in their business transactions" is whether the end product of the relationship between plaintiff is a tangible object (i.e., a product) which could be readily described in a contract or

---

[8]In its response, Freedom argues that the Moorman doctrine is inapplicable because the duty of care owed by Hlava and Exeter arose outside of any contract. However, Freedom argues that it is a third-party beneficiary to the contracts among Hlava, Exeter, Burnham, and Ticor, suggesting that the duty is based on contract. In any event, the court has already found that the duty arose under agreements among the parties, and the Moorman doctrine is applicable.

whether it is intangible.  In short, if the intended end result of the plaintiff-defendant relationship is for the defendant to create a product, a tangible thing, then the defendant will not fit into the 'business of supplying information' negligent misrepresentation exception.

Following this rationale, Illinois courts have held that the <u>Moorman</u> doctrine may bar malpractice claims of negligence against engineers and architects (who supply products such as drawings and plans), but not claims against attorneys, accountants, insurance brokers, investment consultants, and environmental consultants (who supply information such as advice and counseling).  <u>Neumann v. Carlson Envtl., Inc.</u>, 429 F. Supp. 2d 946, 952 (N.D. Ill. 2006).  In <u>Tribune Co. v. Geraghty & Miller, Inc.</u>, 1997 WL 438836 (N.D. Ill. July 25, 1997), the court denied a motion to dismiss a negligence claim against an environmental consultant because, "although defendant's services culminated in a written report, the value of the defendant's services was in the 'analytical work summarized in the report.'  The court reasoned that an environmental consultant provides services more akin to an attorney or accountant, than an architect or engineer."  <u>Neumann</u>, 429 F. Supp. 2d at 952 (quoting <u>Tribune</u>, 1997 WL 438836, at *3).

In <u>Tolan & Son, Inc. v. KLLM Architects, Inc.</u>, 308 Ill. App. 3d 18, 28 (1 Dist. 1999), the court recognized a continuum with attorneys and real estate brokers (as well as accountants, insurance brokers, stockbrokers, termite inspectors, and environmental assessors) at the "pure information" end and manufacturers and sellers at the "tangible product" end.  The <u>Tolan</u> court, 308 Ill. App. 3d at 29 (internal citations omitted), explained:

The first category – pure information providers – includes businesses that provide a product that consists solely of information.  The supplying of information need not encompass the enterprise's entire undertaking but must be central to the business transaction between the parties.  In these cases, the product is obviously information, whether about the financial market, the housing market, termite

infestations, or legal or financial advice. This category involves those situations were the value of the services lies in the analytical work. In other words, the end product is the ideas, not the documents or other objects into which the ideas are incorporated.

In the instant case, Freedom's allegations that Hlava and Exeter were in the business of providing information are sufficient at this stage, in light of the court's discussion thus far. As in Tribune, although Hlava[9] and Exeter's services as closing agents culminated in the closings, the value of their services was plausibly "in the analytical work summarized" in the closing documents and settlement statements. Their services are more like the services rendered by attorneys and real estate brokers than those by manufacturers and sellers; the information provided by Hlava and Exeter was part of the end product, not incidental to a contractual duty or the performance of an act. Thus, the Moorman doctrine does not bar Freedom's negligent misrepresentation and negligence claims.

For the reasons stated above, Hlava and Exeter's motions to dismiss are denied as to Counts VIII, XX, and XXV.

**Civil RICO (Count XXII)**

Hlava and Exeter argue that Freedom fails to state a claim for RICO violations by not pleading with particularity. "[I]n a case involving multiple defendants...'the complaint should inform each defendant of the nature of his alleged participation in the fraud.'" Vicom, Inc. v. Harbridge Merchant Servs., Inc., 20 F.3d 771, 778 (7th Cir. 1994) (quoting DiVittorio v. Equidyne Extractive Indus., Inc., 822 F.2d 1242, 1247 (2d Cir. 1987)). The complaint should not lump multiple defendants together, but should "inform each defendant of the specific

---

[9]Hlava's work as an attorney fits squarely in the category of "pure information providers."

fraudulent acts that constitute the basis of the action against the particular defendant." Id. at 778

(quoting Balabanos v. North Am. Inv. Group, Ltd., 708 F. Supp. 1488, 1493 (N.D. Ill. 1988)).

Count XXII of the amended complaint alleges RICO violations against 21 of the

Defendants and includes references only to "the RICO Defendants" in describing the conduct of

the numerous defendants. Other sections of the amended complaint, such as descriptions of

"The Scheme" and the transactions with respect to each property, generally name the individual

defendants, but the descriptions do not identify which of the 21 defendants are being accused of

engaging in which predicate acts.

Under 18 U.S.C. 1961(1), racketeering activity includes the predicate acts of mail fraud,

wire fraud, and financial institution fraud. Although Freedom implicates these three activities, it

does not specify which defendants engaged in which predicate acts and the nature of their

participation. A RICO complaint "must go beyond a showing of fraud and state the time, place

and content of the alleged mail and wire communication perpetrating the fraud." United States

Textiles, Inc. v. Anheuser-Busch Cos., 911 F.2d 1261, 1268 n.6 (7th Cir. 1990) (quoting New

England Data Servs., Inc. v. Becher, 829 F.2d 286, 291 (1st Cir. 1987)). The pleadings must go

beyond "loose references to mailings and telephone calls." R.E. Davis Chem. Corp. v. Nalco

Chem. Co., 757 F. Supp. 1499, 1516 (N.D. Ill. 1990).

In addition to the collective allegations against "the RICO Defendants" and the

allegations in the Counts against Hlava and Exeter, Freedom states that Hlava and Exeter:

knowingly provided false and inaccurate information in mortgage loan packages; knowingly

prepared and submitted false settlement statements; failed to notify Freedom with regard to

recording of prior titles; failed to comply with closing instructions; failed to obtain signatures on

closing documents; failed to provide powers of attorney prior to closing; violated industry standards of care in disbursement of funds; represented as an attorney each of the sellers; and was negligent in handling funds and preparing documents. The amended complaint goes no further than this to specify the defendants' participation in mail fraud, wire fraud, and financial institution fraud. It neither identifies mail and wire communication nor includes even "loose references to mailings and telephone calls," beyond the general allegations against the 21 defendants. In the RICO context, the amended complaint is inadequate to put the defendants on notice of the conduct alleged.

Hlava and Exeter further argue that Freedom does not state a claim for RICO violations by failing to allege an enterprise and a pattern of racketeering activity.[10] To state a claim under section 1962(c), Freedom must plead "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." Jennings v. Auto Meter Prods. Inc., 495 F.3d 466, 472 (7th Cir. 2007) (citing Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 496 (1985)). Each of these elements must be pled with particularity. Rolls-Royce Corp. v. Alcor Engine Co., 2007 WL 1021450, at *5 (S.D. Ind. Mar. 29, 2007) (dismissing RICO claims for, in part, failure to allege one of the elements with particularity).

"Pattern of racketeering activity" is defined in 18 U.S.C. § 1961(5) as the commission of at least two of the predicate acts enumerated in 18 U.S.C. § 1961(1) within a ten year period. Expanding upon this requirement, courts have instituted what is referred to as the "continuity plus relationship" test to limit the application of RICO to long-term criminal conduct. Midwest Grinding Co., Inc. v. Spitz, 976 F.2d 1016, 1022 (7th Cir. 1992). Thus, a plaintiff must allege

---

[10]The court does not address enterprise here because Count XXII is dismissed on other grounds.

more than just the occurrence of two predicate acts. A plaintiff "must show that the predicate acts are related, and that they amount to or pose a threat of continued criminal activity." H.J., Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 239 (1989). The relationship prong is satisfied, and the parties do not contest this. The Supreme Court has identified the existence of two types of continuity: (1) closed, namely a "closed period of repeated conduct;" and (2) open-ended, namely "past conduct that by its nature projects into the future with a threat of repetition." Id. at 241.

Continuity over a closed period may be demonstrated by proof of a series of related predicate acts extending over a substantial period of time. Id. at 242. The Seventh Circuit has articulated a multi-factor test for determining the relationship and continuity of the predicate acts: (1) the number and variety of predicate acts; (2) length of time over which the predicate acts were committed; (3) the number of victims; (4) the presence of separate schemes; and (5) the occurrence of distinct injuries. Morgan v. Bank of Waukegan, 804 F.2d 970, 975-76 (7th Cir. 1986). Although no single factor is determinative, duration is "the single most important aspect of the closed-ended continuity analysis." Vicom, Inc. v. Harbridge Merchant Servs., Inc., 20 F.3d 771, 781 (7th Cir. 1994). Indeed, a scheme that allegedly lasted nine months was held to be too short in duration in Midwest, 976 F.2d at 1024, and another allegedly lasting seven to eight months was held to be "precisely the type of short-term, closed-ended fraud that, subsequent to H.J., Inc., this circuit consistently has held does not constitute a pattern." Uni*Quality, Inc. v. Infotronx, Inc., 974 F.2d 918, 922 (7th Cir. 1992).

The allegations in the instant complaint do not show the continuity necessary to establish a pattern of racketeering activity. Freedom has alleged only three predicate acts and one scheme,

lasting less than nine months, against one victim with similar but separate injuries.  Moreover,

"[t]he Seventh Circuit [] does not look favorably on relying on many instances of mail and wire

fraud to form a pattern."  Vicom, Inc., 20 F.3d at 781 (quoting Hartz v. Friedman, 919 F.2d 469,

473 (7th Cir. 1990).

Freedom argues that, in addition to the nine-month scheme, "the Defendants conducted

the racketeering activity with other participants, not parties to this action, with different victims

over a period of more than three years."  However, these allegations are insufficient under Fed.

R. Civ. P. 9(b) in the RICO context.  In a similar context, the Seventh Circuit, addressing pattern

in Uni*Quality, 974 F.2d at 922-23 (internal citations omitted), observed:

> Uni*Quality also argues that Infotronx defrauded several other companies in the
> same manner Infotronx defrauded Uni*Quality…The problem with this argument,
> however, is that the only allegations in the complaint concerning other companies
> are that Infotronx hired other companies and that upon information and belief
> none of these companies has been paid in full.
>
> Federal Rule of Civil Procedure 9(b) requires that the circumstances constituting
> fraud…shall be stated with particularity.  While this does not require a plaintiff to
> plead facts that if true would show that the defendant's alleged misrepresentations
> were indeed false, it does require the plaintiff to state the identity of the person
> making the misrepresentation, the time, place, and content of the
> misrepresentation, and the method by which the misrepresentation was
> communicated to the plaintiff…Uni*Quality's allegations of fraud against other
> companies are woefully deficient.  They do not even mention any
> misrepresentations, much less any specifics about those misrepresentations.

Similarly, Freedom does not specify the participants, victims, time, place, and content of

the alleged racketeering activity.  The allegation that "Defendants [Grosz and Dobrowski] have

plead guilty to defrauding mortgage companies in almost exactly the same manner" is also

insufficient.

To show open-ended continuity, a plaintiff must demonstrate: (1) a specific threat of repetition; (2) that the predicate acts or offenses are part of an ongoing entity's regular way of doing business; or (3) that defendants operate a long term association that exists for criminal purposes. Midwest Grinding Co., Inc., 976 F.2d at 1023 (quoting H.J., Inc., 492 U.S. at 242-43).

There is no specific threat of repetition in the instant case because Burnham, the broker, is no longer in business. Burnham has therefore ceased participating in (and in fact is no longer able to participate in) the activities about which Freedom complains. See McDonald v. Schencker, 18 F.3d 491, 497-98 (7th Cir. 1994) (finding that once defendant was fired, there was no longer any "threat of repetition" for his scheme); Midwest, 976 F.2d at 1025 (holding that when defendant resigned, any threat of illegal activity "ceased to exist"). Further, even if Freedom had alleged that the defendants' predicate acts are part of an ongoing entity's regular way of doing business, that entity is no longer "ongoing" because Burnham can no longer participate. Finally, the amended complaint fails to allege that the association among these particular defendants is "long term." As discussed in the closed continuity context, the alleged scheme is not long term.

Freedom relies in part on Guaranty Residential, 305 F. Supp. 2d 846. However, Guaranty Residential is readily distinguishable from the instant case because Burnham is no longer a threat. In Guaranty Residential, the court found that the first prong of open-ended continuity, a specific threat of repetition, was satisfied. Even if the schemes were identical, the absence of Burnham precludes a finding of a specific threat of repetition in the instant case.

For the reasons stated above, Count XXII is dismissed.

**Breach of Fiduciary Duty (Count XXIII)**

Hlava and Exeter argue that Freedom fails to allege facts showing the existence of a fiduciary relationship or its breach. Freedom responds that an escrow or closing agent owes a fiduciary duty to all parties to a real estate transaction.

Under Illinois law, a plaintiff may recover for breach of fiduciary duty where: (1) a fiduciary duty exists on defendant's part; (2) the defendant breached that fiduciary duty; and (3) damages proximately resulted from the breach. Lucini Italia Co. v. Grappolini, 231 F. Supp. 2d 764, 770 (N.D. Ill. 2002). Courts in this district have repeatedly held that a contractual relationship alone does not normally create a fiduciary duty. See, e.g., Prescott v. Allstate Life Ins. Co., 341 F. Supp. 2d 1023, 1024 (N.D. Ill. 2004); Pope v. Smith-Rothchild Fin. Co., 2003 WL 22889377, at *3 (N.D. Ill. Dec. 8, 2003) (citing Oil Express Nat'l, Inc. v. Latos, 966 F. Supp. 650, 650-51 (N.D. Ill. 1997)). A fiduciary duty may arise in the absence of a contract. Thus, Hlava and Exeter's arguments regarding a lack of contractual obligation to Freedom and the absence of fiduciary duties between Freedom and Burnham despite their contract are inapposite.

A fiduciary duty may arise as a matter of law from the existence of a particular relationship, such as an attorney-client or principal-agent relationship. See Ransom v. A.B. Dick, Co., 289 Ill. App. 3d 663, 672 (1 Dist. 1997). In Illinois, "[a]n escrowee has been described as a 'trustee' of both the party making the deposit of property and the party for whose benefit it is made and, therefore, has a duty to act impartially toward all parties. Like a trustee, the escrowee owes a fiduciary duty to act only in accordance with the terms of the escrow instructions." Johnson, 289 Ill. App. 3d at 1028 (citing Meyers v. Rockford Sys., Inc., 254 Ill.

App. 3d 56, 64 (2 Dist. 1993)); <u>see also</u> <u>Reinhold's Estate v. Mansfield</u>, 90 Ill. App. 3d 224, 228

(5 Dist. 1980). Exeter is correct that a fiduciary duty exists in relationships of trust and

influence: "A fiduciary relationship, when not imposed as a matter of law, involves confidence

and trust on one side and dominance and influence on the other. As a result, the dominant party

gains superiority and influence over the servient party." <u>KW Plastics v. U.S. Can Co.</u>, 2001 WL

135722, at *6 (M.D. Ala. Feb. 2, 2001) (applying Illinois law). However, Illinois courts have

recognized a fiduciary duty between an escrowee and the parties to the real estate transaction.

In the instant case, Freedom alleges that a fiduciary duty existed because Hlava and

Exeter were closing escrow agents, Hlava and Exeter breached that fiduciary duty in part by

failing to comply with closing instructions, and damages resulted from their breach. Drawing all

inferences in the light most favorable to Freedom, as the court must, the court finds that Freedom

has sufficiently alleged the existence of a fiduciary duty.

For the reasons stated above, Hlava and Exeter's motions to dismiss are denied as to

Count XXIII.

**Fraud (Counts VII and XIX – Hlava and Exeter; Count XXI – Hlava)**

Hlava and Exeter argue that Freedom fails to state a claim for fraud because Freedom

does not plead with the required particularity. To state a claim for fraud under Illinois law, a

plaintiff must allege that: (1) defendant made a false statement of material fact; (2) which

defendant knew or believed to be false; (3) with the intent to induce plaintiff to act; (4) the

plaintiff justifiably relied on the statement; and (5) the plaintiff suffered damage from such

reliance. <u>Cozzi Iron & Metal, Inc. v. U.S. Office Equipment, Inc.</u>, 250 F.3d 570, 574 (7th Cir.

2001); <u>see also</u> <u>Chatham Surgicore, Ltd. v. Health Care Service Corp.</u>, 356 Ill. App. 3d 795, 804

(1 Dist. 2005).  As the court has discussed above, allegations of fraud are subject to a heightened pleading standard.[11]  Fed. R. Civ. P. 9(b).

Hlava argues that Freedom fails to identify when the misrepresentations were made and which specific misrepresentations were made by whom.  However, Freedom provides adequate detail regarding the circumstances of the transactions and the roles of the Defendants to put Hlava and Exeter on notice.

In Count VII of the amended complaint (Fraud with Respect to the Appraisals), Freedom alleges: (1) Hlava and Exeter "made false representations to Freedom" by giving inflated appraisal values, and they "forged documents or fraudulent[ly] alter[ed] real estate documents;" (2) Hlava and Exeter acted "falsely" and "with actual malice;" (3) Hlava and Exeter acted "with intent to defraud Freedom" and "for the express purpose of inducing Freedom to purchase the mortgage loans;" (4) "Freedom reasonably relied upon the representations;" and (5) the losses sustained by Freedom were a direct result of the defendants' acts, and Freedom paid substantial sums to purchase loans up to 200% of the properties' fair market value.

Exeter argues that Freedom makes conclusory allegations and "admits that Exeter had no involvement with the appraisals."  However, in addition to the above allegations regarding the appraisals, Freedom includes dates, dollar amounts, addresses, and other details in the context of a mortgage fraud scheme.  Although the amended complaint does not provide details with regard to Exeter's involvement in the appraisals, Freedom has provided sufficient particularity to put Exeter on notice.

---

[11]See the court's discussion of Rule 9(b) standards, *supra*.

In Count XIX of the amended complaint (Fraud with Respect to the Real Estate Closing and Related Settlement Statements), Freedom alleges: (1) Hlava and Exeter "represented to Freedom that each borrower made the cash at closing as set forth in the settlement statements when in fact all funds came from Freedom;" (2) Hlava and Exeter acted "falsely" and "with actual malice with the intent to obtain personal financial gain;" (3) Hlava and Exeter acted "with intent to defraud Freedom," and Freedom was "thereby induced" to purchase and fund the mortgage loans; (4) Freedom "relied on the representations set forth in the settlement statements;" and (5) Freedom purchased loans up to 200% of the properties' fair market value, and "the loans are delinquent or in default, proximately and directly causing Freedom to incur damages."  As with Count VII, Freedom also includes allegations and details–such as dates, dollar amounts, addresses–relevant to Count XIX elsewhere in the amended complaint.

Exeter argues that Freedom fails to show that its reliance on a false statement of material fact caused its damages.  Freedom alleges that it "relied upon the representations set forth in the settlement statements submitted by Burnham, Exeter, and Hlava and was thereby induced to purchase the mortgage loans from Burnham and fund the mortgage loans to the respective borrowers."  Assuming Exeter made a false statement of material fact, the settlement statements were part of the alleged scheme to defraud Freedom, and Freedom presumably relied on their preparation in executing the transactions, causing its damages.

For the reasons stated above, Hlava and Exeter's motions to dismiss are denied as to Counts VII and XIX, and Hlava's motion to dismiss is denied as to Count XXI.

**Civil Conspiracy (Count XXVIII)**

Hlava and Exeter argue that Freedom fails to state a claim for civil conspiracy because conspiracy is not a tort separate and distinct from Freedom's other claims against the defendants, which the court should dismiss. Exeter further argues that Freedom fails to allege with particularity the underlying fraud.

To state a claim for civil conspiracy, a plaintiff must allege: (1) an agreement between at least two people for the purpose of accomplishing some unlawful purpose or some lawful purpose by unlawful means; and (2) at least one tortious act by one of the co-conspirators in furtherance of the agreement. Faith Freight Forwarding Corp. v. Ruiz, 1997 WL 159207, at *5 (N.D. Ill. Mar. 24, 1997). "[T]here is no cause of action for conspiracy unless something is done, which, without the conspiracy, would give rise to a claim for relief." Ill. Traffic Court Driver Imp. Educ. Found. v. Peoria Journal Star, Inc., 144 Ill. App. 3d 555, 562 (3 Dist. 1986); see also Bertash Mkt. Co. v. Brown, 70 Ill. App. 2d 8, 16 (1 Dist. 1966). In Vance v. Chandler, 231 Ill. App. 3d 747, 750 (3 Dist. 1992), the court interpreted Ill. Traffic Court to mean that an overt act need not be unlawful:

> [D]efendants interpret the remaining elements of civil conspiracy to require allegations of an unlawful, overt act which must itself be independently actionable in tort. We disagree. Quoting American Jurisprudence 2d, this court in [Ill. Traffic Court] noted that "in a civil action based on a conspiracy, no cause of action can exist in the absence of an overt, tortious, or unlawful act committed in furtherance of the conspiracy." The conjunctive "or " in this passage indicates alternatives in a series and not, as defendants argue, cumulative requirements of the tort. Therefore, we hold that an alleged overt or unlawful act need not be tortious or otherwise actionable in tort to support a cause of action for civil conspiracy.

The Vance court noted that the definition of an "overt act" is not limited to "tortious, unlawful, or otherwise independently actionable" acts. In the instant case, Freedom has

sufficiently alleged numerous overt acts in support of its claims, such as falsification of appraisals and closing documents as well as utilization of false borrower identities.

For the reasons stated above, Hlava and Exeter's motions to dismiss are denied as to Count XXVIII

**Negligence Vicarious Liability (Count XXVII)**

Ticor argues that Freedom fails to plead the pretort relationship necessary for a finding of vicarious liability and that Freedom's claim violates the <u>Moorman</u> doctrine. Freedom responds that it has properly alleged a master-servant relationship between Ticor and Exeter and that its claim does not violate the <u>Moorman</u> doctrine because the duty was extra-contractual.

In support of its argument, Ticor cites several cases, only one of which applies Illinois law. In <u>Pinski v. Adelman</u>, 955 F. Supp. 73, 74 (N.D. Ill. 1996), the court held that "[in these] circumstances we believe that Illinois law continues to recognize that the insurer is not responsible for the broker's representations of which it is unaware and which it did not ratify." The court noted that its conclusion was specific to the circumstances of the case at hand, rather than a recognition that all insurers are not vicariously liable for their brokers' representations.[12]

Other Illinois cases confirm that a title company's vicarious liability for its closing agent is a fact-based inquiry. In <u>Guaranty</u>, 305 F. Supp. 2d 846, 860-62, the court addressed a claim

---

[12]"[T]he imputation of liability to an insurer for the conduct of an insurance intermediary has had a somewhat inconsistent history in Illinois…We recognize, as well, that agency is generally a fact issue. Nevertheless, we believe that the Illinois Supreme Court would not go so far as to attribute the allegedly fraudulent representations of an independent broker to the companies with whom he placed policies *in the absence of additional circumstances which plaintiffs do not and can not allege here*." <u>Pinski</u>, 955 F. Supp. at 74 (emphasis added). The court went on to discuss facts specific to the case.

for vicarious liability in the civil RICO context, finding that the plaintiff's allegations of an agency relationship were sufficient for purposes of a motion to dismiss.

In any event, the court finds that Count XXVII violates the <u>Moorman</u> doctrine. The court has already discussed the <u>Moorman</u> doctrine in detail. With regard to Ticor, "a title insurer is not in the business of supplying information when it issues a title commitment or a policy of title insurance []. The scope of a title insurer's liability is properly defined by contract." <u>First Midwest Bank, N.A. v. Stewart Title Guar. Co.</u>, 218 Ill. 2d 326, 341 (Ill. 2006).

For the reasons stated above, Count XXVII is dismissed.

**Negligent Retention and Negligent Supervision (Counts XXIX and XXX)**

Ticor argues that it was not the employer of Exeter or Exeter's employees and that Freedom fails to allege that Ticor knew or should have known that Exeter had a particular unfitness for the position.

"An action for negligent hiring or retention of an employee requires the plaintiff to plead and prove (1) that the employer knew or should have known that the employee had a particular unfitness for the position so as to create a danger of harm to third persons; (2) that such particular unfitness was known or should have been known at the time of the employee's hiring or retention; and (3) that this particular unfitness proximately caused the plaintiff's injury." <u>Van Horne v. Muller</u>, 185 Ill.2d 299, 311 (Ill. 1998). To state a claim for negligent supervision, a plaintiff must allege that: (1) an employer had a duty to supervise its employees; (2) the employer negligently supervised an employee; and (3) such negligence proximately caused the plaintiff's injuries. <u>Van Horne v. Muller</u>, 294 Ill. App. 3d 649, 657 (1 Dist. 1998), modified on other grounds, 185 Ill. 2d 299 (Ill. 1998).

The court in Soranno v. New York Life Ins. Co., 1999 WL 104403, at *14-16 (N.D. Ill. Feb. 24, 1999), discussed the Moorman doctrine as it relates to negligent hiring, supervision, and retention claims. In Soranno, plaintiff investors filed claims for negligent hiring, supervision, and retention against defendant insurance companies in connection with work by an insurance agent. The insurance companies argued that the plaintiffs' allegations were conclusory and, as in the instant case, that the plaintiffs failed to allege that the insurance companies knew or should have known that their agent was unfit for his position. The insurance companies further argued that the Moorman doctrine barred the plaintiffs claims. Although the parties in the instant case do not consider this argument in their briefs, the court finds the analysis in Soranno applicable and persuasive.

Citing Congregation of the Passion v. Touche Ross & Co., 159 Ill.2d 137, 162 (Ill. 1994) (finding that the Moorman doctrine does not apply "[w]here a duty arises outside of the contract), the Soranno court discussed whether the insurance companies' duties to the plaintiffs arose outside a contract and noted that "[t]hese torts do not fit neatly within the analytical framework because they are indirect and are based on the underlying acts of the employee." Soranno, 1999 WL 104403, at *15. In its analysis, the court relied on two cases. In Anderson v. Keip, 1997 WL 78860 (N.D. Ill. 1997), the court dismissed a claim for negligent supervision because it was barred under the Moorman doctrine:

> In Keip, the plaintiffs alleged that the defendant negligently failed to supervise and control the activities of James Keip, who allegedly sold the plaintiffs investments in violation of the securities laws. The court held, without much discussion, that the Touche Ross did not apply because the "alleged duty to supervise Keip [arose] out of a commercial relationship between plaintiffs and Keip." The court therefore granted a motion to dismiss the negligent supervision claim even though the "precise relationship" between the parties was unclear.

Similar to defendants' arguments here, the court in <u>Keip</u> focused more on the relationship rather than the particular duty.[13]

In <u>Johnson Products Co. v. Guardsmark, Inc.</u>, 1998 WL 102687 (N.D. Ill. 1998), the court also dismissed a claim for negligent supervision based on a similar argument. "The plaintiff hired the defendant security company to guard plaintiff's warehouse. The parties entered into a written contract to govern their relationship. Plaintiff alleged that the defendant's employees stole large amounts of merchandise from the plaintiff's warehouse over a two-year period. Plaintiff filed suit, asserting, among other things, a claim for negligent supervision under Illinois law and argued the duty to employ honest people and to appropriately supervise them was extracontractual under <u>Touche Ross</u>. The court rejected this argument, finding that plaintiff had not identified a 'source' of any such duty."[14]

The <u>Soranno</u> court found that the plaintiffs' negligent supervision claims violated the <u>Moorman</u> doctrine because they related to the insurance and sales agent's actions in selling contracts and annuities because "[t]hose acts–and the related duty to supervise them–appear to have arisen under the contract." <u>Soranno</u>, 1999 WL 104403, at *16. In the instant case, Freedom's negligent retention and supervision claims violate <u>Moorman</u> because they relate to Hlava and Exeter's contractual and commercial relationship with Ticor.

For the reasons stated above, Counts XXIX and XXX are dismissed.

---

[13]<u>Soranno</u>, 1999 WL 104403, at *16 (citations omitted).
[14]<u>Soranno</u>, 1999 WL 104403, at *16 (citations omitted).

**Vexatious Refusal to Pay Insurance Claim (Count XXXI)**

The Illinois Insurance Code, 215 ILCS 5/155, provides in part:

> (1) In any action by or against a company wherein there is in issue the liability of a company on a policy or policies of insurance or the amount of the loss payable thereunder, or for an unreasonable delay in settling a claim, and it appears to the court that such action or delay is vexatious and unreasonable, the court may allow as part of the taxable costs in the action reasonable attorney fees, other costs, plus an amount not to exceed any one of the following amounts:

> (a) 60% of the amount which the court or jury finds such party is entitled to recover against the company, exclusive of all costs;

> (b) $60,000;

> (c) the excess of the amount which the court or jury finds such party is entitled to recover, exclusive of costs, over the amount, if any, which the company offered to pay in settlement of the claim prior to the action.

In enacting Section 155, ""[t]he legislature intended to provide a remedy to an insured who encounters unnecessary difficulties when an insurer withholds policy benefits." Richardson v. Ill. Power Co., 217 Ill. App. 3d 708, 711 (5 Dist. 1991). Ticor argues that an insurer-insured relationship does not exist because the closing protection letter (the "CPL") is distinct from any title insurance policy. Freedom responds that the CPL is a contract of insurance under the Illinois Title Insurance Act, 215 ILCS 155/1, et seq. In support, Freedom cites Fidelity Nat. Title Ins. Co. of New York v. Intercounty Nat. Title Ins. Co., 2001 WL 1414517, at *1 (N.D. Ill. 2001).[15] However, the relevant excerpt is in the "Background" section and not part of the court's

---

[15]The quote from Fidelity Nat. cited by Freedom reads: "Stewart acted as the exclusive underwriter for Old Intercounty until 1995. Between 1984 and 1995, Old Intercounty was the exclusive title and escrow insurance agent for Stewart. In addition to its title policy, Stewart issued closing protection letters. These letters insured parties to Old Intercounty's escrow account against losses in the event Old Intercounty failed to follow real estate closing instructions." In fact, the words "closing protection letters" are used in the opinion in only one other instance.

analysis. This court agrees with Ticor that the excerpt does not have the legal import suggested by Freedom.

The language of the Title Insurance Act, 215 ILCS 155/3, distinguishes between a closing protection letter and a title insurance policy:

> (1.5) "Title insurance" means insuring, guaranteeing, warranting, or indemnifying owners of real or personal property or the holders of liens or encumbrances thereon or others interested therein against *loss or damage suffered by reason of liens, encumbrances upon, defects in, or the unmarketability of the title to the property*; the invalidity or unenforceability of any liens or encumbrances thereon; or doing any business in substance equivalent to any of the foregoing. "Warranting" for purpose of this provision shall not include any warranty contained in instruments of encumbrance or conveyance. Title insurance is a single line form of insurance, also known as monoline. An attorney's opinion of title pursuant to paragraph (1)(C) is not intended to be within the definition of "title insurance".
>
> "Insured closing letter" or "closing protection letter" means an indemnification or undertaking to a party to a real estate transaction, from a principal such as a title insurance company or similar entity, setting forth in writing the extent of the principal's responsibility for *intentional misconduct or errors in closing the real estate transaction on the part of a settlement agent*, such as a title insurance agent or other settlement service provider. [Emphasis added.]

The language of the CPL supports this distinction:

> Any liability of the Company for loss incurred by you or in connection with closings of real estate transactions by an Issuing Agent or Approved Attorney shall be limited to the protection provided by this letter. However, this letter shall not affect the protection afforded by a title insurance binder, commitment or policy of the Company.

Freedom argues that "[a] contract of insurance is established 'if one of the parties to such a contract proposes to be insured and the other party agrees to insure, and the subject, the amount, and the rate of insurance are ascertained or understood and the premium paid if demanded.'" Zannini v. Reliance Ins. Co. of Illinois, Inc., 147 Ill.2d 437, 454 (Ill. 1992) (quoting Devers v. Prudential Property & Casualty Insurance Co., 86 Ill. App. 3d 542, 544 (5

Dist. 1980)).  However, the CPL provides indemnification for loss in connection with the closings and lacks reference to the amount, rate, and premium for insurance.

The court finds that the CPL is a contract of indemnification and specific liability, not an insurance policy.  For the reasons stated above, Count XXXI is dismissed.

**Violation of the Illinois Consumer Fraud and Deceptive Practices Act (Count XXXII)**

Ticor argues that Freedom is not a "consumer" and fails to establish a deceptive practice under the Illinois Consumer Fraud and Deceptive Practices Act  (ICFA).  The ICFA prohibits the use of deceptive acts or practices in the conduct of trade or commerce.  815 ILCS 505/2.  To state a claim under the ICFA, the complaint must allege: (1) a deceptive act or practice by defendant; (2) defendant's intent that plaintiff rely on the deception; (3) the occurrence of the deception in the course of conduct involving trade or commerce; and (4) actual damage to plaintiff; (5) proximately caused by the deception.  Avery v. State Farm Mut. Auto. Ins. Co., 216 Ill. 2d 100, 180 (Ill. 2005).  Because it asserts fraud, a claim under the ICFA must be pled with particularity.  Gallagher Corp. v. Mass. Mut. Life Insurance Co., 940 F. Supp. 176, 180 (N.D. Ill. 1996).  That is, the plaintiff must allege the "who, what, when, where, and how."  DiLeo, 901 F.2d at 627.

Under the ICFA, "consumer" is defined as "any person who purchases or contracts for the purchase of merchandise not for resale in the ordinary course of his trade or business but for his use or that of a member of his household."  815 ILCS 505/1(e).  A consumer may be a corporation.  815 ILCS 505/1(c).  "Person" includes any business entity or association.  815 ILCS 505/1(c).  The term "merchandise" means "any objects, wares, goods, commodities, intangibles, real estate situated outside the State of Illinois, or services."  815 ILCS 505/1(b).

A corporation has standing as a consumer under the ICFA, however, only when it "is a consumer of the other business's product." Lefebvre Intergraphics, Inc. v. Sanden Mach., 946 F. Supp. 1358, 1368 (N.D. Ill. 1996). In the instant case, Freedom was not a consumer of Ticor's "product" – the loans and title commitments, which Freedom purchased for resale. Freedom argues that it purchased the CPL, a transaction not for resale. However, as Ticor notes, Freedom's "business model is premised on the resale of the loans it buys."

Under the ICFA, when a dispute involves two business that are not consumers of each other's products or services, the plaintiff can bring a claim under the ICFA if it meets the "consumer nexus test" by alleging facts to show that the conduct involves trade practices directed to the market generally or otherwise relates to consumer protection issues. 815 ILCS 505/1; see also Petri v. Gatlin, 997 F. Supp. 956 (N.D. Ill. 1997); Athay Products Corp. v. Harris Bank Roselle, 89 F.3d 430, 437 (7th Cir. 1996); Duchossois Industries, Inc. v. Crawford & Co., 2001 WL 59031 (N.D. Ill. 2001). Illinois courts have held:

> To sufficiently establish an implication of consumer protection concerns, [a plaintiff] must plead and otherwise prove (1) that [its] actions were akin to a consumer's actions to establish a link between [it] and consumers; (2) how defendant's representations...concerned consumers other than [plaintiff]; (3) how defendant's particular breach…involved consumer protection concerns; and (4) how the requested relief would serve the interests of consumers.[16]

The specific factual allegations in the complaint relate to Ticor's relationship with Hlava and the CPL. While the complaint alleges that "Ticor's conduct involves trade practices addressed to the market generally and/or otherwise implicates consumer protection concerns," Ticor is not alleged to have made misrepresentations to the general public. Further, the

---

[16]Brody v. Finch Univ. of Health Sciences / The Chicago Medical School, 298 Ill. App. 3d 146, 161 (2 Dist. 1998).

allegation is conclusory and clearly does not establish an implication of consumer protection concerns. The case is a private business dispute that does not relate to consumer protection issues.

For the reasons stated above, Count XXXII is dismissed. Accordingly, Ticor's Motion to Dismiss is granted as to Counts XXVII, XXIX, XXX, XXXI, and XXXII.

## MOTION FOR SUMMARY JUDGMENT - Ticor and Exeter

### Legal Standard

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether a genuine issue of fact exists, the court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. See Bennington v. Caterpillar Inc., 275 F.3d 654, 658 (7th Cir. 2001); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). However, the court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." Bordelon v. Chicago Sch. Reform Bd. of Trustees, 233 F.3d 524, 529 (7th Cir. 2000).

Where a proposed statement of fact is supported by the record and not adequately rebutted, the court will accept that statement as true for purposes of summary judgment. An adequate rebuttal requires a citation to specific support in the record; an unsubstantiated denial is not adequate. See Albiero v. City of Kankakee, 246 F.3d 927, 933 (7th Cir. 2001); Drake v. Minnesota Mining & Mfg. Co., 134 F.3d 878, 887 (7th Cir. 1998) ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it

33

requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.").

**Background**

Judge Filip's March 13, 2006, memorandum opinion and order[17] ("Freedom I") ruled that Freedom's potential recovery is limited by its purchase of the properties at foreclosure sales using credit bids. As a matter of law, the court found that Freedom cannot recover damages from any third party by contending that the property is worth less than the amount of the credit bid.

Ticor argues that the properties located at 708 N. Drake, 728 N. Hamlin, and 4112 W. Potomac are full credit bid properties that should not have been included in Freedom's Fifth Amended Complaint, leaving six of the nine original properties in the complaint. Ticor argues that a full credit bid is an admission that there is no deficiency, and thus Freedom cannot recover any damages with respect to the three full credit bid properties. In response, Freedom argues that it is not limited to the deficiency amounts for all of its claims: "Ticor again simply ignores the difference between the various categories of damages, such as compensatory damages, consequential damages, treble damages, punitive damages and attorney's fees." The crux of Freedom's position is that Judge Filip's opinion held that the amount of its credit bids would offset other potentially recoverable damages. For the reasons stated below, Ticor's motion is granted.

**Analysis**

---

[17]Freedom, 2006 WL 695467.

As a preliminary matter, Freedom argues that Ticor's motion is procedurally deficient. Although Freedom is correct with regard to the requirements of Local Rule 56.1(a), the court declines to deny Ticor's motion on this ground and in this circumstance. As the parties note, this is the third motion for summary judgment on the question of damages for the three properties at issue.

Freedom argues that <u>Freedom I</u> confirmed the application of the credit bid rule and limited Freedom's compensatory damages to the extent of its successful credit bids, but it did not limit Freedom's recovery of other damages. Specifically, Freedom argues that it may recover fraud damages (i.e., consequential, punitive, and treble) for all nine properties.

Credit bidding is the practice of allowing a foreclosing lender to bid on the property at the auction. A full credit bid equals the unpaid principal and interest of the mortgage debt. "Most states, including Illinois, hold that a lender is deemed to have received repayment of a loan in full if, at a foreclosure, it successfully bids the full amount of the loan (the "Full Credit Bid Rule")." <u>Freedom</u>, 2006 WL 695467, at *6; <u>see</u>, <u>e.g.</u>, <u>Partel, Inc. v. Harris Tr. & Sav. Bank</u>, 106 Ill. App. 3d 962, 965 (1 Dist. 1982) (quoting <u>Whitestone Sav. & Loan Assocs. v. Allstate Ins. Co.</u>, 270 N.E.2d 694, 696 (N.Y. 1971) ("Because a mortgagee is entitled to one satisfaction of his debt and no more, the bidding in [full] of the debt to purchase the mortgaged property, thus cutting off other lower bidders, has always constituted a satisfaction of the debt.").

"The deficiency judgment is based on an amount equal to the difference between the foreclosure sale price and the debt owed. [] The Illinois Supreme Court repeatedly has confirmed that a lender's bid (like any ultimate foreclosure sale price) is presumed to be the fair and proper price for the foreclosed property, and therefore, the equivalent and satisfaction of the

lender's lien in the property." Freedom, 2006 WL 695467, at *7. Freedom I and Ticor's motion cite numerous authorities in support of the notion that a full credit bid means that there is no deficiency in the property.

Freedom cites two California cases in support of its argument that it is entitled to consequential damages on the three full credit bid properties.[17] Freedom I also refers to these two cases to: (1) explain fundamental principals;[18] and (2) determine whether, following a foreclosure sale, a lender can obtain damages for fraud over and above the deficiency judgment. The Alliance Mortgage court held that a lender could obtain damages for fraud if the lender did not discover the fraud until after the foreclosure sale. Similarly, the Track Mortgage court held "that the Full Credit Bid Rule applies absent a showing that the lender was fraudulently or otherwise proximately induced by the defendant to make the bid at the relevant auction sale." Freedom, 2006 WL 695467, at *10. Freedom I distinguished the instant case: "Freedom was aware of the alleged fraudulent loan scheme of the Defendants and/or its effects before tendering credit bids in at least eight of the nine auctions at issue." Id. Clearly, Freedom I's reference to these two cases does not establish that the court recognized Freedom's ability to recover fraud damages with respect to all nine properties. This court does not find Alliance Mortgage and Track Mortgage persuasive beyond Freedom I's analysis of those cases.

---

[17]Alliance Mortgage Co. v. Rothwell, 900 P.2d 601 (Cal. 1995), and Track Mortgage Group, Inc. v. Crusader Insurance Co., 120 Cal. Rptr. 2d 228 (Cal. Ct. App. 2002).

[18]For example: "The foreclosing lender is allowed to credit bid in order to 'avoid the inefficiency of requiring the lender to tender cash which would only be immediately returned to it.'" Freedom, 2006 WL 695467, at *6 (quoting Alliance Mortgage, 900 P.2d 601, 609); Alliance Mortgage and Track Mortgage "recognize the importance of finality with respect to foreclosure sales and successful credit bids." Id. at *11.

In its response, Freedom incorrectly argues that "Freedom I also held that other damages stemming from the defendants' fraud may be collected from mortgagors and third parties by 'pursuing a carry-on fraud or contract actions, to the extent one is otherwise maintainable at law.'"  The opinion, Freedom, 2006 WL 695467, at *13 (emphasis added) actually states:

> In the instant case, *the Court is not holding that the Plaintiff is barred from* pursuing a carry-on fraud or contract action, to the extent one is otherwise maintainable in the law, because of the existence of a prior foreclosure suit such that res judicata is in play.  (Such a claim at least putatively might be available to the Borrower-defendants – *the Court takes no view* – but none of them have moved for summary judgment so the Court does not pass on the question).  *Instead, the Court is holding, consistent with [the decisions in Alliance Mortgage and Track Mortgage] referenced above, that Plaintiff is bound by the amount of its credit bid* when seeking recovery for its claims against the Defendants, including the movant Defendants here.

In the instant case, the Seventh Circuit distinguished between claims on a note and claims on a guaranty, noting that the issues involved in a mortgage foreclosure action are even less closely related to claims against a mortgage broker for fraud.  Freedom, 569 F.3d 667, 671-72 (7th Cir. 2009).  In this context, the Seventh Circuit stated:

> Whether the borrower paid is distinct from whether these defendants committed fraud that induced Freedom to make loans, or whether Burnham followed Freedom's prescribed closing procedures (the main issue in the action on the insurance policies).  *We cannot imagine any argument for allowing a separate action on a guaranty, while precluding a separate action against people who induced the loan through fraud.*

In other words, the issues involved in Freedom's claims for fraud are distinct from other claims such that the latter do not preclude a separate action on fraud.  The Seventh Circuit continued:

> Defendants get some aid from issue preclusion (collateral estoppel), given the rule that Freedom is stuck with the value of its credit bids.  *But this does not eliminate damages.  Deficiency judgments remain*, and the non-borrower defendants cannot shelter behind the clause in these judgments precluding collection from the

borrowers. The total amount of deficiency judgments on the properties at issue in this suit is almost $600,000. If Freedom can make out its claim on the merits, some or all of these defendants may be liable for *that shortfall*. Indeed, if Freedom prevails on its RICO claim, some or all of the defendants may be liable for three times *that shortfall*. Punitive damages also may be available under Illinois law. *Nothing in the rule that a credit bid establishes the collateral's value blocks any of these remedies.*

That is, the value of the credit bids does not eliminate damages; there are deficiency judgments (clearly, not for the full credit bid properties), and the Defendants may ultimately be liable for those deficiency judgments and damages for related claims.

Freedom argues that <u>Freedom I</u> did not limit Freedom's damages for Burnham's breach of the Broker Agreement and Ticor's breach of the CPL, or for its negligence claims. Ticor responds that under the transactional test in Illinois, a judgment on a mortgage foreclosure action bars future litigation on contract claims as well as future litigation on tort claims.

<u>Freedom I</u> and the Seventh Circuit opinion make clear that Freedom is limited by its partial credit bids with respect to contract damages but not tort damages, which may be pursued by Freedom in connection with the six partial credit bid properties. Damages are not available to Freedom for the three full credit bid properties because there is no deficiency.

For the reasons stated above, Ticor's Motion for Partial Summary Judgment is granted as to damages for the three full credit bid properties.

## CONCLUSION

For the reasons discussed above: Hlava's motion to dismiss is granted as to Count XXII (Civil RICO) and denied as to Counts VII, VIII, XIX, XX, XXI, XXIII, XXV, and XXVIII; Exeter's motion to dismiss is granted as to Count XXII (Civil RICO) and denied as to Counts VII, VIII, XIX, XX, XXIII, XXV, and XXVIII; Ticor's motion to dismiss is granted as to Counts

38

XXVII, XXIX, XXX, XXXI, and XXXII; Ticor's motion for partial summary judgment is granted; Freedom's request for attorney's fees is stricken from Counts VII, VIII, XIX, XX, XXIII, XXV, and XXVIII; and Freedom's request for prejudgment interest is stricken from Counts VIII, XX, XXV, and XXVIII.

Hlava and Exeter are directed to answer the non-dismissed counts on or before July 8, 2010. The parties are directed to meet and confer, and file a joint status report on or before July 8, 2010, setting forth a final discovery disposition motion and pretrial plan designed to bring this case to a conclusion. This matter is set for a report on status on July 15, 2010, at 9:30 a.m.

**ENTER:**     **June 14, 2010**

**Robert W. Gettleman**
**United States District Judge**